## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| JOHN PAUL ODHUNO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| REED'S COVE HEALTH AND REHABILITATION, | )   Case No. 15-1347-EFM-GEB |
| LLC d/b/a AVITA; AXIOM HEALTHCARE | ) |
| SERVICES, LLC; AUDREY SUNDERRAJ; | ) |
| CAROL SCHIFFELBEIN; CHRISTAN ROSE; | ) |
| TERESA FORTNEY; TREVA BANUELOS; | ) |
| and TIM KECK, in his official capacity as Secretary | ) |
| of the Kansas Department for Aging and Disability | ) |
| Services, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## THIRD AMENDED COMPLAINT

COMES NOW the plaintiff, John Paul Odhuno, by and through his attorneys, Edward L. Keeley and Katy E. Tompkins of McDonald Tinker PA, and for his causes of action against defendants alleges and states:

## I.   PARTIES

1.     Plaintiff John Paul Odhuno is a resident of Sedgwick County, Kansas.

2.     Defendant Reed's Cove Health and Rehabilitation, LLC (doing business as "Avita") is a Kansas limited liability company which may be served with legal process through its Resident Agent, Fred Hermes.

3.      Defendant Axiom Healthcare Services, LLC (referred to herein as "Axiom") is a Kansas limited liability company which may be served with legal process through its Resident Agent, Frederick Hermes.  Axiom provides management services to Avita.

4.      Defendant Audrey Sunderraj is sued only in her individual capacity.  She was an employee or agent of the Kansas Department for Aging and Disability Services (KDADS) during the relevant time period and was acting under color of state law.  She was also acting within the course and scope of her employment.

5.      Defendant Carol Schiffelbein is sued only in her individual capacity.  She was an employee or agent of KDADS during the relevant time period and was acting under color of state law.  She was also acting within the course and scope of her employment.

6.      Defendant Tim Keck is the Secretary of KDADS.  Defendant Keck is sued only in his official capacity for prospective declaratory and injunctive relief to stop ongoing violations of plaintiff's federal constitutional rights.

7.      Defendant Christan Rose is sued only in her individual capacity.  She was an employee or agent of KDADS during the relevant time period and was acting under color of state law.  She was also acting within the course and scope of her employment.

8.      Defendant Teresa Fortney is sued only in her individual capacity.  She was an employee or agent of KDADS during the relevant time period and was acting under color of state law.  She was also acting within the course and scope of her employment.

9.      Defendant Treva Banuelos is sued only in her individual capacity.  She was an employee or agent of KDADS during the relevant time period and was acting under color of state law.  She was also acting within the course and scope of her employment.

## II.   JURISDICTION AND VENUE

10.     This case contains federal claims against defendants arising under Title VII of the Civil Rights Act of 1964 ("Title VII"); 42 U.S.C. § 1981 ("§ 1981"); and 42 U.S.C.

§ 1983 ("§ 1983") giving this Court jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

11.     This case also contains tort claims against some defendants arising under Kansas common law for which this Court has supplemental jurisdiction pursuant to 42 U.S.C. § 1367.

12.     Defendants' unlawful acts and omissions were committed within the State of Kansas which provides proper venue in this Court pursuant to 28 U.S.C. § 1391.

13.     Plaintiff has fully exhausted his administrative remedies with respect to his Title VII claim against defendant Avita.  On August 5, 2015, the EEOC issued a "right to sue" letter to plaintiff with respect to that claim.  The initial Complaint in this action was filed on November 3, 2015, which was within 90 days of plaintiff's receipt of his EEOC right to sue.

### III.    FACTS

14.     Plaintiff John Paul Odhuno ("Odhuno" or "Paul") is a 35 year old black male who is originally from Kenya.  He came to this country when he was 20 years old and has lived in or near Wichita, Kansas, since that time.  He is a legal resident of the United States. He has also been known as Paul Onyango Odhuno.

15.     After being fully and properly trained as a nurse aide, the State of Kansas certified Paul's expertise and ability to work in that profession in 2002.  Pursuant to federal and state law, he became a Certified Nurse Aide (CNA) listed on the Kansas Nurse Aide Registry.  Before his employment with Avita, Paul worked as a CNA for other adult care homes for approximately ten years.

16.     Paul became employed by Avita in January 2014 as a CNA at Avita's adult care home located in Wichita, Kansas, which is licensed by KDADS.  Paul was also going to school to become a registered nurse which was his life-long dream.

17.     Paul's duties at Avita included acting under the supervision of a licensed nurse and assisting Avita's elderly residents with their activities of daily living ("ADLs").  Paul was mostly assigned night shift (10:00 p.m. to 6:00 a.m.) at Avita.  He was a skilled CNA who provided caring service to all of the residents he served.  He was also a good and faithful employee of Avita.

18.     Early in July 2014, one elderly resident ("the resident") of Avita who was white and female made it known to the administrators and nursing staff that she wanted only female nurses and CNAs to care for her.  The resident felt uncomfortable with male staff assisting her with toileting, showering, and similar activities.

19.     Despite the resident's right under Avita's policies to have only female staff care for her, Avita continued to assign plaintiff Odhuno to care for the resident on the night shift for numerous shifts during July 2014.

20.     Ignoring the resident's request, Avita required Paul to come into the resident's room during that July period on a regular and frequent basis to check and change the resident's incontinence undergarment.  The resident was incontinent of bladder and bowel.  Paul was also required to check the resident's bed sensor device every two hours, among other duties in her room.  The bed sensor was to alert staff if the resident attempted to get out of bed without assistance.  Paul's required assignments made the resident uncomfortable, fearful, and afraid to sleep because of her preference for female staff.  However, Avita continued to require Paul to provide direct care for the resident at night.

21.     On or about July 23, 2014, the resident told a therapist at Avita that an unidentified male staff member had touched her buttocks in a sexual way during unidentified nights in the past.  The resident also told the therapist that the staff member had taken the resident outside and had her roll on the ground at the time of the last holiday (presumably July 4th).  Neither of these assertions was true.

