# Department of Health and Human Services

## DEPARTMENTAL APPEALS BOARD

### Civil Remedies Division

Avita Health and Rehab at Reeds Cove,
(CCN: 36-6313),

Petitioner,

v.

Centers for Medicare & Medicaid Services.

Docket No. C-15-364

Decision No. CR4562

Date: March 30, 2016

## DECISION

Following a complaint investigation and partial extended health resurvey, the Kansas Department for Aging and Disability Services (state agency) determined that Avita Health and Rehab at Reeds Cove (Petitioner or facility) was not in substantial compliance with Medicare participation requirements for long-term care facilities relating to prevention of resident abuse, thorough investigation, and timely reporting abuse allegations. The state agency further determined that Petitioner's noncompliance posed immediate jeopardy to the health and safety of its residents. The Centers for Medicare & Medicaid Services (CMS) agreed with the state agency's determination and imposed a $5,650 civil money penalty (CMP) against Petitioner for 13 days of immediate jeopardy and a $300 per-day CMP for 31 days of substantial noncompliance that was not immediate jeopardy, for a total CMP of $82,750. Petitioner now appeals. As explained below, I find that Petitioner was not in substantial compliance with Medicare participation requirements, CMS's determination of immediate jeopardy to resident health and safety was not clearly erroneous, and the CMPs that CMS imposed are reasonable.

**EXHIBIT A**

KDADS 0054

KDADS MSJ 001

## I. Case Background and Procedural History

Petitioner is a long-term care facility located in Wichita, Kansas that participates in the Medicare program as a skilled nursing facility. The facts giving rise to this case involve an 87 year-old female resident in Petitioner's facility, referred to in these proceedings as "Resident 3." Resident 3 was originally admitted to the facility on November 1, 2013, readmitted on April 17, 2014, and again on May 30, 2014, following a general decline in her medical status. P. Ex. 6 at 5, 8. Resident 3 had a medical history of, among other medical conditions, metabolic encephalopathy, memory loss, decreased cognitive ability, dementia, and age-related macular degeneration. *Id.* at 5.

On July 23, 2014, during an occupational therapy session, Resident 3 verbally reported to a treating occupational therapist (OT) that a male nurse had sexually abused and inappropriately touched her. CMS Ex. 1 at 61 (July 23, 2014, OT treatment progress note). She also reportedly alleged that the abuse had occurred at the facility on an ongoing basis. *Id.* Resident 3 stated that she was uncomfortable when the nurse was in her room, and after some hesitation, she explained that while she was in her bed, the male nurse "touched her buttocks." *Id.* She alleged that the perpetrator was a "black male nurse" who worked at night at the facility. *Id.* She reported that although the alleged perpetrator would tell her that he was checking to see if her incontinence pad was dry, she did not believe he was being sincere. *Id.* Resident 3 also reported other incidents where the male nurse touched her, calling it "therapy," and allegedly told her that "it was good for her." *Id.* She reported that during the last holiday [July 4, 2014] after most staff had left, the alleged perpetrator had taken her outside to the facility's courtyard and "was rough with her and had her in the grass." *Id.* She reported that she was afraid to tell anyone and was afraid to sleep at night. *Id.* She stated that there had not been any occurrences for the past few nights. *Id.* She reported that she saw the alleged perpetrator by the nurses' station when she went to the restroom, but when she exited the restroom she noticed that he was gone. *Id.* The OT indicated that Resident 3 thought the alleged perpetrator was scared and had not returned to her room because her son had stayed with her the past Sunday night [July 20, 2014]. Resident 3 also reported to the OT that she was afraid to report the incidents for fear that the alleged perpetrator would retaliate against her. *Id.*; CMS Ex. 1 at 51-52 (notarized statement from the OT who reported the abuse complaint).

After hearing about the alleged abuse from Resident 3, the OT met with her co-worker, a certified occupational therapy assistant (COTA), to discuss the conversation. CMS Ex. 1 at 53, 54. Both employees then immediately met with the facility administrator to report the alleged abuse. CMS Ex. 1 at 51-59; P. Ex. 3 at 2-3 ¶¶ 14-16. The facility administrator initiated an internal investigation and met with Resident 3 that same day. The following day Resident 3 underwent a full body examination with no trauma noted. P. Ex. 3 at 3 ¶ 20; P. Ex. 6 at 2-3 ¶ 13; P. Ex. 6 at 10. The facility administrator

determined that the allegation was not substantiated, and she did not report the allegation of abuse to the state agency. P. Ex. 3 at 4 ¶ 26.

However, someone filed a complaint with the state agency regarding Resident 3's alleged abuse, which prompted the state agency to conduct a complaint investigation of Petitioner's facility beginning July 31, 2014, and concluding August 14, 2014. CMS Ex. 1 at 1; CMS Ex. 2 ¶ 2. During the complaint investigation, the surveyor conducted staff interviews, interviewed Resident 3's son, and reviewed facility records. CMS Ex. 2 ¶ 3; Tr. at 17-18. The state surveyor informed Petitioner that she found noncompliance, including noncompliance that posed immediate jeopardy to the health and safety of its residents. P. Ex. 17 ¶¶ 11-12. Specifically, the surveyor found noncompliance with the following requirements:

- 42 C.F.R. § 483.13(b), (c)(1)(i) (Tag F223) which requires that each resident be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion and that the facility must not use verbal, mental, sexual, or physical abuse, corporal punishment, or involuntary seclusion.

