**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JOHN PAUL ODHUNO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| REED'S COVE HEALTH AND REHABILITATION, | ) | Case No. 15-1347-EFM-GEB |
| LLC d/b/a AVITA; AXIOM HEALTHCARE | ) | |
| SERVICES, LLC; AUDREY SUNDERRAJ; | ) | |
| CAROL SCHIFFELBEIN; CHRISTAN ROSE; | ) | |
| TERESA FORTNEY; TREVA BANUELOS; | ) | |
| and TIM KECK, in his official capacity as Secretary | ) | |
| of the Kansas Department for Aging and Disability | ) | |
| Services, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**PLAINTIFF ODHUNO'S RESPONSE OPPOSING DEFENDANT ROSE'S**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

The plaintiff, John Paul Odhuno, by and through his attorneys, Edward L. Keeley and Katy E. Tompkins of McDonald Tinker PA, submits this memorandum in opposition to the summary judgment motion filed by defendant Christan Rose. (Doc. 105, 106) Rose is one of six defendants in this case who are or were employees of the Kansas Department of Aging and Disability Services (KDADS). All six of the KDADS defendants (Rose, Sunderraj, Schiffelbein, Fortney, Banuelos, and Keck) have filed a joint summary judgment motion. (<u>Id.</u>) These dispositive motions are entirely premature because depositions of only two of these defendants have been taken and not all relevant documents have been produced by KDADS. This response to defendant Rose's summary judgment motion is being filed because Rose's deposition has been taken and it clearly shows that her dispositive motion is wholly without merit. In fact, Rose's deposition and the documents which plaintiff has

obtained in discovery thus far clearly show that Rose is liable to plaintiff on the federal and state claims alleged.  For all of the reasons discussed below, defendant Rose's summary judgment motion should be overruled.  Plaintiff will be filing a separate Rule 56(d) motion and declaration to defer consideration of the other KDADS defendants' motions until necessary discovery has been conducted.

## I.   PLAINTIFF'S CLAIMS AND THE PROCEDURAL HISTORY OF THIS CASE SO FAR

Plaintiff Odhuno filed his original Complaint on November 3, 2015, but did not serve any of the defendants with process.  (Doc. 1)  Plaintiff filed his First Amended Complaint on February 25, 2016.  (Doc. 3)  The named defendants (which included defendants Sunderraj and Schiffelbein[1] but not Rose, Fortney, or Banuelos) in that pleading were served with process and filed Answers.  In short, plaintiff alleged that plaintiff (a Certified Nurse Aide employed by defendant Avita, an adult care facility) was falsely accused of abusing a nursing home resident (identified as #3 or G.C.) in July 2014 and that an investigation by Avita found no evidence of any abuse of the resident by anyone.  Plaintiff further alleged that employees of the Kansas Department for Aging and Disability Services (KDADS), however, forced Avita to fire plaintiff (ignoring the fact that no abuse ever occurred) which made plaintiff unemployed and unemployable as a CNA or in any related elder care jobs.

In Count I of his First Amended Complaint, plaintiff asserted a Title VII cause of action (plaintiff is a black man with Kenyan ancestry) against defendant Avita.  (Doc. 3 at 15)  Count II alleged a § 1981 cause of action against defendants Avita and Axiom (Axiom provided management services to Avita).  (Doc. 3 at 17)  Count III asserted § 1983 claims based on alleged constitutional violations by KDADS employees, defendants Sunderraj and Schiffelbein.  (Doc. 3 at 18)  Count IV alleged a § 1983 cause of action against the Secretary

---

[1] Defendant Carol Schiffelbein's name has since changed to Carol Jackson.  To avoid confusion, she will still be referred to herein as Carol Schiffelbein.

of KDADS (Tim Keck) in just his official capacity in which plaintiff sought only declaratory and equitable relief.  (Doc. 3 at 21)  Count V alleged the state-law tort of outrage against KDADS defendants Sunderraj and Schiffelbein, as well as (on different grounds) against defendants Avita and Axiom.  (Doc. 3 at 23)

On March 22, 2016, KDADS defendants Keck, Sunderraj, and Schiffelbein filed a joint Answer to the First Amended Complaint.  (Doc. 16)  Both Sunderraj and Schiffelbein admitted in their Answer that they were employed by KDADS and that they acted within the scope of that employment during all times relevant to this case.  (Id. at 2-3)

On March 31, 2016, defendant Avita filed its Answer to plaintiff's claims which stated affirmatively in part:

> In July 2014, Avita investigated a complaint of abuse involving one of its residents.  The resident was 87 years old and suffered from dementia and macular degeneration with psychosis and chronic delusions.  Through a reasonable and thorough investigation, Avita found no evidence to corroborate any of the resident's allegations.  In contrast, Avita found evidence that directly refuted some of the resident's allegations.  Based on these findings, Avita concluded that the alleged abuse had not occurred.  Of particular relevance to this lawsuit, Avita was unable to identify an alleged abuser as the resident could not identify that individual by name or provide enough of a description for Avita to be able to identify him.  The only identifying information provided to Avita was that the alleged abuser was a black male nurse and Avita employs many black male nurses.

> About one week later, pursuant to a separate complaint, the Kansas Department of Aging and Disability Services ("KDADS") commenced a compliance investigation (known as a "survey") of Avita that was focused on the same abuse allegations that Avita had just recently investigated.  Despite a dearth of evidence in support of any of the resident's allegations, and in the face of credible evidence directly refuting some of those allegations, KDADS not only determined that the alleged abuse had occurred, but KDADS also determined that Plaintiff was the employee responsible for it.  Avita tried to explain to KDADS why it believed the agency's findings were flawed, but KDADS would not budge from its position.

> Based on its determination, KDADS brought the full weight of its statutory and regulatory authority to bear.  KDADS found that Avita's continued employment of Plaintiff placed Avita's residents' health and safety

3

in "immediate jeopardy."  In addition to substantial monetary penalties, the "immediate jeopardy" finding triggered a countdown commanded by the federal regulations that govern the receipt of federal and state funding (*i.e.* Medicare and Medicaid) by skilled nursing facilities, like Avita.  In short, if Avita did not take steps to abate the "immediate jeopardy," within 23 days one of two events would occur: either KDADS would step in and take over management of the facility, at which time it would take steps on its own to abate the immediate jeopardy, or Avita would become ineligible to receive government reimbursements, which amount to approximately two-thirds of Avita's annual revenues.  *See* 42 C.F.R. § 488.410.  KDADS was crystal clear in its mandate.  The only way it would remove the "immediate jeopardy" finding was if Avita terminated Plaintiff's employment.  With the proverbial gun to its head, Avita made the tough decision to discharge Plaintiff.

(Doc. 19 at 1-2)

Defendant Avita has subsequently supported its contentions through sworn interrogatory responses and the deposition testimony of two key witnesses, Vanessa Underwood of Avita and Kim Summers of Axiom, as well as documents produced by Avita and Axiom.

Written discovery commenced after the First Amended Complaint, and plaintiff's counsel then learned that defendants Sunderraj and Schiffelbein were KDADS supervisors involved in this matter, but they had not actually gone to Avita for the abuse investigation (which KDADS called a survey).  It was learned that defendants Rose, Fortney, and Banuelos were the KDADS employees who conducted the investigation on-site at Avita.  For that reason, plaintiff requested and was allowed to file his Second Amended Complaint which added Rose, Fortney, and Banuelos as named defendants.  (Doc. 40)  That pleading was filed on July 1, 2016.  (Id.)  All of plaintiff's claims remained the same except that the new defendants were added to Count III (§ 1983 cause of action) and Count V (tort of outrage).  (Id. at 19, 24)

On July 22, 2016, KDADS defendants Rose, Fortney, Banuelos, Keck, Sunderraj, and Schiffelbein filed an unopposed motion for a 30-day extension to file an Answer to plaintiff's Second Amended Complaint.  (Doc. 51)  One of the reasons given for the requested extension was that the KDADS individual defendants might be considered federal employees

(entitled to federal representation) because of a contract between the State of Kansas and a federal agency, HHS (or CMS), regarding Medicare funding and surveys of state-licensed nursing homes.  (Id. at 2)  That extension was granted.