22.     Paul never touched the resident in any sexual or inappropriate way, nor had he ever taken her outside to roll on the ground.  Furthermore, Paul was <u>never</u> advised that these were the resident's allegations.

23.     On the same day the resident made the allegation of sexual abuse to the therapist, the therapist reported the allegation to Avita's managing administrators.  One of Avita's administrators investigated the allegation by interviewing the resident, who had a diagnosis at the time of severe dementia.  The resident was clearly confused and mentally unstable during the interview as the Avita administrator noted.

24.     The resident could not confirm with the Avita administrator any facts supporting the allegations she made earlier that day or even identify the gender or race of the alleged perpetrator.  Avita concluded correctly that no act of sexual or other abuse had occurred and that none of Avita's staff had been involved in any act of abuse, sexual or otherwise.  There was no evidence that the incidents alleged by the resident (inappropriate touching and rolling on the ground) had even occurred.  Even if the incidents had occurred, there was no evidence that plaintiff Odhuno was involved.

25.     The Avita staff members (including plaintiff Odhuno) were not notified at the time that the resident had made an allegation of sexual abuse.  Furthermore, plaintiff Odhuno was not reassigned away from his direct care duties regarding the resident.  Avita's decisions not to tell Paul of the allegations and not to reassign him served to set him up for the egregious events that followed.

26.     Pursuant to K.S.A. 39-1402, as amended, Avita's administrator or operator is mandatorily required to make a report to KDADS (Avita's licensing agency) if the administrator/operator "has reasonable cause to believe that a resident is being or has been abused . . . or is in a condition which is the result of such abuse."

27.     Pursuant to K.S.A. 39-1401(f), as amended, the term "abuse" for purposes of a mandatory report is defined as: "any act or failure to act performed intentionally or recklessly that causes or is likely to cause harm to a resident, including: 1) infliction of physical or

mental injury," or "2) any sexual act with a resident when the resident does not consent or when the other person knows or should know that the resident is incapable of resisting or declining consent."

28.     Avita's administrator/operator did not report the resident's allegation to KDADS pursuant to the mandatory reporting statute because there was no "reasonable cause" to believe that the resident was being abused, had been abused, or was in a condition that resulted from abuse.  Absolutely no credible evidence existed to believe that abuse had occurred or that plaintiff Odhuno was involved.

29.     However, despite knowing the resident had made the allegation that she was sexually abused at night, knowing also the resident had requested personal care by female staff only, and further knowing of her dementia and mental instability, Avita still continued to require plaintiff Odhuno to regularly and frequently check and change the resident's incontinence undergarment throughout his night shift and check her bed sensor device every two hours.

30.     By continuing to require plaintiff Odhuno to provide intimate personal care to the resident under those circumstances, without even telling him of her allegation, Avita acted with willful, wanton, and outrageous disregard for Paul's career and wellbeing. Avita's behavior in this regard directly resulted in the catastrophic career-ending events that would shortly follow in Paul's life.  Paul's Kafkaesque nightmare only got worse.

31.     Upon information and belief, on Thursday, July 31, 2014, employees or agents of KDADS, defendants Christan Rose, Teresa Fortney, and Treva Banuelos, came to the Avita facility in the morning and began investigating the resident's allegation of sexual abuse made on July 23.  Avita had not reported that allegation.

32.     Later the same day, July 31, Avita's black male CNAs (including plaintiff Odhuno) were summoned to the Avita facility during the day and advised by Avita and Axiom administrators in general terms that an allegation of abuse had been made by the resident.  The specific nature of the allegation was not disclosed, nor was plaintiff Odhuno

ever questioned by Avita or Axiom regarding the specifics of the allegation or given any opportunity to respond to it.  Defendant Axiom provided management services to defendant Avita.

33.     All of Avita's black male CNAs (including plaintiff Odhuno) were suspended from work that night (July 31) without any basis other than they were black and male.  The decision by Avita and Axiom to suspend them was motivated by racial, national origin, and/or gender animus because Avita and Axiom knew the resident's allegations were false. Plaintiff Odhuno sustained economic and noneconomic damages from this illegal discriminatory suspension.

34.     Within a few days, plaintiff Odhuno was summoned alone to the Avita facility and told by the managing administrators of Avita and Axiom that his employment was being terminated immediately on the purported basis of the resident's July 23 allegations.  Avita's and Axiom's administrators admitted to Paul that there was no factual basis to support the allegation of abuse, let alone any basis to believe that plaintiff Odhuno was the perpetrator. The administrators themselves did not believe that the alleged abuse had occurred.  However, Paul was black, a male, and worked nights in the resident's area.  Avita's and Axiom's decision to terminate plaintiff Odhuno's employment was based on racial, national origin, and/or gender animus.

35.     Plaintiff Odhuno was escorted out of Avita's building that day in a horrible act of purposeful humiliation and disgrace, the sacrificial victim of an allegation known to be false.  Paul's emotional distress and mental anguish caused by this betrayal and termination was so extreme and severe that no reasonable person should have to endure it.  Paul sustained economic and noneconomic damages as a direct result of this illegal discriminatory termination of his employment.

36.     Within a day or two, Paul was called to the office of Axiom's managing administrator who admitted he knew Paul had not abused the resident.  This meeting served only to increase Paul's mental anguish.  The Axiom administrator urged Paul to sign a

release of claims which would waive any legal action against Avita and Axiom. Paul was promised that he would be rehired after he became an RN. Paul declined because Avita and Axiom had horribly discriminated against him on account of his race, national origin, and gender. These defendants had also ruined his career as a CNA and in the medical field in general.