- 42 C.F.R. § 483.13(c)(1)(ii)-(iii), (c)(2)-(4) (Tag F225) which requires that the facility not employ individuals who have been found guilty of abuse, neglect or mistreating residents; that all allegations of abuse be reported immediately to the facility administrator and other officials in accordance with state law, including to the state survey agency; that the facility have evidence that the alleged abuse was thoroughly investigated and that it took actions to prevent further abuse while the investigation is in progress; and that the facility report all investigations to the administrator or designated representative and to other officials in accordance with state law, including the state survey agency, within five working days of the incident, and if the alleged violation is verified, take appropriate corrective actions.

*See* CMS Ex. 1 at 2, 21-22.

The state agency cited the facility at a scope and severity level of "G" for Tag F223, meaning that the surveyor found an isolated instance of actual harm that was not immediate jeopardy. The state agency further determined that the facility's noncompliance with Tag F225 was at a scope and severity level of "L," indicating widespread immediate jeopardy to the health and safety of the facility's residents. The state agency also determined that the facility had abated the immediate jeopardy as of August 4, 2014, but it remained out of substantial compliance at a lower scope and severity until September 5, 2014, as determined upon a revisit to the facility on October 14, 2014. P. Ex. 13. CMS adopted the state agency's findings and informed Petitioner

by letters dated August 28 and October 22, 2014, that it was imposing a CMP of $5,650 per day from July 23 through August 4, 2014, and CMP of $300 per-day from August 5 through September 4, 2014.[1] *Id.*

Petitioner requested an Administrative Law Judge (ALJ) hearing to dispute the determination that it was not in substantial compliance with program requirements at Tags F223 and F225, CMS's determination of immediate jeopardy, and the associated proposed remedies. Petitioner's request was received at the Civil Remedies Division, assigned to me for hearing and decision, and I issued an Acknowledgment and Pre-Hearing Order (Pre-Hearing Order).

In accordance with my Pre-Hearing Order, CMS filed its pre-hearing brief (CMS Pre-Hrg. Br.) along with two proposed exhibits (CMS Exs. 1 and 2). Petitioner then filed its responsive pre-hearing brief (P. Pre-Hrg. Br.) along with 32 proposed exhibits (P. Exs. 3-35).[2] CMS submitted the affidavit of one witness, a state surveyor (CMS Ex. 2). Petitioner requested that CMS's witness be made available for cross-examination during a hearing. Petitioner submitted affidavits for nine witnesses: Petitioner's Executive Director (P. Ex. 3); the President of Axiom Healthcare Services (P. Ex. 4), the Medical Director (P. Ex. 5); an APRN (P. Ex. 6); a Quality Assurance Nurse (P. Ex. 7); a Charge Nurse (P. Ex. 8); an LPN (P. Ex. 9); a Nurse Liaison (P. Ex. 17); and Resident 3's son (P. Ex. 21). CMS declined to request to cross-examine Petitioner's witnesses.

I conducted a hearing by video conference on September 25, 2015, to allow Petitioner to cross-examine CMS's witness. A transcript of the proceedings (Tr.) is incorporated into the record. I admitted, without objection, CMS Exs. 1 (Parts 1-4) and 2 and P. Exs. 3-35 (P. Ex. 33 has two parts) into the record. Tr. at 5. Each party submitted a post-hearing brief (Br.) and Petitioner submitted a reply brief (P. Reply). CMS chose not to file a reply brief.

---

[1] Petitioner does not dispute two of the four deficiency tags identified in the Statement of Deficiencies (SOD), which include findings that it was not in substantial compliance with 42 C.F.R. § 483.15(b) (Tag F242, Resident self-determination and right to make choices); and 42 C.F.R. § 483.20(d)(3) and 483.10(k)(2) (Tag F280, Resident right to participate in care planning). CMS Ex. 1 at 34, 39. These deficiencies are not subject to further appeal. *See* CMS Br. at 1 (noting that deficiencies cited at 42 C.F.R. §§ 483.15(b), 483.20(d)(3) and 483.10(k)(2) also formed the basis for the sanctions CMS imposed against Petitioner); *see also* CMS Ex. 1 at 1-43 (surveyor's summary sheet of deficiencies cited and the SOD for the survey completed on August 14, 2014).

[2] Petitioner's exhibit list includes references to P. Exs. 1 and 2. However, these were references to CMS Exs. 1 and 2 and were not actual exhibits. Therefore, there were no corresponding exhibits to admit.

## II. Issues

Whether Petitioner was in substantial compliance with Medicare participation requirements for long-term care facilities during the period cited;

If so, whether CMS's determination of immediate jeopardy to the health and safety of Petitioner's residents was clearly erroneous; and

If Petitioner was not in substantial compliance, whether the CMPs that CMS imposed are reasonable.