On August 26, 2016, the individual KDADS defendants Rose, Fortney, Banuelos, Sunderraj, and Schiffelbein filed a second motion for extension (this time for 60 days) in which to file an Answer.  (Doc. 61)  That motion indicated that they would likely receive federal representation.  On August 30, 2016, a hearing was held by Magistrate Judge Birzer. (Doc. 62)  During that hearing, plaintiff's counsel indicated that if those defendants were taking the position that they were acting under color of federal law, then plaintiff wanted an opportunity to add a Bivens cause of action to his pleadings.  Judge Birzer granted plaintiff's request and set December 9 as the deadline for defendants' Answers to plaintiff's Third Amended Complaint.  (Doc. 62)

On September 9, 2016, plaintiff filed his Third Amended Complaint.  (Doc. 64)  The only change to plaintiff's prior pleadings was the addition of Count VI which was a Bivens cause of action against defendants Rose, Fortney, Banuelos, Sunderraj, and Schiffelbein.  (Id. at 24-26)  Plaintiff prefaced his Bivens claim by stating that it was brought because these defendants "apparently do or will contend that they were acting, at least in part, under color of federal law during the relevant period of this lawsuit."  (Id.)  Plaintiff did not assert an FTCA cause of action in the Third Amended Complaint (or in any prior pleading).  (Id.)

Defendants Rose, Fortney, Banuelos, Sunderraj, and Schiffelbein filed an Answer to the Third Amended Complaint on December 9, 2016, through an Assistant U.S. Attorney. (Doc. 74)  Their Answer admitted that they were acting within the scope of their employment as KDADS employees.  (Id.)  In paragraph 88 of their Answer, they stated that "to the extent they were individually involved in the case at all, [they] simply conducted an investigation and reported the findings under state and federal law."  (Id. at 9)  This assertion of acting in a dual function is reiterated in paragraph 108 of their Answer.  (Id. at 11)  These defendants

did not assert that they were acting solely in a capacity as federal employees or agents.  (Doc. 74)

Defendant Keck (Secretary of KDADS who is sued only in his official capacity) filed a separate Answer on December 9, 2016, to plaintiff's Third Amended Complaint.  (Doc. 73) Defendant Keck admitted in his Answer (on behalf of KDADS) that defendants Rose, Fortney, Banuelos, Sunderraj, and Schiffelbein were "during all times relevant" acting within the scope of their employment as KDADS employees.  (Id. at 2-3)  Defendant Keck further admitted that KDADS administers the licensing of nursing homes ("adult care homes"), the certification of nurses' aides (CNAs), and the CNA registry pursuant to Kansas law.  (Id. at 4-6)  In addition, defendant Keck admitted that KDADS has state statutory duties to investigate reports of elder abuse pursuant to K.S.A. 39-1401 et seq., as amended.  (Id. at 6)

On the same day, December 9, 2016, the Assistant U.S. Attorney filed a "notice of substitution" which sought to substitute the United States as a defendant in place of defendants Rose, Fortney, Banuelos, Schiffelbein, and Sunderraj.  (Doc. 75)  On December 29, 2016, plaintiff Odhuno moved for an order denying the requested substitution of the United States as a defendant.   (Doc. 80, 81)   Defendants Rose, Fortney, Banuelos, Schiffelbein, and Sunderraj, however, withdrew their request for a substitution on February 3, 2017, and their Assistant U.S. Attorney counsel withdrew.  (Doc. 88-90)

A scheduling order in this case was then entered on March 16, 2017.  (Doc. 94)  On March 22, 2017, plaintiff Odhuno served written interrogatories on defendants Rose, Fortney, Banuelos, Schiffelbein, and Sunderraj.  (Doc. 95)  Plaintiff also requested that the KDADS defendants produce their investigation documents and records in response to plaintiff's earlier First Request for Production of Documents.  Plaintiff's previous document request had been objected to by KDADS based on the argument that only the federal agency HHS (or CMS) could release the investigation file in this case pursuant to the "Touhy regulations" at 45 C.F.R. § 2.2(3).   The KDADS defendants continued to maintain that objection in March – April 2017.  Thus, on March 15, 2017, plaintiff Odhuno served CMS

with a business records subpoena to obtain a copy of the investigation file for the investigation at issue in this case.  (Doc. 96)

Some investigation documents and records were produced by CMS in mid-April 2017 and additional documents were produced by KDADS in May.  However, as shown by the depositions of KDADS defendants Rose and Sunderraj in June 2017, the KDADS/CMS document production is still incomplete.

In May 2017, the parties agreed that plaintiff Odhuno would take the depositions of defendant Rose (June 7), defendant Sunderraj (June 16), and the two key Avita/Axiom witnesses, Underwood and Summers (June 13).  (Doc. 100-103)  Defendant Avita would take the deposition of plaintiff (June 8).  (Doc. 104)  However, at 4:30 p.m. on June 6 (the afternoon before the first deposition, defendant Rose's) the KDADS defendants suddenly filed this summary judgment motion.  (Doc. 105, 106)  The KDADS defendants also filed a motion to stay discovery.  (Doc. 107)  In a conference call hearing that day, Magistrate Judge Birzer denied the KDADS defendants' motion to stay discovery with respect to the already scheduled depositions.  (Doc. 108)  Thus, the first scheduled depositions were completed in June 2017.   More depositions of key witnesses (defendant Schiffelbein, Fortney, and Banuelos, as well as witnesses Bragg, Parsons, and Bertelson) need to be taken.

On June 28, 2017, a Revised Scheduling Order was entered by Magistrate Judge Birzer.  (Doc. 112)  The new order calls for discovery through December 29, 2017, and a Final Pretrial Conference in January 2018.  (Doc. 112 at 2)

## II.  DEFENSES RAISED BY THE KDADS DEFENDANTS IN SUPPORT OF THEIR SUMMARY JUDGMENT MOTION

In support of their motion for summary judgment, defendant Rose and the other KDADS defendants raise the following defenses to plaintiff's federal claims:

1.     Plaintiff Odhuno lacks standing to sue them;

2.     Plaintiff fails to state a viable § 1983 or <u>Bivens</u> claim against them for violating plaintiff's constitutional rights to procedural due process and equal protection under the Fourteenth Amendment;

3.     The individual KDADS defendants are entitled to qualified immunity;

4.     Defendants Schiffelbein and Sunderraj (as supervisors) had no personal involvement in the alleged constitutional violations; and

5.     Eleventh Amendment immunity bars plaintiff's claim for injunctive relief against defendant Keck (in his official capacity).

(Doc. 106 at 15-28)

However, the KDADS defendants have blatantly ignored many uncontroverted material facts established by two of their own witnesses which are contrary to and indeed fatal to their various arguments and defenses.  Moreover, numerous genuine issues of material fact bar their motion under Fed. R. Civ. P. 56.  For all of these reasons, this Court should overrule defendant Rose's summary judgment motion.  Because additional discovery is necessary pursuant to Rule 56(d), plaintiff Odhuno will be filing a motion and declaration requesting the Court allow the discovery still needed in this case (including depositions of defendants Schiffelbein, Keck, Fortney, and Banuelos) before the Court considers the summary judgment motions of Sunderraj, Schiffelbein, Keck, Fortney, and Banuelos.

## III.   PLAINTIFF'S RESPONSE TO STATEMENT OF FACTS IN KDADS' SUMMARY JUDGMENT MOTION

1.     Uncontroverted.  However, the contract between the State of Kansas and HHS is irrelevant to this case except that it explains why the KDADS individual defendants were acting under color of both state and federal law.