37.    On information and belief, on August 5, 2014, the KDADS investigators, defendants Rose, Fortney, and Banuelos, returned to the Avita facility and completed their investigation of the resident's July 23 allegation of abuse. The KDADS investigators never interviewed plaintiff Odhuno. The managing administrators of Avita and Axiom were interviewed and told the KDADS investigators that there was no evidence of any abuse based on their own investigation, including review of surveillance camera recordings. Avita's nurses, social workers, and other staff members were interviewed and also told the KDADS investigators that the alleged abuse had not occurred.

38.    The voluminous records and documentation of the resident's care which defendants Rose, Fortney, and Banuelos purportedly reviewed also did not support any allegation of abuse. Indeed, there was no credible evidence of abuse even from the resident herself or her closest family members. Moreover, there was no credible evidence that plaintiff Odhuno had done anything wrong. All of the credible evidence collected by the KDADS investigators showed that Paul did not abuse the Avita resident. However, the defendant KDADS investigators willfully or wantonly ignored all of the exculpatory and credible evidence in making their findings that Paul had sexually abused the resident.

39.    Despite the fact that there was absolutely no factual basis to believe that the resident was being or had been abused, the defendant KDADS investigators issued a written report dated August 14, 2014, which found that the resident's July 23 allegation of abuse was sustained and that the resident had suffered harm from the purported abuse.

40.    Furthermore, the defendant KDADS investigators' report concluded that "direct care staff E" had committed the abuse. "Direct care staff E" was a reference to

plaintiff Odhuno.  There was absolutely no factual basis, however, to believe that plaintiff Odhuno had committed any act of abuse.  The finding was false and destroyed Paul's good name and reputation.  These defendants essentially found that Paul had committed a heinous criminal act without any credible evidence to support that finding.  These defendants' investigation and finding constituted an arbitrary, irrational abuse of governmental power.

41.    The KDADS investigators never gave plaintiff Odhuno any notice of the resident's allegation or any opportunity to respond to it.  Moreover, the KDADS investigators never even interviewed plaintiff Odhuno before labeling him a sex offender. That finding still remains in KDADS databases and prevents him from obtaining any future employment as a CNA and from going to school to become a registered nurse.

42.    Defendants Audrey Sunderraj and Carol Schiffelbein were employees of KDADS who supervised defendants Rose, Fortney, and Banuelos in their investigation. Defendants Sunderraj and Schiffelbein knew or were deliberately indifferent to the fact that there was absolutely no credible evidence that the alleged abuse had occurred at all. Moreover, they knew there was certainly no credible evidence that plaintiff Odhuno had committed any abuse.  Furthermore, defendants Sunderraj and Schiffelbein knew or were deliberately indifferent to the fact that plaintiff Odhuno was not interviewed by the KDADS investigators, given notice of the resident's allegation, or given any opportunity to respond to it.  In short, defendants Sunderraj and Schiffelbein approved or acquiesced in the KDADS investigators' decision to falsely label plaintiff a sex offender which contributed to his employment termination and prevents his future employment.

43.    On or about August 20, 2014, plaintiff Odhuno was interviewed by a detective with the Wichita Police Department who said that Paul had been reported as the "alleged perpetrator" of the resident's purported sexual abuse.  On information and belief, Avita, Axiom, and/or the KDADS investigators had reported this false and stigmatizing accusation to the police.  Plaintiff Odhuno was never arrested or prosecuted for any crime because no probable cause existed.  But the police interview and the possibility of prosecution for a

horrible crime he did not commit only reinflicted Paul's great mental anguish which continues today.   Furthermore, less than three weeks after KDADS' report on the investigation was issued, the resident's adult son signed an affidavit stating that "the whole incident involving a black man was just a dream and she knows that now."   Despite this affidavit known to defendants, they took no action to correct the injustice already perpetrated on plaintiff Odhuno.

## IV.   STATUTES AND REGULATIONS

44.   Pursuant to K.S.A. 39-1908(a) and (c), as amended, the Secretary of KDADS, defendant Tim Keck, administers the licensure of adult care home administrators, the certification of nurse aides, and the maintenance of the Kansas Nurse Aide Registry.

45.   The KDADS Secretary promulgated and enforces K.A.R. 26-39-100(qq) which defines "nurse aide" to mean an individual who:  1) is certified as a nurse aide by [KDADS] and is listed on the Kansas Nurse Aide Registry, and 2) is supervised by a licensed nurse.   Plaintiff Odhuno met that definition at the time of his termination by Avita and Axiom.

46.   The KDADS Secretary promulgated and enforces K.A.R. 26-50-10(e)(3) which provides that a certified nurse aide (CNA) is not eligible for employment unless that individual has "no record of abuse."   Thus, plaintiff Odhuno cannot be employed as a CNA if he is considered by KDADS to have a record of abuse.   Based on its investigation findings, KDADS does consider Paul to have a record of abuse which makes him unemployable as a CNA.   Furthermore, a federal regulation prohibits all adult care homes which receive Medicare and/or Medicaid funding from employing nurse aides who have a finding of resident abuse in the Kansas Nurse Aide Registry.   42 C.F.R. 483.13(c).

47.   The KDADS Secretary promulgated and enforces K.A.R. 26-50-20(a) which requires that each nurse aide who provides direct care to residents must complete a training

course (at least 90 hours) approved by the Secretary and pass the state test.  Per subsection (b) of that regulation, each nurse aide who successfully completes the required training and passes the state test "shall" be certified and "shall" be listed on the Kansas Nurse Aide Registry.  At the time of his employment termination, plaintiff Odhuno was a certified nurse aide (CNA) and was listed on the Kansas Nurse Aide Registry.

48.     Pursuant to K.S.A. 39-923(a)(1), as amended, all adult care homes are required to be licensed by the KDADS Secretary.  An "adult care home" means any nursing facility, nursing facility for mental health, intermediate care facility for people with intellectual disability, assisted living facility, residential health care facility, home plus, boarding care home, and adult care facility.  Avita was an adult care home licensed by the KDADS Secretary at all times relevant to this action.