## III. Findings of Fact and Conclusions of Law

### A. *Petitioner was not in substantial compliance with Medicare participation requirements for long-term care facilities during the period cited.*

The parties do not dispute that on July 23, 2014, Resident 3 reported to an OT that a facility staff member was abusing her on a recurring basis. CMS Ex. 1 at 61. The parties do not dispute that Resident 3 reported that the alleged perpetrator had touched her buttocks and took her outside in the courtyard during a recent holiday and was "rough with her and had her in the grass." *Id.* at 61, 49-56. The parties also do not dispute that the facility administrator learned of the abuse complaint from the OT at 4:30 p.m. on July 23, 2014, the same day the resident made the allegations. *Id.* at 57. The parties do disagree, however, about whether Petitioner properly reported the alleged abuse to the state agency, whether Petitioner completed a thorough investigation of the abuse complaint before determining it was unsubstantiated, and whether Petitioner took sufficient measures to prevent further potential abuse while the investigation was in process, as required by 42 C.F.R. § 483.13(b) and (c).

#### *1. Petitioner violated 42 C.F.R. § 483.13(b) and (c)(1)(i) (Tag F223) because it did not comply with its own policy and procedures to prevent abuse of residents by staff by attempting to immediately identify and suspend the alleged perpetrator pending a proper investigation.*

Long-term care residents have the right to be free from verbal, sexual, physical, and mental abuse, corporal punishment, and involuntary seclusion. 42 C.F.R. § 483.13(b). To accomplish this, a facility must develop and implement written policies and procedures that prohibit verbal, sexual, physical and mental abuse, corporal punishment, and involuntary seclusion, mistreatment, neglect, and abuse of residents. 42 C.F.R. § 483.13(c)(1)(i). "Abuse" is defined as "the willful infliction of injury, unreasonable

confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish." 42 C.F.R. § 488.301. The Board has explained:

> The goal of section 483.13(b) is to keep residents free from abuse. This goal cannot be achieved if a facility could be found in compliance even though it failed to take reasonable steps to protect residents from potentially injurious acts which it knew or should have known might occur and which might be willful. . . .

*Western Care Mgmt. Corp. d/b/a Rehab Specialties Inn*, DAB No. 1921, at 14 (2004).

Actual abuse need not occur for a facility to violate 42 C.F.R. § 483.13(b) and (c)(1)(i). It is sufficient for CMS to show that the facility failed to protect residents from reasonably foreseeable risks of abuse. *Western Care Mgmt.*, DAB No. 1921, at 15.

Petitioner's abuse policy requires that "[a]ny **alleged** perpetrator of abuse . . . will be immediately suspended from employment and will leave the employment property and not return to the property until the investigation by the facility and law enforcement is complete and the incident is resolved." CMS Ex. 1 at 110 (emphasis added). However, the evidence shows that Petitioner did not attempt to identify, confirm or suspend the alleged perpetrator until the state survey began on July 31, 2014. P. Ex. 3 ¶ 40. Petitioner eventually terminated the alleged perpetrator's employment with the facility on August 5, 2014, but only after the state surveyor renewed the investigation. CMS Ex. 1 at 44; P. Ex. 3 at 5 ¶ 38 (facility administrator's affidavit stating, "Ultimately, the KDADS Surveyor identified an Alleged Perpetrator.").

Petitioner does not dispute the requirements of its own abuse policy but does maintain that the policy was not triggered because Resident 3 did not specifically identify the alleged perpetrator. P. Br. at 4; P. Rely at 5, 6 n.5. However, the record establishes that Resident 3 provided Petitioner's staff with enough specific information about the alleged perpetrator for the Petitioner immediately to have conducted an investigation to identify the employee. According to Petitioner's Self-Report, Resident 3 reported the abuse to the OT and COTA on July 23, 2014 at 4:30 p.m., and at that time, Resident 3 reported that the alleged perpetrator had worked the evening of July 20, 2014. P. Ex. 3 at 12. The COTA provided a notarized statement, dated July 31, 2014, wherein she stated that she accompanied the OT into the facility administrator's office on the afternoon of July 23, 2014, to discuss Resident 3's abuse complaint. CMS Ex. 1 at 53-54. According to the COTA, she and the OT informed the facility administrator on July 23, 2014 of the race and gender of the alleged perpetrator who had worked the night Resident 3's son had stayed overnight with her – July 20, 2014. Instead of taking immediate action to follow the abuse policy and interview staff members working that night, the facility administrator commented to the OT and COTA that Resident 3 "was confused." *Id.* at 54.

Petitioner also argues that the SOD does not include any corroborating evidence that Resident 3 was in fact abused. P. Br. at 5. However, CMS is not required to show actual abuse occurred for a facility to violate 42 C.F.R. § 483.13(b) and (c)(1)(i). *See Holy Cross Vill. at Notre Dame, Inc.*, DAB No. 2291, at 7 (2009) (citation omitted). Rather, CMS only needs to show that a facility did not protect its residents from reasonably foreseeable risks of abuse. *Id.* Here, once Resident 3 alleged that she had been abused by a staff member, it was reasonably foreseeable that the risk of abuse would continue for as long as the alleged perpetrator remained on Petitioner's staff.