2.     Uncontroverted, but irrelevant to KDADS' defenses in this case.

3.     Uncontroverted, but irrelevant to KDADS' defenses in this case.

4.     Uncontroverted, but irrelevant to KDADS' defenses in this case.

5.      Uncontroverted, but irrelevant to KDADS' defenses in this case.

6.      The second sentence of this purported fact is controverted.  During their investigation of the abuse allegation at issue in this case, the individual KDADS defendants did control the scope, procedure, method of analysis, and results of the investigation.  These defendants did <u>not</u> follow the relevant federal Medicare statute and regulations or the relevant state statutes and regulations regarding investigations of elder abuse.  (Rose Depo., pp. 37-39, 55-57, 69-77, 85, 94-95, 106-116, 151-155, 174-187, in Ex. 1.)   <u>See also</u> 42 U.S.C. § 1396r(g)(1)(C); 42 C.F.R. § 488.335; K.S.A. 39-1401 <u>et</u> <u>seq</u>.

7.      Controverted with respect to defendant Keck who is sued only in his official capacity pursuant to <u>Ex</u> <u>parte</u> <u>Young</u> for injunctive relief because of ongoing violations of plaintiff Odhuno's constitutional rights under the Fourteenth Amendment.   <u>See</u> Third Amended Complaint (Doc. 64 at 21-23).  Furthermore, to the extent it is implied, plaintiff Odhuno also controverts any suggestion in this "fact" that the KDADS individual defendants were acting (during the investigation at issue) solely "on behalf of CMS."  These defendants were acting under color of both state and federal law as they have readily admitted in their Answer and even in their summary judgment brief itself.  (Doc. 74 at 9, 11; Doc. 106 at 1)

8.      Uncontroverted.  However, defendants Sunderraj and Schiffelbein actively participated in and supervised the investigation conducted by defendants Rose, Fortney, and Banuelos.  (Rose Depo, pp. 35-37, 68-69, 85-87, 135-136, 162-163, in Ex. 1.)

9.      Controverted.  Defendant Keck is only sued in his official capacity pursuant to <u>Ex</u> <u>parte</u> <u>Young</u> for injunctive relief because of ongoing violations of plaintiff's constitutional rights.  <u>See</u> plaintiff Odhuno's response to No. 7 above.

10.      Controverted.  During the relevant time period (July – August 2014), defendant Rose was a KDADS employee in the position of Health Facility Surveyor I.  (Rose Depo, pp. 217-219, in Ex. 1.)

11.      Uncontroverted.  Rose was employed by KDADS, not CMS.  (Rose Depo, pp. 216-219, in Ex. 1.)

12.     Uncontroverted.

13.     Uncontroverted.

14.     Uncontroverted.

15.     Uncontroverted.

16.     Uncontroverted.   However, defendant Schiffelbein was also the Regional Director for the KDADS region which included Avita in Wichita, Kansas.  (Rose Depo., pp. 135-136, in Ex. 1.)

17.     Uncontroverted.

18.     Controverted.   Defendant Sunderraj's position was Director of Survey & Certification.  (Sunderraj Depo, p. 49, in Ex. 2.)

19.     Uncontroverted.

20.     Uncontroverted.

21.     Uncontroverted.

22.     Uncontroverted.

23.     It is controverted that the resident, G.C., alleged abuse by a CNA.   She alleged incidents involving a black male "nurse."  (Rose Depo, pp. 70-75, in Ex. 1.)

24.     Plaintiff controverts that the KDADS determination of "immediate jeopardy" was "based on Avita's failure to investigate a resident complaint and ensure residents were not subject to reasonably foreseeable harm."   Immediate jeopardy status for Avita was triggered because defendant Rose (and apparently defendant Banuelos) had determined that the alleged abuse had actually occurred and that a black male Avita employee had committed the abuse.  (Rose Depo, pp. 37-39, 55-56, 106-107, 145-155, 158, in Ex. 1.)  In addition, the "immediate jeopardy" determination was discussed with defendant Fortney and supervisors Schiffelbein and Sunderraj who approved it before it was announced to Avita.  (Rose Depo, pp. 85-87, 135-136, in Ex. 1.)

25.     Controverted.  Because of the insistence of defendant Rose, on July 31, 2014, Avita suspended all of its black male employees (including a facility cook) who were already

working on the second shift (2:00 p.m. – 10:00 p.m.) or were to work the third shift (10:00 p.m. – 6:00 a.m.) that night.  (Rose Depo, pp. 106-107, 151-155, in Ex. 1.)  Plaintiff Odhuno was one of the 12 black male employees suspended.  (Underwood Depo, pp. 74-77, 285-286, 342-344, in Ex. 3.)  Rose insisted that all black male employees be suspended rather than just black male nurses which would not have included plaintiff Odhuno or the cook.  (Rose Depo, pp. 106-107, 151-155, in Ex. 1; Underwood Depo, pp. 74-77, 285-286, 342-344, in Ex. 3.)

26.     Uncontroverted, but entirely incomplete.  Plaintiff Odhuno's employment with Avita was terminated on August 6, 2014, after defendants Rose and Sunderraj told Avita the day before of their finding that plaintiff Odhuno committed the alleged abuse.  Rose and Sunderraj also told Avita then that Avita's "immediate jeopardy" status (which included civil monetary penalties) would not be lifted unless Avita fired plaintiff.  (Rose Depo, pp. 109-116, 174-175, 178-189, in Ex. 1; Underwood Depo, pp. 99-108, 141, 377-378, in Ex. 3.)

27.     Uncontroverted, but immaterial to plaintiff's claims.

28.     Uncontroverted, but entirely incomplete.  Avita conducted two separate investigations of the resident's allegations which were first reported to Avita on July 23, 2014.  That investigation determined that no abuse had occurred and no Avita employees could even be identified by the resident as the alleged abuser.  (Underwood Depo, pp. 6, 80, 136-138, in Ex. 3; 1-13-15 Declaration of Vanessa Underwood, in Ex. 4; 5-12-15 Affidavit of Vanessa Underwood, in Ex. 5.)  The second Avita investigation began after KDADS proclaimed "immediate jeopardy" on July 31, 2014, and continued until August 5.  Again, Avita determined after an extremely thorough investigation that no abuse had occurred and no employee (including plaintiff) had committed any abuse.  (Id.)

29.     Controverted.  Defendants Rose and Sunderraj only rescinded Avita's "immediate jeopardy" status after Avita told them that plaintiff Odhuno's employment was being terminated.  (Rose Depo, pp. 109-116, 174-175, 178-189, in Ex. 1.)  Avita made the decision to fire plaintiff at approximately 5:00 p.m. on August 5, 2014, shortly after defendants Rose and Sunderraj told Avita that plaintiff's termination was the only way

"immediate jeopardy" would be lifted.  (Rose Depo, pp. 109-116, 174-175, 178-179, in Ex. 1.)  See also plaintiff's response to No. 26 above.

30.    Controverted because it is misleading and incomplete in the way stated by defendants.  The primary finding made collectively by all of the individual KDADS defendants was that plaintiff Odhuno had committed the abuse alleged by the resident.  (Rose Depo, pp. 94-95, 109-116, 174-175, 177-189, in Ex. 1.)  The secondary finding was that Avita had not complied with federal requirements regarding the reporting and investigation of abuse allegations.  (Rose Depo, pp. 42-44, 46-47, in Ex. 1.)  See also plaintiff's response to No. 26 above.

31.    Uncontroverted, but see plaintiff Odhuno's response to No. 30 above.

32.    Controverted.  The KDADS investigation both found and conveyed to Avita that plaintiff Odhuno had committed the abuse first alleged by the resident on July 23, 2014.  (Rose Depo, pp. 109-116, 174-175, 177-189, in Ex. 1.)  See also plaintiff's response to No. 26 above.