49.     It is unlawful to operate an adult care home in Kansas without first obtaining a license from KDADS per K.S.A. 39-926, as amended.  That license may be denied, suspended or revoked by KDADS pursuant to K.S.A. 39-931(a), as amended, if that agency finds that the adult care home has substantially failed to comply with Kansas statutes or KDADS regulations.  Employing a sex abuser can lead to the suspension or revocation of a license.  The KDADS Secretary is authorized to adopt the rules and regulations necessary to carry out the licensing statutes per K.S.A. 39-950, as amended.

50.     Pursuant to K.S.A. 39-936(c)(4), as amended, the KDADS Secretary "shall" establish a state Registry containing information regarding "unlicensed employees" (which includes CNAs) of adult care homes who provide direct, individual care to residents but who do not administer medications in compliance with federal law.  Plaintiff Odhuno, as a CNA, is included in this "unlicensed employee" Registry maintained by the KDADS Secretary.

51.     No adult care home "shall use an individual as an unlicensed employee" unless the facility has inquired of the state Registry as to information concerning that individual as required by K.S.A. 39-936(c)(5), as amended.  This means that every adult care home in Kansas which might be interested in hiring plaintiff Odhuno as a CNA is <u>required</u> to check

the KDADS "unlicensed employee" Registry.  Moreover, pursuant to K.A.R. 26-50-10(e)(3), Paul is not eligible for employment by any adult care home in Kansas because he is considered by KDADS to have a record of abuse and that information is contained in the "unlicensed employee" Registry which potential employers must check before hiring. Indeed, since his Avita termination, Paul has applied and been denied employment by another adult care home after a background check.

52.     The KDADS Secretary also administers and enforces the reporting and investigation of elder abuse in adult care homes pursuant to K.S.A. 39-1401 *et seq.*, as amended.  As alleged previously, K.S.A. 39-1401(f), as amended, defines "abuse" in this context as any act or failure to act performed intentionally or recklessly that causes or is likely to cause harm to a resident, including "infliction of physical or mental injury," or "any sexual act with a resident when the resident does not consent or when the other person knows or should know that the resident is incapable of resisting or declining consent."

53.     Pursuant to K.S.A. 39-1404, as amended, KDADS has a duty to investigate reports of elder abuse at adult care homes.  Per subsection (a)(2) of that statute, KDADS is required to make a personal visit with the involved resident within 24 hours of the reported abuse if there is imminent danger to the resident's health or welfare or within 3 working days if no imminent danger exists.

54.     Pursuant to K.S.A. 39-1404(a)(3), as amended, KDADS is required to complete "a thorough investigation and evaluation" within 30 working days of the reported abuse.  The same statutory provision requires that the investigation include, but is not limited to, "consultation with individuals having knowledge of the facts of the particular case."

55.     Pursuant to K.S.A. 39-1404(a)(4), as amended, KDADS is required to prepare a written assessment "which shall include an analysis of whether there is or has been abuse" and the agency's recommended action.  Moreover, K.S.A. 39-1404(b), as amended, requires that KDADS inform the complainant upon request following the investigation that corrective measures will be taken if the allegations of abuse "have been substantiated."

56.     Significantly for this case, the KDADS Secretary is also required to maintain an elder abuse Report Register pursuant to K.S.A. 39-1411(a), as amended.  The Report Register must contain the abuse reports received and investigated by KDADS and also "the findings, evaluations, and actions recommended."  The KDADS Report Register contains the false and totally unsupported finding that plaintiff Odhuno abused the elderly resident at Avita.

57.     Furthermore, pursuant to K.S.A. 39-1411(a), as amended, the elder abuse Report Register is available to KDADS personnel and "to such other persons" as may be required by federal law and designated in KDADS regulations.  In addition, the Report Register information regarding KDADS' findings of abuse is required to be available to community service providers, mental health centers, and independent living agencies pursuant to K.S.A. 65-6205(a)(3), as amended, for the purpose of providing background information regarding job applicants to those employers.  Information in KDADS' "unlicensed employee" Register is also available to those potential employers under that statute.  The KDADS Report Register information must be consulted by plaintiff Odhuno's potential employers and precludes all future employment of him as a CNA.  In addition, a federal regulation requires that a finding of elder abuse of a resident must be disclosed by the State "to all requesters."  42 C.F.R. 483.156(c) and (d).

58.     The KDADS Secretary has not promulgated any regulations or policies permitting plaintiff Odhuno and others falsely accused of elder abuse to correct or expunge those findings from KDADS' elder abuse Report Register (K.S.A. 39-1411, as amended), from KDADS' "unlicensed employee" Registry (K.S.A. 39-936, as amended), and from KDADS' Nurse Aide Registry.  Thus, KDADS' false findings of abuse by Paul, based upon no credible evidence, remain in those KDADS databases for all potential CNA employers to see and conclude that Paul is not eligible for employment pursuant to K.A.R. 26-50-10(e)(3).  Paul was not even interviewed by the KDADS investigators and was not provided any kind of pre-deprivation hearing before the false and stigmatizing findings were communicated to

Avita (his employer at the time) and made available by KDADS databases to all potential future employers. Furthermore, the KDADS Secretary has not provided plaintiff Odhuno with any opportunity for a full post-deprivation hearing to clear his name.

59.     Plaintiff Odhuno will continue to suffer ongoing violations of his 14th Amendment rights to procedural due process for which declaratory and injunctive relief against the KDADS Secretary in his official capacity is authorized and proper pursuant to the *Ex parte Young* doctrine.   Unless equitable relief is granted to plaintiff, KDADS will continue to deprive Paul of procedural due process in the following ways:

a)     by failing to remove its abuse finding against Paul which is based on evidence that is facially not credible and by willfully or wantonly ignoring overwhelming exculpatory evidence which shows the alleged abuse did not occur and that Paul is innocent of any abuse allegation;

b)     by failing to remove the abuse finding despite not providing Paul with notice and an opportunity to be heard (a pre-deprivation hearing) before the finding was made and before false information was placed in the three database registries maintained by KDADS which are available to all potential employers; and

c)     by failing to remove the abuse finding despite not providing Paul with notice and an opportunity to be heard (a post-deprivation hearing) to challenge and cause the false finding, as well as the related investigation records, to be permanently deleted from the three registries maintained by KDADS.