Furthermore, the facility administrator had sufficient information on July 23, 2014 to conduct an investigation to identify the alleged perpetrator and to take decisive action to suspend the employee pending a proper investigation of the allegations. However, the administrator chose not to immediately interview staff members, thereby placing Resident 3 (and other residents) at risk of foreseeable and likely further abuse. Petitioner claims that due to Resident 3's diminished capacity she was not a credible reporter, and her story was not logically possible. P. Br. at 4; P. Reply at 5 n.4. However, evidence in the record shows that Resident's 3 cognitive abilities were not totally unreliable. For example, Resident 3's June 3, 2014 Minimum Data Set (MDS) assessment shows that Resident 3 had moderately impaired cognitive skills for daily decision making; she had a short-term memory problem but that her long-term memory was fine and she could identify staff names and faces and knew she was in a nursing home (P. Ex. 9 at 20); her speech was not clear but she was usually understood and could understand others (P. Ex. 9 at 18). *Id.* at 20.

Resident 3's health improved and her July 18, 2014 MDS assessment, which was taken five days before she reported the abuse, also notes that she had moderate cognitive impairment, inattention; disorganized thinking; minimal depression, but no delusions or hallucinations; her speech was clear with distinct intelligible words; she was usually understood and usually understood others; her vision was noted as adequate but she did wear corrective lenses; she was able to report the correct year and day of week; and there were no symptoms that she was feeling down, depressed or hopeless. P. Ex. 7 at 30-32, 35. In spite of some evidence that Resident 3 may have had diminished capacity at times, there is considerable evidence that her allegations were credible, and the fact that she came forward with an articulated allegation of abuse was sufficient to trigger both Petitioner's abuse prevention policy requirements and Medicare program requirements.

> *2. Petitioner violated the abuse prevention requirements of 42 C.F.R. § 483.13(c)(2) - (4) (Tag F225) because it did not immediately report the allegation of employee abuse to the state agency, it did not timely and thoroughly investigate the abuse allegations, and it did not protect residents from likely further abuse during an investigation.*

The survey SOD may constitute prima facie evidence of the undisputed facts asserted in it. *See, e.g., Universal Health Care – King*, DAB No. 2383 (2011). The SOD from the August 14, 2014 complaint investigation states that based on observation, record review, and interview, Petitioner did not immediately report to the state agency an allegation of employee-to-resident sexual abuse and inappropriate touching. CMS Ex. 1 at 22. The SOD further states as a basis for noncompliance that Petitioner did not thoroughly investigate the allegation, Petitioner did not submit the results of its internal investigation to the state agency within five working days, and Petitioner did not protect all residents from likely abuse during the investigation. *Id.*

### *a. Petitioner did not immediately report the alleged abuse to the state agency as required by 42 C.F.R. § 483.13(c)(2).*

A facility must report all allegations of resident abuse. The regulation specifically requires:

> The facility must ensure that all alleged violations involving mistreatment, neglect, or abuse, including injuries of unknown source . . . are reported immediately to the administrator of the facility and to other officials in accordance with State law through established procedures (including to the State survey and certification agency).

42 C.F.R. § 483.13(c)(2). Appendix PP of the State Operations Manual (SOM), defines "immediately" to mean "as soon as possible, but ought not exceed 24 hours after discovery of the incident, in the absence of a shorter State time frame requirement." SOM, app. PP, Guidance for Tag F225.

Here, staff reported Resident 3's abuse allegations to the facility administrator the same day Resident 3 reportedly informed the staff, on July 23, 2014. CMS Ex. 1 at 51-59. Petitioner does not dispute that it did not report the alleged abuse to the state agency until July 31, 2014 – the date the state surveyor first came to the facility to conduct the complaint investigation related to the resident's alleged abuse. P. Ex. 3 at 4 ¶ 30; P. Ex. 3 at 12-14. I find Petitioner did not immediately report the allegations of abuse to the survey agency as required because it reported the incident well over 5 working days since Petitioner first discovered the incident.

Petitioner argues that the *Kansas Long Term Care Regulation Interpretation Manual* (rev. Feb.14, 2002), which Petitioner relied on, interprets the requirements of 42 C.F.R. § 483.13(c) to mean that the requirement to immediately report an allegation of abuse is only triggered if the facility has "'reasonable cause to believe that a resident is being or has been abused.'" P. Br. at 12 citing P. Ex. 28 at 2. According to Petitioner, because the "reasonable cause" threshold was not reached, Petitioner was not required to immediately report Resident 3's allegations of abuse to the state agency. P. Br. at 11-13.