33.    Controverted.   KDADS (through defendants Rose, Fortney, Banuelos, Schiffelbein, and Sunderraj) did make a finding (without any credible evidence) that plaintiff Odhuno abused the resident as the resident alleged.  (Rose Depo, pp. 109-116, 174-175, 177-189, in Ex. 1.)  Defendants Rose and Sunderraj also conveyed that finding to Avita to force Avita into firing plaintiff without any legitimate reason.  (Id.)  See also plaintiff's response to No. 26 above.

34.    Uncontroverted, but entirely immaterial to plaintiff's claims.   The administrative appeal was pursued by Avita regarding the civil monetary penalties imposed on it.  (Underwood Depo, pp. 326-333, in Ex. 3.)  Plaintiff had no opportunity for a due process hearing before or after his termination which had been forced by KDADS and no avenue (except this lawsuit) to challenge KDADS' finding that he abused the resident.  (Id.)

35.    Uncontroverted, but entirely immaterial to plaintiff's claims.  See plaintiff Odhuno's response to No. 34 above.

36.     Uncontroverted, but entirely immaterial to plaintiff's claims against the KDADS defendants.

37.     Uncontroverted, but entirely immaterial to plaintiff's claims against the KDADS defendants.

38.     Uncontroverted.

39.     Uncontroverted.

40.     Uncontroverted.

41.     Uncontroverted.

42.     Uncontroverted, but incomplete.   Besides a declaratory judgment, plaintiff Odhuno also seeks injunctive relief against defendant Keck in his official capacity pursuant to Ex parte Young because of ongoing violations of plaintiff's constitutional rights.  (Doc. 64 at 21-23)  See also plaintiff's response to No. 7.

43.     Uncontroverted, although this assertion by the KDADS defendants is a paraphrase of ¶ 100 in plaintiff's Third Amended Complaint and not a direct quote. Plaintiff's requested injunctive relief in this case is stated more comprehensively in the prayer for relief at the conclusion of the Third Amended Complaint.  (Doc. 64 at 26-27)

44.     Uncontroverted, but see also ¶ 94 of the Third Amended Complaint.  (Doc. 64 at 21-22)

45.     Controverted in part.  Plaintiff Odhuno does not base his due process claims on the 8th Amendment.  (Doc. 64, ¶ 958, at 22)  Moreover, plaintiff does not challenge the KDADS policies and procedures involving "fraud" investigations.  (Doc. 64, Count IV, at 21-23)

46.     Uncontroverted, but incomplete.  Paragraph 88 in plaintiff's Third Amended Complaint alleges much more than this.  (Doc. 64 at 19-20)

47.     Uncontroverted, but incomplete.  Paragraphs 87 and 89 in plaintiff's Third Amended Complaint allege much more than this.

48.     Uncontroverted.

49.     Uncontroverted, but wholly incomplete.  KDADS is also required by K.S.A. 39-396(c)(4), as amended, to maintain an "unlicensed employee" registry which includes CNAs and would pertain to plaintiff Odhuno.  (Doc. 64, ¶¶ 50-51, at 11-12)  In addition, KDADS is required by K.S.A. 39-1411(a), as amended, to maintain an elder abuse report register containing the abuse reports received and investigated by KDADS, as well as "the findings, evaluations, and actions recommended."  (Doc. 64, ¶¶ 56-58, at 13-14)

50.     Controverted.  Although the public website for KDADS' CNA Registry shows that plaintiff Odhuno is "active," the KDADS defendants forced his employment termination by Avita based on their finding (without any credible evidence) that plaintiff abused the resident.  (Rose Depo, pp. 109-116, 174-175, 177-189, in Ex. 1; Underwood Depo, pp. 99-108, in Ex. 3; 8-5-14 Summers Notes, Rose Depo. Ex., in Ex. 6.)  Furthermore, KDADS' own records continue to show that this finding was made and conveyed to Avita.  (Rose Depo, pp. 53-55, 142, in Ex. 1; 8-13-14 Investigation Report in Ex. 7; Alleged Perpetrator Information Form, in Ex. 8.)

51.     Uncontroverted, but immaterial.  Plaintiff was never charged criminally of abuse regarding the resident, let alone convicted.

52.     Uncontroverted, but incomplete.  Paragraph 90 in plaintiff's Third Amended Complaint alleges much more than this.  (Doc. 64 at 20-21.)

53.     Uncontroverted, but incomplete.  Paragraph 90 in plaintiff's Third Amended Complaint alleges much more than this.  (Doc. 64 at 20-21.)


IV.     STATEMENT OF PLAINTIFF'S ADDITIONAL UNCONTROVERTED
        MATERIAL FACTS

1.      In July and August 2014, defendant Christan Rose was employed by the Kansas Department of Aging and Disability Services (KDADS) as a surveyor.  (Rose Depo, pp. 9-11, in Ex. 1.)

2.      One of Rose's duties was performing complaint surveys which consisted of doing investigations regarding alleged abuse, neglect, or exploitation (ANE) of elderly residents in adult care homes in Kansas licensed by KDADS.  (Rose Depo, pp. 9-11, in Ex. 1.)

3.      Rose was employed by KDADS, but she was also federally certified by the Center for Medicare and Medicaid Services (CMS) to do surveys.  KDADS has a contract with CMS to conduct surveys in Kansas adult care homes which receive Medicare or Medicaid funds.  (Rose Depo, pp. 22, 28, in Ex. 1.)

4.      Pursuant to her KDADS job description, Rose was a Health Facility Surveyor I.  Rose's immediate supervisor was the Regional Manager, defendant Carol Schiffelbein. Part of Rose's job duties were to "[c]onduct surveys according to the federal State Operations Manual and state statutes or directives."  She was also to maintain a "working knowledge of state and federal regulations and apply them accurately to the survey process." Regarding investigations of complaints, she was to complete written reports "and make recommendations as required in a manner appropriate to substantiate findings of investigations."  (Rose Depo, pp. 217-219, in Ex. 1; Rose Job Description, Rose Depo Ex., Bates Nos. 1966-1969, in Ex. 9.)

5.      Rose is not paid by CMS for the investigations she does for CMS; she is an employee of and paid by the State of Kansas (KDADS).  (Rose Depo, p. 216, in Ex. 1.)

6.      As required by her KDADS employment, Rose signed an oath to "support the constitution of the United States and the constitution of the State of Kansas, and faithfully discharge the duties of her office."  (Rose Depo, pp. 218-219, in Ex. 1; Kansas Employee's Oath, Rose Depo Ex., Bates No. 1979, in Ex. 10.)

7.      After an investigation she conducts, Rose usually discusses with her immediate supervisor whether Rose believes an allegation of abuse is substantiated or not substantiated.  Rose and her supervisors make a "consensus decision" as to that finding

which is then discussed with the facility at a "findings meeting."  (Rose Depo, pp. 26-28, 33-35, in Ex. 1.)

8.      If an "alleged perpetrator" (AP) has been identified and Rose believes the evidence substantiates that the AP committed the substantiated abuse, then Rose also usually discusses her belief and the evidence with defendant Audrey Sunderraj, a higher level supervisor within KDADS.  (Rose Depo, pp. 35-37, in Ex. 1.)

9.      If the alleged perpetrator is still employed, then Rose (or someone from KDADS) will read a prepared warning statement to the facility indicating that KDADS has "strong evidence" to believe the alleged perpetrator has committed the abuse or "strong evidence" to show a high probability that residents are still at risk.  (Rose Depo, pp. 36-39, in Ex. 1.)

10.     An adult care home (like Avita) is not allowed to employ anyone who has committed abuse of a resident.  (Rose Depo, p. 39, in Ex. 1.)

11.     On July 31, 2014, Rose arrived at the Avita facility to begin an investigation at about 7:00 a.m. regarding the reported abuse of resident G.C.  (Rose Depo, p. 51, in Ex. 1.)