60.     In contrast to the KDADS Secretary, the Secretary of the Kansas Department for Children and Families (DCF), a separate state agency, has promulgated the following regulations which provide due process regarding agency investigations of alleged child abuse and placement of information in the state child abuse registry:

a)    Each alleged perpetrator has the right to be interviewed <u>before</u> a finding that the accused committed child abuse pursuant to K.A.R. 30-46-13;

b)    a "substantiated perpetrator" is a person whose act of child abuse has been "validated" by DCF based on "clear and convincing evidence" pursuant to K.A.R. 30-46-10;

c)    the confirmed perpetrator shall be notified in writing of DCF's decision to place the person on the child abuse registry pursuant to K.A.R. 30-46-15.  The notice shall also state the reasons for the abuse finding and inform the person of his or her right to appeal the decision per the same regulation;

d)    the name of a validated perpetrator shall not be entered into the child abuse registry <u>until</u> the person has exhausted or failed to exercise the administrative appeal process pursuant to K.A.R. 30-46-16; and

e)    the perpetrator may apply for expungement from the child abuse registry per K.A.R. 30-46-17 when three years have passed or new information is presented that was not available at the time of the abuse finding.

61.    Federal law requires due process be given to nurse aides (like plaintiff Odhuno) if they are accused of abuse by residents at adult care homes receiving Medicare and/or Medicaid funding.  42 USC § 1396r(g)(1)(c).  "The State shall, after notice to the individual involved and a reasonable opportunity for a hearing for the individual to rebut allegations, make a finding as to the accuracy of the allegations."  <u>Id</u>.  After a hearing, if the State finds that a nurse aide has abused a resident, the State must notify the nurse aide and the State Registry of such finding.  The nurse aide has the right to place a brief statement disputing the findings on the State Registry.  42 USC § 1396r(e)(1)(B).

62.    Federal regulations likewise require due process be given to nurse aides (like plaintiff Odhuno) accused of resident abuse in adult care homes receiving Medicare and/or

Medicaid funding.  If a State makes a preliminary determination that the alleged abuse occurred, it must notify the accused in writing and the notice must include: a) the date and time of the alleged occurrence, and b) the accused's right to request a hearing and be represented by an attorney.  42 C.F.R. 488.335(c).  The hearing must be completed within 120 days of the accused's request.  42 C.F.R. 488.335(d).  Only if the hearing results in a finding that the accused nurse aide abused the resident does that finding get reported to the State Registry.  42 C.F.R. 488.335(f).  Even then, the accused nurse aide must still be given an opportunity to correct any misstatements or inaccuracies in the State Registry.  42 C.F.R. 483.156(d).

## V.   CAUSES OF ACTION

### COUNT I -- TITLE VII DISCRIMINATION CLAIMS AGAINST DEFENDANT AVITA

63.     Paragraphs 1 – 62 above are fully incorporated herein by reference.

64.     Because he is black, plaintiff Odhuno belongs to a protected class under Title VII which protects him against racial discrimination.

65.     Plaintiff Odhuno suffered adverse employment action when Avita suspended him from work and then terminated his employment because he is black.

66.     No similarly situated Caucasian CNAs have been suspended or terminated by Avita under similar circumstances.

67.     Avita's motivation for suspending and terminating plaintiff Odhuno's employment was illegal racial animus in violation of plaintiff's rights under Title VII.

68.     In addition, because he is originally from Kenya, plaintiff Odhuno also belongs to a protected class under Title VII which protects him against national origin discrimination.

69.     Plaintiff Odhuno suffered adverse employment action when Avita suspended him from work and then terminated him from employment because of his national origin.

70.     No similarly situated American-born CNAs have been suspended or terminated by Avita under similar circumstances.

71.     Avita's motivation for suspending and terminating plaintiff Odhuno's employment was illegal national origin animus in violation of plaintiff's rights under Title VII.

72.     Furthermore, because he is a male, plaintiff Odhuno also belongs to a protected class under Title VII which protects him against gender discrimination.

73.     Plaintiff Odhuno suffered adverse employment action when he was suspended from work and then terminated from employment because he is male.

74.     No similarly situated female CNAs have been suspended or terminated by Avita under similar circumstances.

75.     Avita's motivation for suspending and terminating plaintiff Odhuno's employment was illegal gender animus in violation of plaintiff's rights under Title VII.

76.     As a direct result of plaintiff Odhuno's discriminatory suspension and employment termination, he has suffered economic and noneconomic damages for which he is entitled to recover monetary damages from Avita under Title VII.

77.     Those damages include compensation for his past and future extreme emotional distress and mental anguish; back pay and lost benefits; future lost income and benefits; reimbursement for student loans taken out for nursing school which he now cannot attend; other compensatory damages; statutory interest; attorney fees; litigation expenses; and court costs.

## COUNT II -- § 1981 DISCRIMINATION CLAIMS (RACE AND NATIONAL ORIGIN) AGAINST DEFENDANTS AVITA AND AXIOM

78.     Paragraphs 1 – 77 above are fully incorporated herein by reference.

79.     Because plaintiff is black and originally from Kenya, he belongs to a protected class under 42 U.S.C. § 1981.

80.     In violation of § 1981, plaintiff Odhuno suffered adverse contract and employment actions: a) when Avita and Axiom did not reassign him away from the resident after her July 23 allegation, b) when Avita and Axiom did not notify him of that allegation, c) when Avita and Axiom did not give him an opportunity to respond to that allegation, d) when Avita and Axiom suspended him because he is black and originally from Kenya, and e) when Avita and Axiom terminated his employment because he is black and originally from Kenya.