The gist of Petitioner's argument is that because the federal regulation instructs facilities to report allegations "in accordance with State law through established procedures," the federal regulation defers to the state law. According to Petitioner, because the facility's initial investigation results ultimately found no abuse, the facility administrator was not required to report Resident 3's allegations of abuse to the state agency. However, I reject Petitioner's argument. First, the phrase "in accordance with State law through established procedures" refers to the procedures the facility should follow in reporting the allegation; it does not address whether the facility must report the allegations. A facility must report all allegations, without regard to a state's reporting requirements. *Britthaven, Inc.*, DAB No. 2018, at 15 (2006) (citing *Cedar View Good Samaritan*, DAB No. 1897, at 11 (2003) ("for reporting allegations of abuse to the state, 'the salient question is not whether any abuse in fact occurred or whether [a facility] had reasonable cause to believe that any abuse occurred, but whether there was an allegation that facility staff had abused a resident.'"). In *Britthaven* the Board explained that pursuant to section 1819(g)(1)(C) of the Act, "Congress gave states and facilities concurrent responsibility for investigating allegations of abuse by staff in long term care facilities." The Board further explained that when CMS promulgated section 483.13(c), it stated that the regulation required facilities to report "all alleged violations." *Britthaven*, DAB No. 2018 at 15, citing 56 Fed. Reg. 48843-48844 (Sept. 26, 1991). Requiring the facility to report the allegations "assures that a neutral third party (the state) will be apprised of the allegations and will be in a position to take protective action if necessary." *Illinois Knights Templar*, DAB No. 2369 at 12-13 (2011).

> ***b. Petitioner did not timely and thoroughly investigate the abuse allegation and did not protect residents from further likely abuse as required by 42 C.F.R. § 483.13(c)(3).***

A facility must thoroughly investigate any allegation of abuse while also protecting residents from any further potential abuse during the investigation process. 42 C.F.R. § 483.13(c)(3). I find Petitioner's investigation was not thorough and did not substantially comply with the Medicare participation requirements. Further, Petitioner did not take adequate preventative measures to protect Resident 3, or other residents, from further potential abuse during the investigation.

The facility administrator's notarized statement, dated July 31, 2014, indicates she took the following actions in investigating Resident 3's abuse complaint that she received notice of the allegation at about 4:30 p.m. on July 23 2014:

• At 5:00 p.m. on July 23, 2014, the facility administrator went to Resident 3's room to speak with her about the allegations. The resident indicated she did not want to talk because she was waiting for her grandmother to come get her. In response to questions the facility administrator asked, the resident "kept motioning

Case 6:15-cv-01347-EFM-GEB Document 106-1 Filed 06/06/17 Page 10 of 17

10

with her hand and shaking her head," but did report that she was not afraid of any of the facility staff because "she didn't know anyone here." P. Ex. 3 at 16; *see also* P. Ex. 3 at 10 (undated, typed notes admitted with the facility administrator's May 12, 2015 affidavit, which contain her notes outlining her initial investigation. The notes indicate that on July 23, 2014, the facility administrator spoke with two staff members who reported that they were not aware of any complaints from the residents "about nights." The identity of the staff members the facility administrator interviewed prior to July 31, 2014 are not noted in her July 31, 2014 notarized statement (P. Ex. 3 at 16); and her undated, typed notes relating to her preliminary investigation only identify the first name and last initial of the two staff members she spoke with on July 23, 2014 (P. Ex. 3 at 10). However, the record does contain corroboration that some staff members were interviewed during the initial investigation. See P. Ex. 12 at 1 (affidavits from three employees all signed on August 22, 2014, noting that on July 23, 2014 one employee was interviewed by the facility administrator, and on July 24, 2014 two employees report being interviewed by the facility administrator).

• Mid-morning on July 24, 2014, the facility administrator reported attempting again to interview Resident 3. The resident reportedly stated that living at the facility was "good," that she "liked all the kids who worked here," and responded "no" when asked if there was anyone she did not like. P. Ex. 3 at 16-17; *see also* P. Ex. 3 at 3 ¶ 20 (the facility administrator's May 15, 2015 affidavit indicates that on July 24, 2014, a full body physical was performed on Resident 3 and no trauma was noted); P. Ex. 3 at 10 (the facility administrator's typed investigation notes indicating she spoke with three staff members who reported they were not aware of any problems regarding Resident 3 but that she "doesn't like men providing care"); P. Ex. 3 at 4 ¶ 24 (in her affidavit of May 12, 2015, the facility administrator reports that she, along with staff, "conducted interviews of all alert and oriented residents," and that no one "reported being fearful of any staff member.").

• On July 25, 2014, the facility administrator interviewed Resident 3. The resident reported that she was doing "good," and responded "no" when asked if she had any problem with anyone working at the facility. Resident 3 began "talking about someone who wasn't the same person every time." During the interview the resident reportedly indicated that she was not afraid of living at the facility. P. Ex. 3 at 17-18; *see also* P. Ex. 3 at 10. In her undated, typed notes of the preliminary investigation the facility administrator provides only the first names of the three staff she spoke with on July 24, 2014 but no indication as to which house they worked in, which shift they worked, or their relationship to Resident 3. P. Ex. 3 at 10.

**KDADS 0063**

**KDADS MSJ 010**

- Although the facility administrator's statement did not indicate dates or names, she indicated that she also spoke with "primary CNAs" who worked with the resident and that she spoke with the facility Charge Nurse. The staff informed her that they were not aware of any issues Resident 3 had with any facility staff, and they reported that the resident did not want men "taking care of her." P. Ex. 3 at 18.