12.     On that date, Rose talked to resident G.C. regarding the allegation that G.C. had been abused.  Rose took notes and then prepared a handwritten statement for G.C. to sign.  Although notarized by Rose herself, the written statement was not a sworn affidavit.  (Rose Depo, pp. 66-67, 69-70, in Ex. 1; 7-31-14 Written Statement of Resident G.C., Rose Depo Ex., in Ex. 11.)

13.     The written statement of resident G.C. states in pertinent part:

> I don't want to cause any problems and I don't have any proof but there has been someone abusing me.  It hasn't happened for a while but it has gone on for the last couple of months, since the Spring.  It is a black man and he tells me he is a nurse.  My son stayed all night not too long ago and the black man tried to come in then, but I think it scared him away when he saw my son.  For 3 days after that, he stayed away.  He always had an excuse that he was checking on something to be sure I didn't fall.  I know my memory is not very good, but I know what

happened to me.  He would come in my room late at night without knocking and say he was trying to see if my pants were wet and he would touch my bottom.  I'm not making it sound as bad as it actually was.  One time on a weekend when there wasn't anyone else around, on a holiday, he took me outside and rolled me around on the ground.  I don't know what he was trying to do.  I hit him on the arms and it made him mad and he finally gave up.  He has come back and tried to do it again and I have fought him off.  I lay there every night scared that he will come back.  He would tell me it will make me feel good and it was healthy for me.  I hate to think what else he would have done if I hadn't fought him off. … It has gone on for a couple of months and there were a lot of times he came in and messed with me.  I was very scared every time I saw him.  I have lost so much sleep over this.

(Rose Depo, pp. 70-75, in Ex. 1; 7-31-14 Written Statement of Resident G.C., Rose Depo, Ex., in Ex. 11.)

14.     In response to deposition questioning regarding resident G.C.'s statement, Rose has testified under oath:

> Q.     Without getting into who did it but just that abuse – she had been abused for the last couple of months since the spring which she apparently told you?
> A.     We don't have concrete evidence, I don't have concrete evidence that abuse occurred.
> Q.     At all?
> A.     At all.

(Rose Depo, p. 71, in Ex. 1.)

15.     Rose also admits that plaintiff Odhuno was not a nurse like the person described in resident G.C.'s statement.  (Rose Depo, p. 71, in Ex. 1.)

16.     Rose doesn't recall whether resident G.C. wore incontinent briefs for a period of time in July 2014.  (Rose Depo, pp. 72-73, in Ex. 1.)  Resident G.C. did wear incontinent briefs for some of that period.  (Underwood Depo, pp. 115-118, 265-266, in Ex. 3.)

17.     Rose admits that she did not find any evidence during her investigation to support the allegation that someone rolled resident G.C. on the ground outside the facility.

Rose further admits that Avita told Rose that surveillance camera recordings had been checked and nothing like that had happened.  (Rose Depo, pp. 73-74, in Ex. 1.)

18.    When questioned further regarding the specific act or acts of abuse, Rose testified under oath:

> Q.    And based on what evidence you had obtained – well, let me strike that.  What specific act or acts of abuse occurred?
> A.    I don't have any evidence to say abuse did occur.
> Q.    But you find that it's substantiated?
> A.    The allegation was substantiated.
> Q.    In what way?
> A.    Regardless of whether abuse actually happened or not, Grace Cornett suffered emotional distress because of the facility's failure to protect her after she made an allegation of abuse.  That substantiates the allegation.

(Rose Depo, pp. 74-75, in Ex. 1.)

19.    In response to a question regarding the rights of facility staff accused of abuse, Rose testified under oath:

> Q.    Do you have any – any responsibility or thought about protecting employees of the facility who are accused of abuse?
> A.    My job as a federal surveyor is to protect the residents.  My concern is not with protecting staff.  It's the concern with the residents.  The regulations are geared toward the residents and keeping the residents safe.

(Rose Depo, p. 77, in Ex. 1.)

20.    The Avita facility is divided into four different living areas (called "houses") which are connected to each other by hallways.  Resident G.C.'s room was in the Saghbene house.  (Rose Depo, pp. 91-93, in Ex. 1; Avita Diagram, Rose Depo Ex., in Ex. 12.)

21.    Rose says she interviewed G.C.'s son, John Bertelson, during the investigation but that was by phone.  She does not recall what day she spoke to him.  Bertelson told Rose that he had not seen any physical evidence of abuse; he had only heard his mother make the allegations.  (Rose Depo, pp. 96-97, 100, in Ex. 1.)

22.     Rose testified that even if Bertelson had told Rose he didn't believe abuse had occurred, it would not have made a difference in Rose's investigation or findings:

> Q.     What if Mr. Bertelson when you talked to him on the phone during your investigation had said like he says in his affidavit that he doesn't believe the alleged abuse ever happened?
> A.     You said what if?
> Q.     Yeah.
> A.     Would it have changed my investigation?
> Q.     Yeah, in any way?
> A.     No.  The facility still would have been cited for the failure to protect the resident after an allegation was made. Whether the allegations are true or false has no bearing on whether or not – or on the facility's responsibility to protect the resident.

(Rose Depo, p. 102, in Ex. 1.)

23.     Rose's investigation report shows that the "alleged perpetrator" warning and "immediate jeopardy" warning was given to Avita at approximately 3:30 p.m. on July 31. (Rose Depo, pp. 142-145, 150, in Ex. 1; 8-13-14 Investigation Report, Rose Depo Ex., p. 10, in Ex. 7.)

24.     When Rose read the warning statement to Avita's administrator, Vanessa Underwood, Rose identified plaintiff, Paul Odhuno, as the alleged perpetrator.  Rose told Avita's administrator then that there was "strong evidence" plaintiff committed the alleged abuse.  (Rose Depo, pp. 37-39, 55-56, in Ex. 1.)

25.     In an email thread right before Avita was advised of its "immediate jeopardy" status that day, Rose and defendant Banuelos flippantly joked about dropping "the bomb" on Avita.  (Rose Depo, pp. 145-150, in Ex. 1; 7-31-14 Rose/Banuelos Email Thread, Rose Depo Ex., in Ex. 13.)

26.     "Immediate jeopardy" refers to a situation in which resident safety is in jeopardy.  It means that something needs to be removed immediately for residents to be safe

or something needs to be done immediately to make them safe.  (Rose Depo, pp. 203-204, in Ex. 1.)

27.    After the "immediate jeopardy" status was declared, Rose discussed with Underwood, Avita's administrator, the suspension of all black male employees, including a cook, whether or not they had ever provided care for resident G.C.  Shortly after that meeting with Rose on July 31, Avita suspended all of its black male employees because of Rose's insistence.  However, that did not abate the IJ status.  (Rose Depo, pp. 151-155, 158, in Ex. 1; Underwood Depo, pp. 74-77, 285-286, 342-344, in Ex. 3.)

28.    Despite resident G.C.'s allegation that it was a black male "nurse" who had committed the alleged abuse, Rose insisted that the suspension be broadened from just black male nurses to all black male employees.  (Rose Depo, pp. 106-107, in Ex. 1; Underwood Depo, pp. 74-77, 285-286, 342-344, in Ex. 3.)

29.    On August 5, 2014, at approximately 4:22 p.m., a meeting was held at Avita in which defendant Rose appeared in person and defendant Sunderraj (KDADS supervisor) participated by telephone.  Also attending were representatives of defendant Avita and defendant Axiom Healthcare Services, LLC ("Axiom").  (Rose Depo, pp. 109-116, in Ex. 1.)

30.    Shortly before the August 5 meeting with Avita and Axiom, Rose called Sunderraj and discussed the completion of Avita's parallel investigation into resident G.C.'s abuse allegations which had not found that abuse had occurred or that plaintiff Odhuno was involved.  (Rose Depo, pp. 164-166, 186-187, in Ex. 1.)