81.     No similarly situated Caucasian or American-born CNAs employed by Avita and/or Axiom were or have been treated in a similar way under similar circumstances.

82.     Defendants Avita and Axiom were motivated by illegal racial and/or national origin animus in their acts and omissions set forth in this Complaint in violation of § 1981.

83.     As a direct result of the violations of § 1981, plaintiff Odhuno has suffered economic and noneconomic damages for which he is entitled to recover monetary damages from defendants Avita and Axiom.

84.     Those damages include compensation for his past and future extreme emotional distress and mental anguish; back pay and lost benefits; future lost income and benefits; reimbursement for student loans taken out for nursing school which he now cannot attend; other compensatory damages; statutory interest; attorney fees and litigation expenses; and court costs.

## COUNT III -- § 1983 CLAIMS (CONSTITUTIONAL VIOLATIONS) AGAINST DEFENDANTS ROSE, FORTNEY, BANUELOS, SUNDERRAJ AND SCHIFFELBEIN

85.     Paragraphs 1 – 84 above are fully incorporated herein by reference.

86.     Defendants Rose, Fortney, Banuelos, Sunderraj and Schiffelbein, while acting under color of state law,  as employees or agents of KDADS, deprived plaintiff Odhuno of his constitutional rights or caused him to be subjected to the deprivation of those rights in violation of 42 U.S.C. § 1983.

87.     In particular, plaintiff Odhuno was deprived of his 14th Amendment rights to procedural due process of law by these defendants.  Paul has a protected property interest in his state certification as a nurse aide.  Stidham v. Peace Officer Standards and Training, 265 F.3d 1144, 1149-1153, (10th Cir. 2001).  That property right has been deprived by these defendants without due process.  Plaintiff Odhuno also has a liberty interest in his good name and reputation which includes the right not to have defendants' false and stigmatizing statements foreclose all opportunity for him to obtain future employment as a CNA without due process of law.  Defendants have deprived Paul of this liberty interest.  In addition, these defendants have deprived Paul of his 14th Amendment right to equal protection.

88.     Plaintiff Odhuno has a property interest in his state certification as a CNA which has been revoked or effectively revoked because of the sham investigation, report, and conclusions reached by these KDADS defendants without any notice to plaintiff or opportunity to be heard (either pre-deprivation or post-deprivation).  Stidham, supra. Without any credible evidence at all, these defendants have falsely branded plaintiff forever as a sexual abuser of an elderly woman which precludes him from working as a CNA or continuing his education to become a nurse as he had dreamed.  These defendants willfully or wantonly ignored all of the available exculpatory and credible evidence in finding that Paul sexually abused the Avita resident.  These defendants published that false finding to Avita during their investigation which was a contributing factor in Paul's suspension and termination by Avita.  Defendants' false finding has been and will continue to be disclosed to Paul's potential employers through KDADS databases.   This revocation or effective revocation of plaintiff Odhuno's state-created nurse aide certification is a violation of plaintiff's 14th Amendment right to procedural due process under clearly established law.

Stidham, 265 F.3d at 1149-1153.  A reasonable KDADS employee in defendants' position would have known that.  Id.  The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.

89.    Plaintiff Odhuno also has a protected liberty interest in his good name, reputation, honor and integrity.  These KDADS defendants made false and stigmatizing statements to Avita indicating that plaintiff was the perpetrator of sexual abuse (a felony crime) which has severely injured Paul's good name, reputation, honor and integrity. Knowing that the statements were false or recklessly asserting them anyway, these defendants created a stigma on plaintiff's name which forecloses plaintiff's future employment anywhere in the medical field.  These false and stigmatizing statements were published to Avita during the investigation which led, in part, to Paul's termination.  They were made in the course of plaintiff's termination and also published to law enforcement. Furthermore, these false and stigmatizing statements remain in KDADS databases and have been and will continue to be published to prospective employers and nursing schools which have and will continue to inquire regarding plaintiff.  In fact, Paul's prospective employers are required to check those databases and are prohibited by law from hiring Paul because he has a KDADS "record" of abuse.  These facts constitute clear "stigma plus."  The KDADS defendants did not afford plaintiff any notice and opportunity to be heard or any "name clearing" (pre-deprivation or post-deprivation) hearing despite willfully or wantonly destroying his career under color of state law.  This is a violation of plaintiff's 14th Amendment right to procedural due process under clearly established law.  Brown v. Montoya, 662 F.3d 1152, 1167-1171 (10th Cir. 2011).  A reasonable KDADS employee in defendants' position would have known that.  Id.

90.    In addition, these KDADS defendants intentionally discriminated against plaintiff based on his race, national origin, and/or gender in violation of plaintiff's 14th Amendment right to equal protection of the laws.  These defendants discriminated against plaintiff by failing to even interview him or give him an opportunity to respond to the

allegations.  The defendants further discriminated against plaintiff by concluding that he was a sexual abuser without credible evidence and by ignoring overwhelming exculpatory evidence.  That conclusion was motivated by illegal racial, national origin, and/or gender animus, which is prohibited by the 14th Amendment.  Similarly situated white, American-born males accused of sexual abuse have not been treated the same way by these defendants or other KDADS employees in abuse investigations before or since which they have conducted.

91.     As a direct result of the deprivation of plaintiff's 14th Amendment rights to due process and equal protection, he has suffered economic and noneconomic damages for which he is entitled to monetary recovery from these KDADS defendants under 42 U.S.C. § 1983.

92.     Those damages include compensation for his past and future extreme emotional distress and mental anguish; back pay and lost benefits; future lost income and benefits; reimbursement for student loans taken out for nursing school which he now cannot attend; other compensatory damages; statutory interest; attorney fees and litigation expenses; and court costs.  Because these defendants acted intentionally or recklessly, plaintiff is also entitled to punitive damages from them.