In her affidavit, the facility administrator indicates that she determined that the abuse complaint was not substantiated because: Resident 3 could not corroborate what she had reported to the OT, other residents in her housing section did not express fear, and there was no evidence of trauma detected when a body-assessment was conducted on Resident 3. P. Ex. 3 at 4 ¶ 26. The facility administrator stated that she was not able to suspend, pending investigation, an alleged perpetrator because "I had no information leading me to an Alleged Perpetrator." P. Ex. 3 at 4 ¶ 27. However, I find she neglected to take this reasonable step in preventing the potential abuse because the record shows that Resident 3 had been consistent in providing a specific description to others of the alleged perpetrator with regard to his gender, race, position, and time of shift. CMS Ex. 1 at 49, 51. Further, the OT's report to the facility administrator included allegations that Resident 3 was fearful to report abuse due to potential retaliation, and therefore the facility administrator should not have determined Resident 3's allegations lacked merit simply because Resident 3 would not repeat them to her.

The facility's abuse policy provides that "Administrative staff will have evidence that all alleged violations of abuse . . . are thoroughly investigated, and must prevent further potential abuse while the investigation is in progress." CMS Ex. 1 at 109. Additionally, Petitioner's abuse investigation procedures required that after each interview "the individual interviewed will complete a witness statement . . . sign and date their witness statement in front of a Notary Public." CMS Ex. 1 at 107. However, prior to July 31, 2014, when the state agency initiated its complaint investigation at the facility, Petitioner only conducted a cursory interview of a few staff members and residents whom the facility did not specifically identify in its initial investigation. *See* P. Ex. 3 at 3 ¶ 21 (facility administrator's affidavit stating "[o]n July 24, 2014, I spoke with members of the staff"); P. Ex. 3 at 4 ¶ 24 (facility administrator states that on July 24, 2014 "I worked with my staff to conduct interviews of all alert and oriented residents."); P. Ex. 3 at 10 (facility administrator's undated, typed notes stating that on July 23, 2014, she talked with "Daniele H and Ralysha L, and on July 24, 2014, she talked with Becca, Morgan & Angie.").

However, in comparing the facility administrator's undated typed notes of the content of her investigation prior to July 31, 2014 with her contemporaneous self-report to the state agency on July 31, 2014, it appears that the latter does not indicate that prior to July 31, 2014 staff or residents were interviewed. *Compare* P. Ex. 3 at 10 *with* P. Ex. 3 at 12-14. The facility administrator's notes summarizing the interviews that occurred from August

2-4, 2014, do provide the full name, position of the employees interviewed, and their shift. *See* P. Ex. 3 at 20-23. It was not until after the surveyor arrived to the facility on July 31, 2014, did both staff and facility contractors speak with Resident 3's son and also interviewed all residents and staff whom were able to be interviewed. P. Br. at 9.

Although there appears to be evidence showing that the facility administrator and the quality assurance nurse interviewed some employees and residents prior to the commencement of the complaint survey on July 31, 2014, the information initially documented is not thorough. For example, Petitioner did not interview all staff including immediately interviewing night staff the evening of July 23, 2014, staff did not check Resident 3's bed alarm log to see if there was a pattern of the alarm triggering during the night shift, staff did not take reasonable measures to confirm the identity of the alleged perpetrator even though the administrator had sufficient initial information on July 23, 2014 to narrow down a possible perpetrator, and the facility administrator did not properly document her investigation with written and signed statements from staff. Based on her cursory investigation the facility administrator reached a premature determination that Resident 3's allegations of abuse were unfounded.

Further, Petitioner did not provide the surveyor with a written report documenting the efforts taken by Petitioner during its initial investigation in response to the surveyor's request for this documentation. During an interview on July 31, 2014, the facility administrator reportedly told the surveyor that she did not obtain written statements from the individuals who were interviewed during her initial investigation nor did she obtain any documentation of her investigation outside of an unsigned written statement from the facility social worker. CMS Ex. 1 at 29.

It was not until July 31, 2014, in response to the surveyor's determination that there was immediate jeopardy to the health and safety of facility residents, that Petitioner took further, more comprehensive investigative efforts. For example, staff completed resident "interviews of alert" and oriented residents in Resident 3's housing section, asking many more questions specifically based on Resident 3's abuse allegations. The facility administrator and a nurse consultant also reviewed surveillance video footage recorded on July 4, 2014 showing the courtyard area in order to determine if there was footage of Resident 3 being taken to the courtyard. In addition, staff interviewed male caretakers after reviewing staff assignment sheets on relevant dates, staff reviewed Resident 3's bed sensor alarm log, and staff rearranged assignments so there were no male staff working in

Resident 3's housing section. CMS Ex. 1 at 30-31. Considering Petitioner did not do this immediately after learning of Resident 3's allegation, I find staff did not comply with Medicare requirements to conduct a thorough investigation.