31.    The purpose of the August 5 meeting was for Rose and Sunderraj to find out how Avita was going to abate its "immediate jeopardy" status announced by KDADS on July 31.  Going into that meeting, Avita had rearranged staffing so that no male staff (including Odhuno) would work in resident G.C.'s house (Saghbene).  However, that was not sufficient for Rose and Sunderraj.  (Rose Depo, pp. 109-116, in Ex. 1.)

32.    Rose admits that near the end of that meeting, the following conversation took place or words to this effect:

> Audrey (Sunderraj) then asked Christan (Rose) if she had
> anything else?  Christan said, "No, nothing else, other than my
> concern for the resident."  Audrey then stated she was not sure
> that moving him (sic) to a different house was an effective
> intervention because that placed the other residents at risk.
> Christan then asked Vanessa (Underwood, Avita's
> Administrator) "How can you be 100% certain this did not
> happen?"  Kim (Summers of Axiom) asked "How can you be
> 100% certain that it did?"  Audrey then said "We are done.  We
> have shared with you that we are very concerned.  Your IJ
> (immediate jeopardy) status will be determined by the decisions
> you make regarding this employee (Odhuno)."  Christan said
> again "We will let you know the status of your IJ when you let
> us know the status of his suspension.  Actually, his
> employment."  Christan then left the room and the phone call
> with Audrey was ended.

(Rose Depo, pp. 109-116, in Ex. 1; 8-5-14 Summers Notes, Rose Depo Ex., in Ex. 6;
Underwood Depo, pp. 99-108, 141, 377-378, in Ex. 3.)

33.    During the August 5 meeting, Rose and Sunderraj conveyed to Avita that they
believed the residents in the other houses were "at risk" from plaintiff Odhuno.  However,
Rose admits that her investigation had not substantiated that plaintiff had ever committed any
abuse.  (Rose Depo, pp. 109-116, in Ex. 1.)

34.    It was clear from the statements of Rose and Sunderraj during the August 5
meeting that Avita's "immediate jeopardy" status would not be lifted by KDADS unless
plaintiff Odhuno's employment was terminated.   (Rose Depo, pp. 109-116, in Ex. 1;
Underwood Depo, pp. 99-108, 141, 377-378, in Ex. 3.)

35.    Despite having no "concrete" evidence that actual abuse had occurred or that
plaintiff Odhuno was in any way involved, Rose thought it was insufficient for Avita to
allow plaintiff to come back to work at other Houses because of Rose's fear that other
residents might be "at risk."  (Rose Depo, pp. 178-181, in Ex. 1.)

36.    At the time of the August 5 meeting with Avita and Axiom, Rose had not
concluded that any abuse had actually occurred regarding resident G.C.:

> No.  I had come to a conclusion that whatever was happening,
> the resident was afraid and had suffered – she was obviously
> traumatized by whatever happened.  Whether it was perceived
> or real, she was in distress.

(Rose Depo., pp. 174-175, in Ex. 1.)

37.    That is why Rose said to the Avita and Axiom officials at the August 5
meeting that whether Avita's IJ status was rescinded depended on what Avita did regarding
plaintiff Odhuno's employment (i.e., whether Avita terminated him or not).  (Rose Depo, pp.
181-187, in Ex. 1.)

38.    Rose's own investigation report states the following regarding the August 5
meeting with Avita and Axiom officials:

> On 8/5/14, at 4:45 p.m., this surveyor with Audrey Sunderraj via
> speakerphone, talked with the facility about our concerns and
> told them the results of our investigation revealed strong
> evidence the alleged perpetrator was Paul Odhuno, CNA.  The
> facility decided they needed to discuss the matter and came to
> this surveyor at 5:00 p.m. and reported the facility had
> terminated the A.P.  The immediate jeopardy was abated at this
> time.

(Rose Depo, p. 142, in Ex. 1; 8-13-14 Investigation Report, Rose Depo Ex., p. 14, in Ex. 7.)

39.    Shortly after that meeting on August 5, a representative of Axiom told Rose
that plaintiff Odhuno's employment with Avita was being terminated.  (Rose Depo, pp. 188-
189, in Ex. 1.)

40.    The next day, August 6, 2014, Rose again had a conversation with Avita's
administrator and two representatives of Axiom.   During that discussion, an Axiom
representative asked Rose the following question and Rose gave the following answer:

> So we're going to terminate Paul without knowing exactly what
> he did & without interviewing him?  *Yes.  Because it doesn't
> matter what he did because she believes it happened.  He has
> caused her harm.  It will be in the written report, that this is an
> IJ because he caused harm.*

(Underwood Depo, pp. 338-340, 348-352, in Ex. 3; 8-6-14 Bragg Notes, Underwood Depo. Ex., in Ex. 14.)

41.     Rose was on-site at Avita when this August 6 conversation occurred.  Rose was told that plaintiff Odhuno would be there in a short time for his termination meeting. Rose, however, made no attempt to interview him or give him any opportunity to respond to the allegations while both he and she were at Avita.  (Underwood Depo, pp. 348-349, in Ex. 3; Rose Depo, pp. 56-57, 85, in Ex. 1.)

42.     Rose never talked to or interviewed plaintiff Odhuno during her investigation despite identifying him as the alleged perpetrator.  Rose claims that she attempted to contact plaintiff by phone but she doesn't recall the dates or times.  She also doesn't recall if she left him a message but that isn't something she generally does.  Rose also doesn't recall why she did not try to contact plaintiff during the time he was at work at Avita.  (Rose Depo, pp. 56-57, 85, in Ex. 1.)

43.     Rose believes the federal regulations only require that she "attempt" to interview the alleged perpetrator.  (Rose Depo, p. 57, in Ex. 1.)

44.     Rose doesn't recall if she interviewed G.C.'s doctor and treating nurse regarding the resident's dementia diagnosis and other medical and physical conditions. (Rose Depo, p. 70, in Ex. 1.)  In fact, Rose did not interview them.  (5-5-15 Affidavit of Dr. Lakin, in Ex. 20; 5-7-15 Affidavit of APRN Tan, in Ex. 21.)

45.     On July 31, the first day of the investigation, Rose was at Avita from 7:00 a.m. to approximately 7:30 p.m. (Rose Depo, pp. 209-212, in Ex. 1; Survey Team Time Sheet, Rose Depo Ex., in Ex. 15.)

46.     During the investigation, Rose did not have any communication with anyone at CMS.  (Rose Depo, pp. 41-42, in Ex. 1.)

47.     KDADS investigators (including Rose) were on-site at Avita on July 31 and August 1, 5, and 6.  Rose was on-site on each of those dates except August 1.  (Rose Depo, pp. 124-125, in Ex. 1.)

48.   Rose also testified as follows regarding the results of her investigation:

> Q.   So you did not substantiate that Miss Cornett's buttocks had been touched inappropriately by staff member?
> A.   I had no concrete evidence to show that happened.
> Q.   Okay.   Did you ever have any concrete evidence to substantiate that some staff member had looked into her room at night and grinned at her?
> A.   I did not.
> Q.   That was one of her allegations, wasn't it?
> A.   Yes.

(Rose Depo, pp. 94-95, in. Ex. 1.)

49.   In her investigation report, Rose wrote: "Based on observation, interview, and record review, the allegation of abuse was substantiated."  For Rose to make a finding of "substantiated," it did not matter whether the alleged abuse had actually occurred:

> As I said, whatever happened to her, she was obviously traumatized, whether it was perceived or actual events.  I do not have concrete evidence nor is there anywhere in here that says, yes, she was abused.

(Rose Depo, p. 177, in Ex. 1.)

50.   Rose completed and signed a Complaint Processing Form on August 11, 2014. (Rose Depo, pp. 51-53, in Ex. 1; 8-11-14 Complaint Processing Form, Rose Depo Ex., in Ex. 16.)

51.   The Complaint Processing Form has a space to refer a matter to the KDADS legal department for further investigation regarding an alleged perpetrator of abuse.  Rose did not refer the allegation regarding plaintiff Odhuno to the KDADS legal department for additional investigation and possible criminal charges.  Thus, the legal department never reviewed her investigation or findings.  (Rose Depo, pp. 229-236, in Ex. 1.)