### COUNT IV -- § 1983 (CONSTITUTIONAL VIOLATIONS) AGAINST DEFENDANT KECK IN HIS OFFICIAL CAPACITY FOR PROSPECTIVE EQUITABLE RELIEF

93.     Paragraphs 1 – 92 above are fully incorporated herein by reference.

94.     Defendant Tim Keck is Secretary of KDADS and is sued only in his official capacity for prospective equitable relief because of ongoing violations of plaintiff Odhuno's constitutional rights caused by KDADS.  Keck is in charge of all employees, policies, rules, regulations, and departmental operations of KDADS.  By state law, he administers, promulgates, and enforces regulations regarding certified nurse aides (CNAs), the Kansas Nurse Aide Registry, the "unlicensed employee" registry, and the elder abuse Report

Register.  The KDADS Secretary also administers, promulgates, and enforces regulations relating to the investigations of elder abuse at adult care homes and the dissemination of that information to current and potential employers of Kansas CNAs.

95.    Defendant Keck (in his official capacity) has deprived and will continue to deprive plaintiff Odhuno of his 14th Amendment rights to due process and equal protection. Moreover, the KDADS Secretary has deprived and will continue to deprive other CNAs falsely accused of abuse of their 14th Amendment rights.

96.    Current KDADS' policies, rules, and regulations do not require that alleged perpetrators be given notice and a meaningful opportunity to be heard to challenge false allegations of abuse during KDADS investigations (a pre-deprivation hearing), although constitutionally mandated by due process.  Brown, supra.  In addition, current KDADS regulations deny plaintiff Odhuno equal protection because State DCF investigations would provide him due process if the allegation was child abuse.

97.    Current KDADS' polices, rules, and regulations do not require that alleged perpetrators be given notice and an opportunity to respond after a finding of abuse (a post-deprivation hearing) to challenge the conclusions reached by KDADS.  That, too, is constitutionally mandated.  Stidham, supra.  Again, current KDADS regulations also deny plaintiff Odhuno equal protection because State DCF regulations would provide him due process if the allegation was child abuse.

98.    Current KDADS' policies, rules, and regulations do not require that its investigators only make a finding that abuse occurred (and that an alleged perpetrator committed the abuse) based on credible evidence, including the consideration of all exculpatory evidence.  That also is constitutionally mandated.  Dupuy v. Samuels, 397 F.3d 493, 504-507 (7th Cir. 2005); Valmonte v. Bane, 18 F.3d 992, 1003-1005 (2nd Cir. 1994); Jamison v. State of Missouri, 218 S.W.3d 399, 410-412 (Mo. Sup. Ct.) (en banc). Furthermore, plaintiff Odhuno is also denied equal protection because State DCF regulations would provide him due process under similar circumstances.

99.     All of these failures with respect to current KDADS' policies, rules, and regulations constitute ongoing violations of plaintiff's 14th Amendment rights because he has no way (other than this lawsuit) to force the removal and deletion of all findings and investigation files in KDADS' records which have and will continue to preclude his employment as a CNA and his schooling to become a nurse. Plaintiff continues to suffer ongoing irreparable harm because of KDADS' continuing violations of his constitutional rights to due process and equal protection.  Humphries v. County of Los Angeles, 554 F.3d 1170, 1175-1176, 1200-1201 (9th Cir. 2008).

100.    Plaintiff Odhuno is entitled to declaratory relief in the form of a court order declaring KDADS' policies, rules, and regulations to be constitutionally defective and deficient on their face and as applied to plaintiff.  Plaintiff is also entitled to injunctive relief in the form of a court order directed to defendant Keck in his official capacity which requires that he institute polices, rules, and regulations which will put in place the constitutional standards mandated by the 14th Amendment during and after all KDADS investigations of abuse.  Plaintiff is also entitled to a mandatory injunction requiring the KDADS Secretary to remove and destroy all findings, files, ESI, and records regarding the Avita resident's allegations against plaintiff and KDADS' investigation of those allegations from all KDADS databases and hard-copy files.  Plaintiff is further entitled to a mandatory injunction requiring that the KDADS Secretary place a statement on all KDADS databases indicating plaintiff has been totally exonerated from any alleged wrongdoing during his Avita employment, as well as for KDADS to cease disseminating false information regarding plaintiff to his potential employers and medical field educators.

### COUNT V -- TORT OF OUTRAGE CLAIMS
### AGAINST DEFENDANTS AVITA, AXIOM, ROSE, FORTNEY,
### BANUELOS, SUNDERRAJ, AND SCHIFFELBEIN

101.    Paragraphs 1 – 100 above are fully incorporated herein by reference.

23

102.    Defendants Avita, Axiom, Rose, Fortney, Banuelos, Sunderraj, and Schiffelbein intentionally or recklessly caused extreme emotional distress and anguish to plaintiff Odhuno by their extreme and outrageous misconduct.

103.    These defendants acted intentionally or recklessly in total disregard for plaintiff's career, as well as his physical and emotional wellbeing.  Their misconduct was willful or wanton, extreme, outrageous, and cruel.  It caused plaintiff Odhuno to suffer unbearable mental distress and anguish.

104.    These defendants' atrocious misconduct went well beyond the bounds of decency and is utterly intolerable in a civilized community.  Furthermore, no reasonable person should be expected to endure the emotional distress and anguish caused by that misconduct.

105.    As a direct result of these defendants' intentional infliction of emotional distress, plaintiff Odhuno suffered economic and noneconomic damages for which he is entitled to recover monetary damages under Kansas tort law.

106.    Those damages include compensation for his past and future extreme emotional distress and mental anguish; back pay and lost benefits; future lost income and benefits; reimbursement for student loans taken out for nursing school which he now cannot attend; other compensatory damages; statutory interest; attorney fees; litigation expenses; and court costs.  Because defendants Rose, Fortney, Banuelos, Sunderraj, and Schiffelbein acted intentionally or recklessly, plaintiff is also entitled to punitive damages from them.