The regulation also requires prevention of further potential abuse. 42 C.F.R. § 483.13(c)(3). Here, the facility administrator, based on her cursory investigation, reached a premature determination that Resident 3's allegations of abuse were unfounded. Consequently, she decided not to take preventive measures to protect the resident from likely further abuse. As a result, the alleged perpetrator was able to continue to work in Petitioner's home, and Resident 3 continued to be in fear of the alleged perpetrator. In fact, the record shows that Resident 3 mentioned to the OT during a therapy session on July 28, 2014 that the alleged perpetrator was still coming into her room in the evening. CMS Ex. 1 at 62 ("Pt states that the male nurse she complained about has been in to fix the bed alarm but has not bothered her inappropriately). CMS Ex. 1 at 62. Then again on July 29, 2014, Resident 3 expressed to the OT her continued fear of the alleged perpetrator. An OT progress note dated July 29, 2014 indicates "…pt stated she was up to 1:00 am, pt was afraid to fall asleep in fear of her male nurse would come into her room." *Id.* Facility staff assignment sheets show that the alleged perpetrator worked at Resident 3's house on July 23-23, 28 and 29. CMS Ex. 1 at 60, 113-18.

Ultimately, Resident 3 needlessly continued to experience emotional distress as evidenced by her reports to the OT on both July 28 and July 29, 2014 where, as noted above, she reported that the alleged perpetrator continued to enter her room, and she was afraid to go to sleep for fear that the "male nurse would come into her room." CMS Ex. 1 at 62. Other residents were at risk of potential abuse too because staff did not properly determine the allegations precluded the required further protective actions and reporting.

Petitioner argues that both Resident 3 and Resident 3's son have recanted some of the prior statements they made regarding Resident 3's allegations of abuse and how they related to inappropriate touching. P. Br. at 11-12; P. Reply at 5; P. Ex. 21. However, any later recantations from Resident 3 and her son in 2015 do not excuse Petitioner from its responsibility to have immediately reported the July 23, 2014 allegation of abuse to the state agency, to have protected Resident 3 and other facility residents from a reported alleged perpetrator, and to have performed a thorough investigation of the allegation of sexual abuse against one of its residents by a staff member.

> ### c. *Petitioner did not report the results of its investigation to the state agency within five working days of the complaint as required by 42 C.F.R. § 483.13(c)(4).*

The results of all investigations must be reported to the administrator or his designated representative and to other officials in accordance with State law (including to the State

survey and certification agency) within 5 working days of the incident, and if the alleged violation is verified appropriate corrective action must be taken. 42 C.F.R. § 483.13(c)(4).

Here, Petitioner did not timely submit investigation reports to the state agency as required. The regulation makes clear that *all* investigation results are to be reported both to the administrator of the facility *and* to the state agency within 5 working days. The evidence shows, and Petitioner does not deny, that it did not originally report the alleged abuse to the state agency, nor did it intend to report its investigation results to the state agency within 5 days. P. Br. at 12, 14-15. The alleged abuse was not reported until the surveyor arrived at the facility on July 31, 2014, eight days after Petitioner learned of the abuse allegations, and required Petitioner to report the complaint.

### B. *CMS's determination that the facility's noncompliance with 42 C.F.R. §§ 483.13 (c)(2)-(4) posed immediate jeopardy to resident health and safety is not clearly erroneous.*

Immediate jeopardy exists if a facility's noncompliance has caused or is likely to cause "serious injury, harm, impairment, or death to a resident." 42 C.F.R. § 488.301. CMS's determination as to the level of a facility's noncompliance, which would include an immediate jeopardy finding, must be upheld unless it is "clearly erroneous." 42 C.F.R. § 498.60(c). The "clearly erroneous" standard imposes on facilities a "heavy burden" to show no immediate jeopardy, and the Board has sustained determinations of immediate jeopardy where CMS presented evidence "from which '[o]ne could reasonably conclude' that immediate jeopardy exists." *Barbourville Nursing Home*, DAB No. 1931, at 27-28 (2004), citing *Koester Pavilion*, DAB No. 1750 (2000); *Daughters of Miriam Ctr.*, DAB No. 2067, at 7, 9 (2007). The facility has the burden to rebut the presumption with evidence and argument showing that the harm or threatened harm did not meet any reasonable definition of "serious." *Yakima Valley School*, DAB No. 2422, at 8 (2011). I do not find the facility has met its burden here.

For the reasons detailed above, I find that the facility administrator did not perform a timely and thorough investigation nor did she take reasonable measures to protect facility residents from reasonably foreseeable abuse. Consequently, the facility residents, including Resident 3, remained vulnerable to an abusive employee so long as that employee remained on staff. In fact, Resident 3 continued to make the OT aware days after her initial complaint that she believed the alleged perpetrator still had access to her in the evenings and that she was unable to sleep because she feared the alleged perpetrator would return to her room.

Even if I accept Petitioner's argument that no abuse or harm occurred, which I do not, I find that the facility's failure to properly investigate the allegation of abuse posed immediate jeopardy, which does not require a showing of actual harm. The immediate

jeopardy was appropriately abated on August 5, 2014 when the facility: (1) completed their comprehensive investigation of Resident 3's abuse complaint; (2) provided *all* employees with retraining on the requirements of reporting allegations, and (3) suspended the alleged perpetrator. CMS Ex. 1 at 34; P. Exs. 29-33; CMS Br. at 12.