52.   Rose would have discussed with her supervisor, defendant Schiffelbein, whether or not to refer the allegation against plaintiff Odhuno to the KDADS legal department for additional investigation.  (Rose Depo, pp. 238-240, in Ex. 1.)

53.     Rose denies completing the Alleged Perpetrator Information Form in the record which is undated and unsigned but which was produced pursuant to a business records subpoena that plaintiff served on CMS in this case.  Plaintiff Odhuno is identified as the alleged perpetrator on this form.  It also shows that his Avita employment was terminated on August 5, 2014.  (Rose Depo, pp. 53-55, in Ex. 1; Alleged Perpetrator Information Form, Rose Depo Ex., in Ex. 8.)

54.     After her investigation, Rose wrote out "the deficiencies" which she found regarding Avita and those deficiencies were incorporated into the Statement of Deficiencies (CMS form 2567) which was dated August 14, 2014.  One of Rose's findings was that "the facility failed to protect resident [G.C.] from abuse and mental anguish."  (Rose Depo. pp. 42-44, 46-47, in Ex. 1; 8-14-14 Statement of Deficiencies, Rose Depo Ex., p. 1, in Ex. 17.)

55.     Less than three weeks after the investigation concluded with the Statement of Deficiencies, Mr. Bertelson (G.C.'s son) signed a sworn affidavit which stated in pertinent part:

> 3.   That on September 1, 2014, Labor Day, my daughter and I visited with my mother and then spoke with Vanessa Underwood, facility administrator.
>
> 4.   That I informed Ms. Underwood that my mother reported to me and my daughter that the whole incident involving a black man was just a dream and she knows that now.
>
> 5.   That I observed that her mind is clear now and she realizes that she was confusing a dream with reality.
>
> 6. That I am <u>very</u> upset that the employee, Paul, lost his job.
>
> 7.   That I am giving this statement under oath to rectify this situation and clear Paul's name.
>
> 8.   That my mother decided on her own that the incident never happened and no one prompted her to reach this decision.

(Rose Depo, pp. 98-99, in Ex. 1; 9-2-14 Bertelson Affidavit, Rose Depo Ex., in Ex. 18.)

56.     Mr. Bertelson's affidavit was presented to KDADS on September 2, 2014, but KDADS ignored it.  (Underwood Depo, pp. 80-85, 185-187, in Ex. 3.)

57.     Mr. Bertelson subsequently signed another sworn affidavit regarding his communication with defendant Rose during the investigation.   That affidavit states in pertinent part:

> 9.     During the Kansas Department of Health and Environment's (sic) survey of the facility in July and August 2014, I spoke with the surveyor on one occasion regarding my mother and the allegations.
>
> 10.    That conversation solely related to my mother's allegation that a black male nurse rolled her around in the grass. During that conversation, the surveyor did not question me about any allegations involving inappropriate touching.
>
> 11.    On September 1, 2014, my daughter and I visited with my mother.  During our conversations, my mother reported to me (and my daughter) that the whole incident involving a black man was just a dream and she knows that now.

(Rose Depo, pp. 100, in Ex. 1; 5-10-15 Bertelson Affidavit, Rose Depo Ex., in Ex. 19.)

58.     Because of KDADS' completely false finding that he had abused an Avita resident, plaintiff Odhuno has been unable to obtain work as a CNA since his termination by Avita.  (Odhuno Depo, pp. 34-35, 140-142, 241-242, 251-252, in Ex. 22.)

## V.     ARGUMENTS AND AUTHORITIES

In their summary judgment motion, the KDADS defendants disingenuously contend that they had nothing to do with plaintiff Odhuno's employment termination by Avita.  The KDADS defendants assert that they made no finding that plaintiff had abused the Avita resident and that plaintiff's termination was solely Avita's unrelated decision.  As can be seen by the depositions taken so far, however, nothing could be further from the truth. Defendant Rose has admitted under oath to finding plaintiff guilty of abuse and conveying that finding to representatives of Avita and Axiom on August 5, 2014.   It is also

uncontroverted that Rose conveyed the same finding to Avita and Axiom representatives on August 6.   Plaintiff was not fired until defendants Rose and Sunderraj made it clear on August 5 that his termination was the only way Avita could lift the KDADS-imposed "immediate jeopardy" status.   It is also uncontroverted that plaintiff was never given notice or an opportunity to respond to the abuse allegation against him (before or after his firing) by means of a hearing or even an interview.   See Plaintiff's Statement of Uncontroverted Facts in Section IV above.

## A. THE KDADS DEFENDANTS DID NOT COMPLY WITH THE DUE PROCESS SAFEGUARDS BUILT INTO THE MEDICARE STATUTE AND FEDERAL REGULATIONS.

The federal Medicare statute requires due process be given to nurse aides (like plaintiff Odhuno) if they are accused of abuse by residents at adult care homes receiving Medicare and/or Medicaid funding.   42 USC § 1396r(g)(1)(C).   "The State shall, after notice to the individual involved and a reasonable opportunity for a hearing for the individual to rebut allegations, make a finding as to the accuracy of the allegations."   Id.   After a hearing, if the State finds that a nurse aide has abused a resident, the State must notify the nurse aide and the State CNA Registry of such finding.   The nurse aide has the right to place a brief statement disputing the findings in the State CNA Registry.   42 USC § 1396r(e)(1)(B).

Federal Medicare regulations likewise require due process be given to nurse aides (like plaintiff Odhuno) accused of resident abuse in adult care homes receiving Medicare and/or Medicaid funding.   If a State makes a preliminary determination that the alleged abuse occurred, it must notify the accused in writing and the notice must include: a) the date and time of the alleged occurrence, and b) the accused's right to request a hearing and be represented by an attorney.   42 C.F.R. 488.335(c).   The hearing must be completed within 120 days of the accused's request.   42 C.F.R. 488.335(d).   Only if the hearing results in a finding that the accused nurse aide abused the resident does that finding get reported to the State CNA Registry.   42 C.F.R. 488.335(f).   Even then, the accused nurse aide must still be

given an opportunity to correct any misstatements or inaccuracies in the State CNA Registry. 42 C.F.R. 483.156(d).

Defendants Rose and the other KDADS defendants did not comply with these basic due process principles in the case at bar.  See Lamb v. Protective Health Services, 239 P.3d 973, 977-979 (Okla Ct. Civ. App. 2010); Molden v. Mississippi State Department of Health, 730 S.2d 29, 35-39 (Miss. Sup. Ct. 1998).

In addition, the federal Medicare regulation defines the term "abuse" as follows:

> Abuse is the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish.  Abuse also includes the deprivation by an individual, including a caretaker, of goods or services that are necessary to attain or maintain physical, mental, and psychosocial well-being.  Instances of abuse of all residents, irrespective of any mental or physical condition, cause physical harm, pain or mental anguish.  It includes verbal abuse, sexual abuse, physical abuse, and mental abuse including abuse facilitated or enabled through the use of technology.  Willful, as used in this definition of abuse, means the individual must have acted deliberately, not that the individual must have intended to inflict injury or harm.

42 U.S.C. § 488.301.

In the case at bar, there is absolutely no evidence of "willfull infliction of injury … with resulting physical harm, pain or mental anguish."  Id.  For Rose and the other KDADS defendants to find that "abuse" occurred under that definition and that plaintiff Odhuno committed the "abuse" is entirely arbitrary, irrational, and itself an unconstitutional abuse of governmental authority.

## B. PLAINTIFF ODHUNO HAS STANDING TO BRING THIS LAWSUIT AGAINST THE KDADS DEFENDANTS.

Rose and the other KDADS defendants contend in their summary judgment motion that plaintiff does not have "standing" to bring this lawsuit against them.  However, to establish standing, plaintiff must only show "injury in fact," a causal connection, and the

likelihood the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).  Plaintiff Odhuno has clearly established all three elements in the case at bar.  Id.  The KDADS defendants caused plaintiff's employment termination in a manner which violated his 14th Amendment rights to procedural due process and equal protection.