## COUNT VI -- BIVENS CLAIMS (CONSTITUTIONAL VIOLATIONS) AGAINST DEFENDANTS  ROSE, FORTNEY, BANUELOS, SUNDERRAJ, AND SCHIFFELBEIN

107.    Paragraphs 1 – 106 above are fully incorporated herein by reference.

108.    Defendants Rose, Fortney, Banuelos, Sunderraj and Schiffelbein apparently do or will contend that they were acting, at least in part, under color of federal law during the

relevant period of this lawsuit.  To the extent these five individual defendants were acting under color of federal law, their constitutional violations of plaintiff Odhuno's Fifth Amendment right to procedural due process and equal protection of the laws is actionable pursuant to <u>Bivens v. Six Unknown Fed. Narcotic Agents</u>, 403 U.S. 388 (1971).

109.    Plaintiff Odhuno has a protected property interest in his state certification as a nurse aide.  That property interest has been deprived by these five individual defendants without due process.  Plaintiff also has a liberty interest in his good name and reputation which includes the right not to have these defendants' false and stigmatizing statements foreclose all opportunity for him to obtain future employment as a CNA without due process. Plaintiff's state certification as a CNA has been revoked or effectively revoked because of the sham investigation, report, and conclusions reached by these five defendants without any notice to plaintiff or opportunity to be heard (either pre-deprivation or post-deprivation). Moreover, these five defendants made false statements to defendant Avita indicating that plaintiff was the perpetrator of sexual abuse (a felony crime) which led, in part, to plaintiff's employment termination by Avita and which continues to result in plaintiff's inability to obtain other employment  as a CNA.

110.    These five defendants also intentionally discriminated against plaintiff based on his race, national origin, and/or gender in violation of plaintiff's constitutional right to equal protection of the laws.  These defendants unconstitutionally discriminated against him by failing to even interview him during their investigation or give him an opportunity to respond to the false allegations.  These defendants further unconstitutionally discriminated against plaintiff by concluding that he was a sexual abuser without any credible evidence and by ignoring the overwhelming exculpatory evidence.

111.    Reasonable employees in the positions held by these five defendants would have known plaintiff's constitutional right to due process and equal protection was being violated.  As a direct result of those constitutional violations, plaintiff has suffered economic

and noneconomic damages for which he is entitled to monetary recovery from these defendants through a Bivens action.

112.    Those damages include compensation for plaintiff's past and future extreme emotional distress and mental anguish; back pay and lost benefits; future lost income and benefits; reimbursement for student loans taken out for nursing school which he now cannot attend; other compensatory damages; statutory interest; attorney fees and litigation expenses; and court costs.  Because these defendants acted intentionally or recklessly, plaintiff is also entitled to punitive damages from them.

WHEREFORE, the plaintiff, John Paul Odhuno, prays that the Court enter judgment in his favor and against defendants Rose, Fortney, Banuelos, Sunderraj, and Schiffelbein for monetary damages in excess of $75,000.00 in the nature of compensatory damages as alleged, punitive damages, statutory interest, attorney fees, litigation expenses, court costs, and such other monetary relief as this Court deems just and proper.  Plaintiff also prays for a monetary judgment in excess of $75,000 against defendants Avita and Axiom for compensatory damages, statutory interest, attorney fees, litigation expenses, and court costs. Furthermore, plaintiff prays for declaratory and injunctive relief against defendant Keck in his official capacity as Secretary of KDADS to stop ongoing violations of plaintiff's Fourteenth Amendment rights to due process and equal protection.  The Court should declare that KDADS' policies, rules, and regulations pertaining to abuse investigations and findings violate the 14th Amendment on their face and as applied to plaintiff Odhuno.  The Court should further enjoin defendant Keck from administering and enforcing those policies, rules, and regulations.  The Court should also order defendant Keck to remove and destroy all findings, files, ESI, and records regarding the Avita resident's allegations against plaintiff and KDADS' investigation of those allegations from all KDADS databases and hard-copy files.  Moreover, the Court should order that a statement be placed on all KDADS databases indicating plaintiff has been totally exonerated from any alleged wrongdoing during his Avita employment, as well as for KDADS to cease disseminating false information regarding

plaintiff to his potential employers and medical field educators.  In addition, the Court should grant plaintiff such other equitable relief as this Court deems just and proper.

Respectfully submitted,

s/ Edward L. Keeley
Edward L. Keeley (#09771)
ekeeley@mcdonaldtinker.com
Katy E. Tompkins (#25581)
ktompkins@mcdonaldtinker.com
**Attorneys for Plaintiff**
McDONALD TINKER PA
300 West Douglas Avenue, Suite 500
Wichita, Kansas  67202
Phone:   (316) 263-5851
Fax:      (316) 263-4677

## DEMAND FOR TRIAL BY JURY

COMES NOW the plaintiff, John Paul Odhuno, and demands a trial by jury.

s/ Edward L. Keeley
Edward L. Keeley

## DESIGNATION OF PLACE OF TRIAL

COMES NOW plaintiff, John Paul Odhuno, and designates Wichita, Kansas, as the place of trial of this action.

s/ Edward L. Keeley
Edward L. Keeley

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of September, 2016, the foregoing **Third Amended Complaint** was filed with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to the following:

Forrest T. Rhodes, Jr.
FOULSTON SIEFKIN LLP
1551 N Waterfront Pkwy, #100
Wichita, KS  67206
*Attorneys for Defendants*
  *Reeds Cove & Axiom*

Kimberly M.J. Lynch
Jessica F. Conrow
KANSAS DEPARTMENT FOR AGING
  AND DISABILITY SERVICES
503 S. Kansas Ave.
Topeka, KS  66603
*Attorneys for Defendants Keck, Sunderraj,*
 *Schiffelbein, Rose, Fortney and Banuelos*

s/ Edward L. Keeley
Edward L. Keeley