### C. The CMPs that CMS imposed are reasonable.

CMS imposed a penalty in the amount of $5,650 per day for the period of July 23 through August 4, 2014, the period of immediate jeopardy, and $300 per day for the period of August 5 through September 4, 2014, after the immediate jeopardy was abated but the deficiency remained. Based on a revisit on October 14, 2014, CMS determined Petitioner corrected the remaining deficiencies and achieved substantial compliance with the Medicare participation requirements on September 5, 2014. P. Ex. 13 at 1.

CMS must consider several factors when determining the amount of a CMP (factors an ALJ considers de novo when evaluating the reasonableness of the CMP that CMS imposed): (1) the facility's history of noncompliance; (2) the facility's financial condition, i.e., its ability to pay the CMP; (3) the severity and scope of the noncompliance, the "relationship of the one deficiency to other deficiencies resulting in noncompliance," and the facility's prior history of noncompliance; and (4) the facility's degree of culpability. 42 C.F.R. §§ 488.438(f), 488.404(b), (c). In addition, the "absence of culpability is not a mitigating circumstance in reducing the amount of the penalty." 42 C.F.R. § 488.438(f)(4).

The Board has repeatedly concluded that "an ALJ or the Board properly presumes that CMS considered the regulatory factors and that those factors support the amount imposed." *See, e.g., Pinecrest Nursing & Rehab. Ctr.*, DAB No. 2446, at 23 (2012). The burden was on Petitioner "'to demonstrate, through argument and the submission of evidence addressing the regulatory factors, that a reduction is necessary to make the CMP amount reasonable.'" *Id.* (quoting *Oaks of Mid City Nursing & Rehab. Ctr.*, DAB No. 2375, at 26-27 (2011)).

Where CMS determines to impose a per-day CMP, the regulation provides for penalties of $3,050 to $10,000 per day for deficiencies constituting immediate jeopardy. 42 C.F.R. § 488.438(a)(1). Therefore, a $5,650 per day CMP for the period of July 23 through August 4, 2014, is in the mid-level of the range of penalties CMS could impose for deficiencies constituting immediate jeopardy.

The immediate jeopardy-level violation here evidenced wide-spread disregard for Resident 3's well-being, as well as that of the other facility residents, particularly those least able to defend themselves against abuse. The facility administrator disregarded facility policy, did not conduct a thorough investigation, and did not immediately report the allegations of abuse or the facility's findings. In failing to do a thorough

investigation, the facility administrator was not able to sufficiently and immediately rule out that there was no abusive incident or also that there was a perpetrator at large. I find a high level of culpability in the facility's omissions.

Petitioner argues that its compliance history does not support the penalties because the facility had not previously been penalized for noncompliance. P. Pre-Hrg. Br. at 23; P. Ex. 3 at 8 ¶ 63. Even if that may be true, the seriousness of Petitioner's noncompliance and its culpability here are sufficient to justify the penalty amounts.

Petitioner also argued that the amount of the CMP would present a financial hardship and would place its facility at risk of closure. P. Ex. 4 ¶ 27; P. Pre-Hrg. Br. at 23-24; P. Br. at 15-16; P. Reply at 9; P. Ex. 15. Petitioner offered the affidavit of the President and Chief Operating officer of Axiom Healthcare Services (Axiom President), an administrative support services company that provided services to Petitioner since Petitioner opened in January 2013, in support of its position that it is unable to pay the CMP. P. Ex. 4 at 1 ¶¶ 3-5. The Axiom President states that he is also a member of Petitioner's governing body. *Id.* at ¶ 6. In his affidavit, he references various financial documents that he included with his statement, including Petitioner's *Independent Auditor's Report* for the period ending December 31, 2013, stating that the report best represents Petitioner's "dire financial position." *Id.* at 3 ¶ 20; *see Id.* at 7-33. He explains that the report shows that in 2013, Medicare reimbursements account for 78% of Petitioner's revenue and that Medicaid reimbursements accounted for 11 % of Petitioner's total revenue. The Axiom President states that the "*Independent Auditor's Report* indicates that '[a] significant reduction in the level of this support, if it were to occur, might have a substantial effect on the company's activities." *Id.* at 3 ¶¶ 21-23 citing *Id.* at 26.

However, Petitioner submitted its *Profit and Loss Statement* ending in October 31, 2014, which covers a 10-month operating period. The statement shows that Petitioner's Medicare revenue, including Medicare A, B and Medicare Replacement A, for the 10-month period in 2014 was $3,478,809. P. Ex. 4 at 10-11. The total penalty here of $82,750 represents just 2.37% of the facility's gross Medicare revenues for a 10-month period, so I do not find this to be a substantial financial burden.

## IV. Conclusion

For the reasons set forth above, I sustain CMS's determinations. I find that Petitioner was not in substantial compliance with the participation requirement at 42 C.F.R. §§ 483.13(c), (c)(1)(i) and 483.13(c)(2)-(4), CMS's determination of immediate jeopardy

is not clearly erroneous, and the CMP imposed of $5,650 per day from July 23 through August 4, 2014, and the CMP of $300 per day from August 5 through September 4, 2014, are reasonable.

*[signature]*
Joseph Grow
Administrative Law Judge