### C. PLAINTIFF ODHUNO HAS STATED A VIABLE CLAIM FOR UNCONSTUTUTIONAL VIOLATION OF PROCEDURAL DUE PROCESS UNDER § 1983 AND BIVENS.

Plaintiff has been deprived of his 14th Amendment right to procedural due process based on both a property interest theory and a liberty interest (stigma-plus) theory.

### 1. Plaintiff Has Been Deprived Of A Property Right In His CNA Certification Without Due Process.

In July – August 2014, plaintiff had a protected property interest in his CNA certification which allowed him to work in his chosen field of medical care.  Stidham v. Peace Officer Standards and Training, 265 F.3d 1144, 1149-1153 (10th Cir. 2001).  That certification was revoked or effectively revoked when defendant Rose and defendant Sunderraj conveyed their finding to Avita on August 5, 2014, that plaintiff was guilty of abusing the resident despite no credible evidence to support that finding.  Id.  That finding directly caused the deprivation of plaintiff's property interest.  Id.  The KDADS finding that plaintiff had committed elder abuse was made and published to Avita without any notice to plaintiff Odhuno or any opportunity for him to have  a hearing (either pre-deprivation or post-deprivation) as required to satisfy 14th Amendment due process requirements.  Id.

Pursuant to K.S.A. 39-1908(a) and (c), as amended, the Secretary of KDADS administers the licensure of adult care home administrators, the certification of nurse aides, and the maintenance of the Kansas Nurse Aide Registry.  The KDADS Secretary has promulgated and enforces K.A.R. 26-39-100(qq) which defines "nurse aide" to mean an individual who:  1) is certified as a nurse aide by [KDADS] and is listed on the Kansas Nurse

Aide Registry, and 2) is supervised by a licensed nurse.  The KDADS Secretary has also promulgated and enforces K.A.R. 26-50-10(e)(3) which provides that a certified nurse aide (CNA) is not eligible for employment unless that individual has "no record of abuse."  In addition, the KDADS Secretary has promulgated and enforces K.A.R. 26-50-20(a) which requires that each nurse aide who provides direct care to residents must complete a training course (at least 90 hours) approved by the Secretary and pass the state test.  Per subsection (b) of that regulation, each nurse aide who successfully completes the required training and passes the state test "shall" be certified and "shall" be listed on the Kansas Nurse Aide Registry.  At the time of his employment termination, plaintiff Odhuno was a certified nurse aide (CNA) and was listed on the Kansas Nurse Aide Registry.  Therefore, plaintiff had a protected property interest in his CNA certification under state law.

Besides Stidham, supra, two U.S. Supreme Court cases provide plaintiff Odhuno a § 1983 or Bivens cause of action under the facts at bar because of KDADS' deprivation of plaintiff's property interest in his CNA certification without due process.  See Federal Deposit Insurance Corp. v. Mallen, 486 U.S. 230, 240-243 (1988); Bell v. Burson, 402 U.S. 535, 539-542 (1971).  See also Jones v. Wildgen, 428 F.Supp. 2d 1178, 1182-1183 (D. Kan. 2006).  Because all of these cases predate August 2014, they represent clearly established law and defeat the qualified immunity defense raised by the individual KDADS defendants. Id.

### 2.  Plaintiff Has Been Deprived Of A Liberty Interest In His Good Name And Reputation Without Due Process.

Plaintiff also had a liberty interest in his good name, reputation, honor, and integrity. Brown v. Montoya, 662 F.3d 1152, 1167-1171 (10th Cir. 2011).  The false and stigmatizing statements by defendants Rose and Sunderraj to Avita regarding plaintiff Odhuno (i.e., finding he had committed a heinous criminal offense) caused Avita to fire plaintiff and severely injured plaintiff's good name and reputation for any future employability.  These

facts constitute a clear "stigma plus" which required KDADS to afford plaintiff with procedural due process in the form of a "name clearing" hearing. Id.

Besides Bivens, several other 10th Circuit cases provide plaintiff Odhuno with a § 1983 and Bivens cause of action for deprivation of his constitutionally protected liberty interest in his good name and reputation without providing him with a "name clearing" due process hearing. McDonald v. Wise, 769 F.3d 1202, 1212-1215 (10th Cir. 2014); Bjorklund v. Miller, 467 Fed. Appx. 758, 767-770 (10th Cir. 2012); Gwinn v. Awmiller, 354 F.3d 1211, 1221-1224 (10th Cir. 2004). Moreover, all of these cases predate August 2014 which defeats any qualified immunity defense which the KDADS defendants have raised because the law was clearly established.

In addition, the weight of authority from other jurisdictions shows the law was clearly established in August 2014 with respect to plaintiff's claim regarding his liberty interest deprivation. See Humphreys v. County of Los Angeles, 554 F.3d 1170, 1184-1201 (9th Cir. 2008); Dupuy v. Samuels, 397 F.3d 493, 503-512 (7th Cir. 2005); Doyle v. Camelot Care Centers, Inc., 305 F.3d 603, 616-621 (7th Cir. 2002); Valmonte v. Bane, 18 F.3d 992, 999-1005 (2nd Cir. 1994); Jamison v. State Dept. of Social Services, 218 S.W. 3d 399, 405-415 (Mo. Sup. Ct. 2007). Therefore, the individual KDADS defendants' defense of qualified immunity is clearly without merit. Id.

### 3. **Plaintiff Has Been Deprived His Constitutional Right to Equal Protection**

Plaintiff Odhuno is a black man of Kenyan ancestry. The insistence by defendant Rose that all black males be suspended (without any credible evidence that "abuse" had even occurred) \shows racial and gender animus beginning on the very first day of her investigation. Moreover, forcing Avita to terminate plaintiff's employment on August 5, 2014 (again without any credible evidence that plaintiff had committed any "abuse") shows clear racial, gender, and national origin animus against plaintiff. Such intentional discrimination deprived plaintiff of his 14th Amendment right to equal protection of the laws

and provides him with a § 1983 and <u>Bivens</u> cause of action against defendant Rose.  <u>Village of Arlington Heights v. Metropolitan Housing</u>, 429 U.S. 252, 264-265 (1977).

## VI.      CONCLUSION

For all of the reasons discussed herein, defendant Christan Rose's summary judgment motion should be overruled.

Respectfully submitted,

s/ Edward L. Keeley

Edward L. Keeley (#09771)
ekeeley@mcdonaldtinker.com
Katy E. Tompkins (#25581)
ktompkins@mcdonaldtinker.com
McDONALD TINKER PA
300 West Douglas Avenue, Suite 500
Wichita, Kansas  67202
Phone:   (316) 263-5851
Fax:       (316) 263-4677
 *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of July, 2017, the foregoing was filed with the Clerk of the Court by using the CM/ECF System which will send a notice of electronic filing to the following:

Forrest T. Rhodes, Jr.
FOULSTON SIEFKIN LLP
1551 N Waterfront Pkwy, #100
Wichita, KS  67206
*Attorneys for Defendants*
  *Reeds Cove & Axiom*

Kimberly M.J. Lynch
Jessica F. Conrow
KANSAS DEPARTMENT FOR AGING
   AND DISABILITY SERVICES
503 S. Kansas Ave.
Topeka, KS  66603
*Attorneys for Defendants Keck, Sunderraj,*
 *Schiffelbein, Rose, Fortney and Banuelos*

Thomas E. Beall
T.G. Luedke
United States Attorney's Office
District of Kansas
Federal Building, Suite 290
444 SE Quincy Street
Topeka, KS 66683
*Attorneys for Defendants Sunderraj,*
 *Schiffelbein, Rose, Fortney and Banuelos*

s/ Edward L. Keeley
Edward L. Keeley