# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOHN PAUL ODHUNO,

      *Plaintiff,*

    vs.

REED'S COVE HEALTH AND
REHABILITATION, LLC d/b/a AVITA;
AXIOM HEALTHCARE SERVICES, LLC;
AUDREY SUNDERRAJ; CAROL
SCHIFFELBEIN; CHRISTAN ROSE;
TERESA FORTNEY; TREVA BANUELOS;
and TIM KECK, in his official capacity as
Secretary of the Kansas Department for
Aging and Disability Services,

      *Defendants.*

Case No. 15-1347-EFM-GEB

## MEMORANDUM AND ORDER

Plaintiff John Paul Odhuno was employed as a certified nurse aide ("CNA") at a long-term care facility owned by Defendant Reed's Cove Health and Rehabilitation, LLC d/b/a Avita ("Avita"). In late July 2014, the Kansas Department for Aging and Disability Services ("KDADS") investigated the facility after receiving an anonymous tip of alleged resident abuse. During the investigation, Avita terminated Odhuno's employment. Odhuno now asserts claims against KDADS Secretary Tim Keck and five KDADS employees involved in the investigation: Audrey Sunderraj, Carol Shiffelbein, Christan Rose, Teresa Fortney, and Treva Banuelos (the

"KDADS employees"). He alleges that they violated his Fourteenth Amendment rights to due process and equal protection. Additionally, he alleges that the KDADS employees committed the tort of outrage under Kansas law.

This matter comes before the Court on Defendants' Motion for Summary Judgment (Doc. 105). The KDADS employees assert the defense of qualified immunity, and Defendant Keck asserts that he is entitled to sovereign immunity under the Eleventh Amendment. In response to the motion, Odhuno decided not to oppose the summary judgment motion of Defendants Schiffelbein, Fortney, and Banuelos and filed a response only as to the summary judgment motion of Defendants Rose, Sunderraj, and Keck.[1] As explained in more detail below, the Court concludes that Defendants Rose and Sunderraj are not entitled to qualified immunity and that Defendant Keck is not entitled to sovereign immunity. Therefore, the Court grants in part and denies in part Defendants' motion.

## I.     Factual and Procedural Background

### A.     KDADS Relationship with Centers for Medicaid and Medicare Services ("CMS")

Under 42 U.S.C.A. § 1395a, the State of Kansas entered into an agreement (the "Agreement") with the Secretary of Health and Human Services (the "Secretary") to determine whether a provider or supplier meets specific standards of participation in the federal Medicare and Medicaid programs. The Agreement provides that the State of Kansas, through a KDADS surveyor, is required under § 1864(a) of the Social Security Act to survey providers or suppliers in Kansas that are participating in Medicare and/or Medicaid services. In addition, the Agreement defines the role of the surveyors as federal contractors surveying on behalf of the Secretary. The

---

[1] Odhuno does not concede or agree to the dismissal of his state law claims against these Defendants.

surveyors are required to make reports in the form and containing the information required by the Secretary. To complete the surveys, they generally follow forms created by CMS or Health and Human Services.

Long-term care facilities, such as Avita, must follow federal conditions of participation to obtain coverage under the Medicare program.[2] Included in these conditions are rules governing the reporting and investigation of resident abuse.[3] Federal regulations define "abuse" as "the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish."[4] If there is an allegation of resident abuse, a facility must (1) immediately report the allegation to "other officials in accordance with State law through established procedures";[5] (2) thoroughly investigate all allegations of abuse, prevent further abuse while the investigation is in progress, and report the investigation findings within five days to the appropriate state officials;[6] and (3) immediately report to KDADS if there is "reasonable cause to believe that a resident is being or has been abused, neglected or exploited."[7]

KDADS receives reports of alleged abuse through a hotline managed by the agency.[8] KDADS will review the report and conduct a survey to determine whether the long-term care

---

[2] 42 C.F.R. § 488.3(a).

[3] *Id*. § 483.13

[4] *Id*. § 488.301

[5] *Id*. § 483.13(c)(2).

[6] *Id*. § 483.13(c)(3)-(c)(4).

[7] K.S.A. § 39-1402(a).

[8] *See id*. 39-1411(a).

facility meets the conditions of participation in the Medicare program.[9]  It also makes recommendations to CMS, which will determine whether the long-term care facility is eligible to participate in the Medicare program.[10]

The final results of the survey and CMS' determination are provided to the long-term care facility.[11]  If the facility is not in compliance with the conditions of the Medicare program, KDADS will provide a description of the specific deficiencies that resulted in that determination.[12]  The long-term care facility may appeal the survey findings through the process set forth in the federal Medicare regulations.[13]

If the KDADS investigation substantiates that a CNA abused a resident, the investigation is forwarded to the KDADS legal department.[14]  In this situation, the KDADS surveyor is required to fill in a particular box on the "complaint processing form," which is sent to KDADS headquarters with all documents gathered during the investigation.[15]  The KDADS legal department then determines whether to initiate proceedings against the CNA and place a prohibition on the Kansas Nurse Aide Registry.  After the investigation is completed, and if a

---

[9] 42 C.F.R. § 488.10(a)(1); 42 C.F.R. § 488.11(a).

[10] *Id*. § 488.11(a) and § 488.12(a).

[11] *Id*. § 488.12(b).

[12] *Id*. § 488.18(a).

[13] *Id*. § 488.330(e).

[14] *See* K.S.A. § 39-1411(b); 42 C.F.R. § 488.335 (imposing requirements on states to implement procedures for review and investigation of abuse, neglect, or exploitation).

[15] Defendants Rose and Sunderraj call this form by different names.  Rose calls it the "complaint processing form," while Sunderraj calls it the "complaint cover sheet."  The Court will refer to it as the "complaint processing form."

finding of abuse, neglect, or exploitation is made, a Notice of Action is sent to the CNA.[16]  This

Notice of Action may be appealed under the Kansas Administrative Procedure Act.[17]  If a CNA

decides not to appeal the Notice of Action or if after an appeal the finding of abuse, neglect, or

exploitation is upheld, then the finding of abuse is placed on the KDADS website[18] and a

prohibition against employment will be placed on the Kansas Nurse Aide Registry.[19]  Prospective

employers must review the online CNA Registry before employing a CNA.

**B.      Complaint Investigation at Avita**

Odhuno is a black male who is originally from Kenya.  Odhuno was employed as a CNA

at Avita—which is operated by Defendant Axiom Healthcare Services, LLC ("Axiom").  On July

31, 2014, KDADS began a complaint survey at Avita based on an anonymous complaint made to

the KDADS hotline.  The complaint stated that Avita failed to investigate and report an allegation

of resident abuse purportedly committed by a black male nurse.

One of the KDADS surveyors was Defendant Rose.  On the first day of the investigation,

Rose spoke with the resident regarding the alleged abuse.  She took notes and prepared a

handwritten statement for the resident to sign, which states in part:

> It hasn't happened for a while but it has gone on for the last couple of months, since
> the Spring.  It is a black man and he tells me he is a nurse.  My son stayed all night
> not too long ago and the black man tried to come in then, but I think it scared him
> away when he saw my son.  For 3 days after that, he stayed away. . . . He would
> come in my room late at night without knocking and say he was trying to see if my
> pants were wet and touch my bottom.  I'm not making it sounds as bad as it actually
> was.  One time on a weekend when there wasn't anyone else around, on a holiday,

---

[16] K.S.A. § 39-1404(a); K.A.R. § 26-4-1; 42 C.F.R. § 488.335.

[17] K.S.A. § 39-1411(a); K.A.R. § 26-4-1; 42 C.F.R. § 488.335.

[18] *See* https://www.kdads.ks.gov/commissions/scc/abuse-neglect-or-exploitation.

[19] 42 C.F.R. § 483.156(c)(iv)(C); 42 C.F.R. § 488.335(f).

he took me outside and rolled me around on the ground. I don't know what he was trying to do. I hit him on the arms and it made him mad and he finally gave up. He has come back and tried to do it again and I have fought him off. . . . It has gone on for a couple of months, and there were a lot of times he came in and messed with me. I was very scared every time I saw him. I have lost so much sleep over this.

Rose admits that there was no concrete evidence that the abuse occurred and that she did not find any evidence during her investigation that someone rolled the resident on the ground outside the facility. Rose testified, however, that the allegation was substantiated because "[r]egardless of whether abuse actually happened or not, [the resident] suffered emotional distress because of the facility's failure to protect her after she made an allegation of abuse. That substantiates the allegation."

Rose interviewed the resident's son, John Bertelson, during the investigation by phone. Bertelson told Rose that he had not seen any physical evidence of abuse; he had only heard his mother make the allegations. Bertelson further stated that his mother suffered from some memory loss, but that it had improved a lot and that she seemed to be the person he knew her to be. He also said that he had spoken with her several times about the incident and that the resident's story was always the same. Rose testified, however, that even if Bertelson had told Rose he didn't believe abuse had occurred, it would not have made a difference in Rose's investigation or findings. According to Rose, the facility would still have been cited for the failure to protect the resident after an allegation was made.

Rose had several phone conversations on July 31 with Defendant Sunderraj, who was the Director of Survey & Certification for KDADS. Sunderraj was not Rose's direct supervisor, but because Rose's immediate supervisor was unavailable that day, she discussed the investigation with Sunderraj instead. At some point, Rose and Sunderraj discussed whether to place the facility in "immediate jeopardy." As defined in the regulations, the term "immediate jeopardy" means "a

situation in which the provider's . . . non-compliance with one or more Medicare requirements, conditions of participation, conditions for coverage or certification has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident or patient."[20]  Ultimately, Sunderraj determined that Avita should be in "immediate jeopardy" status and advised Rose to inform its administrator of the news.

Rose advised Avita's administrator of the immediate jeopardy status around 3:30 p.m. on July 31 by reading out loud a "Prepared Warning Statement."  Under KDADS protocol, this statement is to be read whenever an alleged perpetrator poses a continuing risk of abuse to the complaining resident and/or other residents.  The Prepared Warning Statement states as follows:

**Prepared Warning Statement**

The prepared warning statement is read to a facility if and when an alleged perpetrator is still working in the facility.  This statement is read privately to the administrator only after:

1.  the surveyor has investigated and gathered enough evidence to strongly support a finding of abuse, neglect or exploitation by the AP

2.  discussion with and concurrence of the Regional Manager

Once the surveyor has discussed findings with the Regional Manager, the following statement should be read to the administrator.  The surveyor needs to document the time & date the statement was read, as well as the names of those persons present.

"As a result of my investigation, I am informing you that there may be a risk to the residents as a result of (alleged perpetrator's name) presence in your facility.  You need to investigate (or continue with your investigation) and determine whether (alleged perpetrator's name) poses a threat to the victim or other residents in the facility.  Adult care home regulations specifically require that the facility do whatever is necessary to prevent potential abuse, neglect, and exploitation while investigations are in progress."

---

[20] 42 C.F.R. § 488.1.

When Rose read this statement to Avita, she identified Ohduno as the alleged perpetrator.

After the immediate jeopardy announcement, Rose discussed with Avita's administrator, Vanessa Underwood, its plan to abate immediate jeopardy status. Initially, Underwood was only going to suspend all black male nurses, but when Rose questioned her, asking "just nurses?" Underwood decided to suspend all black male employees, including a cook, regardless of whether they ever provided any care to the resident. The suspensions were lifted the next day (August 1) after Avita investigated and determined that the alleged abuse did not occur. KDADS knew of the reinstatements by the end of the day on August 1.

On August 4, Sunderraj received and reviewed four emails with voluminous attachments from Underwood. Those emails and attachments contained the facility's investigation of the resident's allegations after immediate jeopardy was announced. Avita's investigation revealed that no abuse occurred.

On August 5, Rose and Sunderraj discussed Avita's Amended Plan of Correction requesting that KDADS abate immediate jeopardy status. The Amended Plan of Correction showed that Avita had reassigned all male staff, including Odhuno, so that they would not work in the resident's unit or provide her care due to her stated preference for personal care only by female staff.

That same day, at approximately 4:22 p.m., a meeting was held at Avita in which Rose appeared in person and Sunderraj appeared by telephone. Representatives of Avita and Axiom also attended. During the meeting, Rose and Sunderraj conveyed to Avita that they believed the residents in the other houses were "at risk" from Odhuno. According to Sunderraj, she was not assured at the time of the call that the facility had done everything they could to keep the residents safe, especially the resident who made the abuse allegation at issue. Sunderraj also told Avita that

merely moving Odhuno to a unit where the resident was not housed was not acceptable to abate the facility's immediate jeopardy status. Although the KDADS Defendants dispute that these conversations took place, a memorandum from this call reports that the following conversations took place or words to this effect:

> Audrey (Sunderraj) then asked Christan (Rose) if she had anything else? Christan said, "No, nothing else, other than my concern for the resident." Audrey then stated she was not sure that moving him (sic) to a different house was an effective intervention because that placed the other residents at risk. Christan then asked Vanessa (Underwood, Avita's Administrator) "How can you be 100% certain this did not happen?" Kim (Summers of Axiom) asked "How can you be 100% certain that it did?" Audrey then said "We are done. We have shared with you that we are very concerned. Your IJ (immediate jeopardy) status will be determined by the decisions you make regarding this employee (Odhuno)." Christan said again "We will let you know the status of your IJ when you let us know the status of his suspension. Actually, his employment." Christan then left the room and the phone call with Audrey was ended.

A few minutes after the August 5 meeting concluded, an Axiom representative told Rose of Avita's decision to terminate Odhuno's employment. Avita's immediate jeopardy status was abated within minutes of Rose receiving this information. Avita, however, still received monetary penalties of more than $73,000 for the period before immediate jeopardy status was abated. If immediate jeopardy status was not abated, all federal Medicare/Medicaid funding to Avita would have been terminated within 23 days.

The next day, on August 6, Rose met with Avita's administrator and two other Axiom representatives. Notes taken by one of the Axiom representatives state:

> So we're going to terminate Paul without knowing exactly what he did & without interviewing him? Yes. Because it doesn't matter what he did because she believes it happened. He has caused her harm. It will be in the written report, that this is an IJ because he caused harm.

After completing the investigation, Rose prepared and signed several documents. On August 11, 2014, Rose completed and signed the complaint processing form. Rose did not

complete the box referring the abuse allegation to the KDADS legal department for additional investigation. On August 13, 2014, Rose prepared the complaint processing form that was reviewed and approved by Sunderraj. That form states that "[b]ased on observation, interview, and record review, the allegation of abuse was substantiated. . . . On 8/5/14, at 4:45 p.m., the surveyor with Audrey Sunderraj via speakerphone, talked with the facility about our concerns and told them the results of our investigation revealed strong evidence the alleged perpetrator was Paul Oduno, CNA." That report is maintained by KDADS, but it is not a public document.

Additionally, Rose prepared a Statement of Deficiencies, dated August 14, 2014, which was also reviewed and approved by Sunderraj. In the initial comments, Rose noted that "the facility failed to protect [the] resident from abuse and mental anguish." In addition, the Statement of Deficiencies noted that:

> The facility abated the immediate jeopardy on 8/5/14 at 5:00 p.m. when the facility completed their investigation, provided re-education on ANE to all employees on reporting allegations, suspended all non-Caucasian staff of the opposite gender that were in the building the time the immediate jeopardy was identified, then all non-Caucasian staff of the opposite gender until the facility's investigation was complete. The alleged perpetrator was also removed from the facility and was not expected to return.

> This deficient practice of failure to report, thoroughly investigate and report an allegation of abuse, exploitation, and protect residents during the investigation remained at a scope and severity of an F.

Finally, CMS has produced an Alleged Perpetrator Information Form pursuant to a business records subpoena. This form is undated and unsigned, and Rose denies completing it. Odhuno is identified as the alleged perpetrator on this form. It also states that his Avita employment was terminated on August 5, 2014.

Rose testified as follows regarding the results of her investigation:

Q. So you did not substantiate that Miss Cornett's buttocks had been touched inappropriately by a staff member?
A. I had no concrete evidence to show what happened.
Q. Okay. Did you ever have any concrete evidence to substantiate that some staff member had looked into her room at night and grinned at her?
A. I did not.
Q. That was one of her allegations, wasn't it?
A. Yes.

Less than three weeks after Rose prepared the Statement of Deficiencies, Bertelson (the resident's son) signed an affidavit stating that he informed Underwood that his mother determined on her own that the incident never happened. The affidavit further stated that his mother's mind was clear and that she was confusing a dream with reality. The affidavit was presented to KDADS. Bertelson subsequently signed another affidavit stating in part:

> 9. During the Kansas Department of Health and Environment's (sic) survey of the facility in July and August 2014, I spoke with the surveyor on one occasion regarding my mother and the allegations.

> 10. That conversation solely related to my mother's allegation that a black male nurse rolled her around in the grass. During that conversation, the surveyor did not question me about any allegations involving inappropriate touching.

> 11. On September 1, 2014, my daughter and I visited with my mother. During our conversations, my mother reported to me (and my daughter) that the whole incident involving a black man was just a dream and she knows that now.

This affidavit was also presented to KDADS. KDADS did not reopen its investigation of the resident's abuse allegation after receiving Bertelson's affidavits.

Odhuno has not been able to find work as a CNA since his termination from Avita. He interviewed for and was offered a position as a CNA at a facility in Haysville, Kansas, but after receiving his schedule and a tuberculosis shot, he was told to wait for a call from an administrator to begin work. He never received a call and did not obtain employment with that facility. In addition, some of the job applications Odhuno filled out asked whether he had ever been accused

of sexual abuse.  Odhuno answered this question by stating, "I will explain."  None of these applications resulted in employment.

## C.    This Lawsuit

Odhuno filed this lawsuit on November 3, 2015.  After amending his complaint several times, he filed a third Amended Complaint on September 9, 2016.  That complaint asserts claims against Avita, Axiom, the KDADS employees, and Tim Keck, the Secretary of KDADS.  First, Odhuno asserts a Title VII discrimination claim based on his race, national origin, and gender against Avita.  Second, he asserts discrimination claims under § 1981 based on his race and national origin against Avita and Axiom.  Third, he brings a § 1983 claim against the KDADS employees in their individual capacities asserting that they violated his Fourteenth Amendment rights to procedural due process and equal protection of the laws.  Fourth, he asserts a § 1983 claim against Defendant Keck in his official capacity seeking prospective equitable relief based on violations of his Fourteenth Amendment rights of due process and equal protection.  Fifth, Odhuno asserts claims under Kansas law for the tort of outrage against the KDADS employees, Avita, and Axiom.  And sixth, he asserts a *Bivens* claim against the KDADS employees for violation of his Fourteenth Amendment rights.

The KDADS employees and Defendant Keck filed a motion for summary judgment seeking dismissal of Odhuno's federal claims.  Odhuno filed a Rule 56(d) motion seeking additional discovery to respond to the summary judgment motion, which the Court denied.  Odhuno then decided only to oppose the summary judgment motion as to Defendants Rose,

Sunderraj, and Keck.[21]  The parties have extensively briefed the issues, and the motion is ripe for the Court's consideration.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[22]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[23]  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[24]  If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[25]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[26]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[27]

---

[21] Odhuno has not agreed to the dismissal of his state-law claims against Defendants Schiffelbein, Jackson, Fortney, and Banuelos.

[22] Fed. R. Civ. P. 56(a).

[23] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[24] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[25] *Id*. (citing Fed. R. Civ. P. 56(e)).

[26] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[27] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III.    Analysis

Defendants make several arguments as to why Odhuno's claims must be dismissed.  First, they argue that Odhuno lacks Article III standing to bring his claims.   Second, Defendants Sunderraj and Rose assert that they are entitled to qualified immunity on the § 1983 and *Bivens* claims.  Third, Defendant Keck argues that he is entitled to sovereign immunity under the Eleventh Amendment.  And fourth, Defendants argue that the Court should decline to exercise supplemental jurisdiction over the remaining state-law claims.

### A.    Standing

Article III standing is a threshold question central to the Court's subject matter jurisdiction.[28]   To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[29]   The plaintiff bears the burden of showing that Article III standing exists.[30]

Odhuno asserts the following three claims as sources of standing against Defendants: (1) the revocation or effective revocation of his CNA certification without due process of law; (2) the loss of his good name and reputation without due process of law; and (3) intentional discrimination based on his race, gender, and national origin.   Defendants contend that Odhuno lacks Article III standing because he has not shown a harm that is fairly traceable to their conduct. However, for both of his due process claims Odhuno has submitted evidence that indicates

---

[28] *United States v. McVeigh*, 106 F.3d 325, 334 (10th Cir.1997)

[29] *Spokeo, Inc. v. Robins*, -- U.S. --, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[30] *Id*. (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)).

Defendants Sunderraj and Rose were responsible for his termination. For example, the August 5 meeting ended with Defendants informing Avita that they would inform it of its immediate jeopardy status when Avita informed Rose of Odhuno's employment status. While Defendants now argue that Avita was in immediate jeopardy because it failed to report the abuse allegations and conduct its own investigation, by the time of the August 5 meeting, Avita had already sent KDADS the results of its own investigation that revealed no abuse occurred. KDADS, however, only abated the immediate jeopardy after learning of Odhuno's termination. In addition, notes taken from a meeting with Rose on August 6 indicate that Rose believed Odhuno committed the abuse and that's why the facility was placed in immediate jeopardy. This evidence is sufficient to show that Defendants' conduct is fairly traceable to any deprivation of due process rights Odhuno may have suffered.

For Odhuno's equal protection claim, Odhuno has produced evidence indicating that Rose insisted that Avita suspend all black male staff while Avita investigated the allegation. This evidence is also sufficient to tie Odhuno's equal protection claim to Defendants. Thus, despite Defendants' insistence that they had nothing to do with Odhuno's termination, the evidence suggests otherwise. Odhuno has satisfied his burden to show that he suffered harm that is fairly traceable to Defendants' conduct, and he has Article III standing to assert his claims.

## B.    Qualified Immunity

Defendants Rose, Sunderraj, and Keck assert the defense of qualified immunity to Odhuno's § 1983 and *Bivens* claims.[31]  When a defendant raises the defense of qualified immunity,

---

[31] Although Defendant Keck has asserted the defense of qualified immunity, it is not available to him because he has not been sued in his individual capacity.  He has only been sued in his official capacity.  *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006) ("The defense of qualified immunity shields government officials

-15-

the plaintiff must satisfy a two-part test.[32]  First, the plaintiff must establish that the defendant's actions violated a constitutional or statutory right.[33]  And second, the plaintiff must demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct.[34]  Qualified immunity applies unless the plaintiff can satisfy both prongs of the inquiry.[35]  The Court has discretion to decide the order in which to examine these two prongs.[36]

A right is clearly established if "there [is] a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."[37]  The "plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it."[38]  The Court must instead analyze "whether the violative nature of *particular* conduct is clearly established."[39]  The plaintiff, however, does not have to produce a "reported case directly on point" to prevail.[40]  Instead, the

---

performing discretionary functions from liability for civil damages arising from claims brought against them in their *individual* capacities.") (emphasis added) (citation omitted).

[32] *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (citation omitted). A *Bivens* suit "is the federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983."  *Hartman v. Moore*, 547 U.S. 250, 255 n.2 (2006). Therefore, the Court will address these claims together.

[33] *Estate of Booker*, 745 F.3d at 411.

[34] *Id.*

[35] *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir.2009) (citing *Pearson*, 555 U.S. at 232).

[36] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

[37] *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)).

[38] *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) (citation and internal quotation marks omitted).

[39] *Ziglar v. Abbasi*, -- U.S. --, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, -- U.S.--, 136 S. Ct. 305, 308 (2015)).

[40] *Id.* at 1867 (citation and internal quotation marks omitted).

Court must evaluate whether "the unlawfulness of the officer's conduct [is] 'apparent' " in light of pre-existing law.[41]

When the defendant has moved for summary judgment based on qualified immunity, the Court still views the facts in the light most favorable to the non-moving party and resolves all factual disputes and reasonable inferences in its favor.[42]  "Unlike most affirmative defenses, however, the plaintiff [] bear[s] the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law."[43]  Thus, at summary judgment, the Court must grant qualified immunity unless the plaintiff establishes:  "(1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct."[44]  If a plaintiff carries this burden, then the defendant must show that no genuine issues of material fact exist that would defeat the claim for qualified immunity.[45]

Odhuno claims that Rose and Sunderraj deprived him of his Fourteenth Amendment right to procedural due process based on a property interest theory and a liberty interest (stigma-plus) theory.  He also claims that Rose and Sunderraj intentionally discriminated against him based on his race, gender, and national origin in violation of Fourteenth Amendment right to equal protection of the laws.  The Court will address each claim below.

---

[41] *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[42] *Estate of Booker*, 745 F.3d at 411.

[43] *Id*.

[44] *Id*. (citations omitted).

[45] *Id*. at 412 (citing *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996)).

### 1. Deprivation of Due Process Based on Odhuno's CNA Certification

Odhuno contends that Sunderraj and Rose "effectively revoked" his CNA certification without due process of law when they "conveyed their purported belief to [Defendant Avita] on August 5, 2014, that plaintiff was guilty of abusing the resident despite absolutely no evidence to support that allegation." According to Odhuno, this finding was "made and published" to Avita without notice to Plaintiff or an opportunity for a hearing. In support of his claim, Odhuno relies primarily on the Tenth Circuit's decision in *Stidham v. Peace Officer Standards and Training*.[46]

The plaintiff in *Stidham* was a law enforcement officer certified by the State of Utah who sought employment in the law enforcement field.[47] Despite being highly ranked among the number of potential job candidates, the plaintiff was rejected by several prospective employers.[48] The plaintiff was informed that the state certification agency was informing potential employers that he allegedly raped a young girl, assaulted a resident, and resigned from his previous position under threat of termination.[49] The state agency, however, had not suspended or revoked the plaintiff's certification and officially maintained that he was eligible for hire.[50] The plaintiff brought a § 1983 claim against the state agency and its director alleging that the officer had been unconstitutionally deprived of a liberty interest in his certification without due process of law.[51]

---

[46] 265 F.3d 1144 (10th Cir. 2001).

[47] *Id.* at 1149.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

The Tenth Circuit first addressed whether the plaintiff had a constitutionally-protected right in his state-issued certification as a law enforcement officer.[52] Discussing prior Supreme Court precedent, the Tenth Circuit stated: "[T]he revocation or removal of a license or certificate that is 'essential in the pursuit of a livelihood' requires procedural due process under the Fourteenth Amendment."[53] The Tenth Circuit concluded that because the plaintiff's certification both required and enabled him to work as a peace officer in Utah, he retained a protected property right in his peace officer certificate.[54]

Next, the Tenth Circuit addressed whether the defendants deprived him of due process by effectively revoking his law enforcement certification.[55] The plaintiff argued that even though his certification was not formally suspended or revoked, the defendants "effectively revoked" his certificate by disseminating the allegations to potential employers.[56] In analyzing this issue, the Circuit first noted that the defendants exceeded their authority under state law and ignored the state statutory requirements for due process.[57] The statutory authority governing the defendants did not allow the director or the council to report information about an officer to potential employers other than the state agency's normal role of evidencing certification status.[58] The Tenth Circuit then

---

[52] *Id*. at 1150.

[53] *Id*. at 1150 (quoting *Bell v. Burson*, 402 U.S. 535, 539 (1971)).

[54] *Id*.

[55] *Id*. at 1150-52.

[56] *Id*. at 1150.

[57] *Id*. at 1151.

[58] *Id*. at 1152.

analyzed whether the defendants deprived plaintiff of his property interest in his certification under federal law.[59]  The Circuit concluded that they had, stating:

> Defendants have disseminated false and fatally damaging allegations against [the plaintiff] to his potential employers.  Defendants have done this in lieu of statutory procedures, in excess of their statutory authority, and in contravention of statutorily mandated procedural due process.  More importantly, the consequence of Defendants' actions is that [the plaintiff] cannot use his certificate to obtain employment . . . A state agency cannot escape liability for depriving an individual of a legitimate property interest merely by arguing that it has not revoked or destroyed the actual legal title to that interest. Actions taken by the State which destroy the value or utility of a protected property interest constitute a Fourteenth Amendment deprivation of that interest for which due process cannot be denied.[60]

There is no dispute in this case that Odhuno had a constitutionally protected right in his CNA certification at the time of his termination in August 2014.  Kansas law requires KDADS to certify any individual who successfully completes the required training and passes the state CNA exam.[61]  Odhuno was a certified CNA while he was employed at Avita.

But, that is where the similarities between *Stidham* and this case end.  Odhuno has failed to provide any evidence, even inferential evidence, that Rose and Sunderraj "effectively revoked" his CNA certification.  There is no evidence that Rose and Sunderraj provided information regarding the circumstances of his termination to any potential employer.  Furthermore, the complaint processing form, which was prepared by Rose under Sunderraj's supervision and edits, is not publicly available.  The only publicly available information on the KDADS website concerning the investigation is the Statement of Deficiencies and that document does not contain Odhuno's name.  It only refers to an "alleged perpetrator."

---

[59] *Id.*

[60] *Id.* at 1153.

[61] K.A.R. § 26-50-20; *see also* K.S.A. § 39-1908(a) and (c).

Odhuno argues that he was deprived of his CNA certification when Defendants informed Avita that there was "strong evidence" that Odhuno committed abuse. But this statement alone, is not sufficient to "effectively revoke" Odhuno's CNA certification. The *Stidham* court found that the defendants "effectively revoked" the plaintiff's law enforcement certification when they disseminated false information about the plaintiff to *multiple* potential employers. Here, Rose and Sunderraj only informed his current employer of his involvement in the abuse. There is no evidence they informed multiple future employers thereby destroying the value of his CNA license. Accordingly, Odhuno has failed to provide specific evidence that Defendants Rose and Sunderraj deprived him of a constitutionally protected property interest without due process.

Odhuno has also failed to satisfy the second prong to overcome the defense of qualified immunity—a clearly established constitutional right. The Court cannot find, and Odhuno has not pointed to, any authority protecting a CNA from arbitrary interference in his employment by a state agency. The only case cited by Odhuno that comes close to granting such a right is *Federal Deposit Insurance Corp. v. Mallen*.[62]

The plaintiff in *Mallen* was the president and a director of a federally insured bank who was indicted on federal charges of making false statements to the FDIC.[63] Before the plaintiff was convicted, the FDIC issued an *ex parte* order suspending him from his duties and prohibiting him

---

[62] 486 U.S. 230 (1988). Odhuno also cites *Bell v. Burson*, 402 U.S. 535 (1971), in support of his argument. The plaintiff in that case filed suit against the director of public safety who suspended the plaintiff's driver's license because the plaintiff caused an automobile accident. *Id*. at 537-38. The Supreme Court found that the license "may become essential in the pursuit of a livelihood" and that the hearing was not meaningful because the director rejected the plaintiff's proffer of evidence on liability where the "statutory scheme makes liability an important factor in the State's determination to deprive an individual of his licenses." *Id*. at 539-41. Here, however, Odhuno's license has not been suspended or revoked. Therefore, *Bell* does not establish that Rose and Sunderraj violated clearly established law.

[63] *Mallen*, 486 U.S. at 236-37.

from working for any FDIC-insured bank.[64]  The plaintiff demanded a hearing and the FDIC granted him one, but he sued before it could occur.[65]  The Supreme Court held that it was "undisputed" that the FDIC could not arbitrarily interfere with the employment of a regulated-bank's employee.[66]  It also held, however, that the FDIC's conduct was not arbitrary and that process the FDIC was prepared to give (a post-deprivation hearing) was sufficient.[67]

The Tenth Circuit discussed *Mallen* in a recent unpublished opinion—*Coleman v. Utah State Charter School Board*.[68]  In that opinion, the Circuit recognized that the Supreme Court has "long held that the government may not arbitrarily interfere with private employment."[69]  It also noted that in *Mallen*, the Supreme Court recognized "a right against governmental interference with employment in the context of regulated banking."[70]  But, the Tenth Circuit declined to extend *Mallen* beyond the specific facts of that case.[71]  Indeed, the Circuit stated that it has never explicitly recognized a claim for arbitrary governmental interference with private employment "beyond the circumstances encountered by the Supreme Court."[72]

Although the Tenth Circuit's opinion in *Coleman* was unpublished and therefore non-binding, it is still persuasive.  The opinion thoroughly analyzes relevant case law setting forth

---

[64] *Id*. at 238.

[65] *Id*. at 239.

[66] *Id*. at 240.

[67] *Id*. at 248.

[68] 673 F. App'x 822 (10th Cir. 2016).

[69] *Id*. at 831

[70] *Id*. at 832.

[71] *Id*. at 833.

[72] *Id*. at 832-33.

when government interference in private employment is a violation of a clearly established constitutional right. Given the Tenth Circuit's reluctance to extend this right to situations beyond those explicitly found in Supreme Court precedent, the Court declines to do so here. Thus, *Mallen* does not support a clearly established constitutional right that defeats Rose and Sunderraj's claims of qualified immunity. The Court grants Rose and Sunderaj's motion for summary judgment as to Odhuno's § 1983 and *Bivens* claims for deprivation of property interest without due process of law.

        2.       *Deprivation of a Liberty Interest in Odhuno's Good Name and Reputation*

Odhuno next alleges that Rose and Sunderraj deprived him of a liberty interest in his good name and reputation without due process of law. Odhuno argues that when Rose and Sunderraj told Avita there was "strong evidence" that he committed the abuse, this caused Avita to fire him and severely injure his good name and reputation thus preventing any future employability. According to Odhuno, these allegations constitute a "stigma plus" which entitle plaintiff to procedural due process in the form of a "name clearing" hearing.

"An employee has a liberty interest in his good name and reputation as it affects his protected property interest in continued employment."[73] This liberty interest is only infringed, however, if a plaintiff meets a four-part test set forth by the Tenth Circuit.[74] In addition to meeting § 1983's state action requirement, the plaintiff must show that "(1) the statements impugned his good name, reputation, honor, or integrity; (2) the statements were false; (3) the statements occurred in the course of terminating the employee or will foreclose other employment

---

[73] *Bjorklund v. Miller*, 467 F. App'x 758 (10th Cir. 2012).

[74] *Id.*

opportunities; and (4) the statements were published."[75]  The Tenth Circuit has clarified that the third element of the test is conjunctive—meaning that the employee must show both that the defamatory statement occurred in the course employment termination and that it will foreclose other employment opportunities.[76]

At this stage in the litigation, Odhuno has come forward with sufficient evidence to satisfy this four-part test.  First, the evidence shows that Rose and Sunderraj made several statements that impugned Odhuno's good name and reputation.  The complaint processing form states that the allegation of abuse was substantiated and that Rose informed Avita that there was "strong evidence" that Odhuno was the alleged perpetrator.[77]  During the August 5 meeting regarding Avita's immediate jeopardy status, Sunderraj and Rose stated that they were concerned for any resident that would be cared for by Odhuno, implying that Odhuno was a dangerous individual who committed the abuse.  And during an August 6 meeting between Rose, Avita, and Axiom, Rose stated that Odhuno committed the abuse and that's why the facility was in immediate jeopardy.

Second, Odhuno has shown that the statements were false.  Affidavits from the resident's son show that the resident later realized that the facts underlying her allegation were only a dream. The resident now understands that the abuse never occurred.

---

[75] *Id*. (citing *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994)).

[76] *Id*. (citing *Guttman*, 669 F.3d at 1126).

[77] Defendants argue that the complaint processing form did not indicate that the abuse occurred.  Instead, Defendants claim that the language "the allegation of abuse was substantiated" means that Rose substantiated that the resident made an allegation of abuse and was fearful or anxious because of abuse she suffered.  The Court finds the language in the complaint processing form to be ambiguous, and at this stage in the litigation, it must be read in the light most favorable to Odhuno.

Third, the statements occurred in the midst Odhuno's employment termination and have foreclosed other employment opportunities. According to the Tenth Circuit, a roughly contemporaneous remark that concerns the " 'manner or reasons for the employee's termination' may qualify as one made 'in the course of termination of employment.' "[78] In this case, Avita terminated Odhuno after being informed that there was "strong evidence" that he was the alleged perpetrator, and more importantly, after the August 5 meeting with Defendants regarding Avita's immediate jeopardy. In addition, Odhuno has not been able to obtain employment since his termination. On several employment applications, Odhuno was required to answer whether he had ever been accused of sexual abuse. Odhuno's response was "I will explain," but none of these applications ever resulted in employment opportunities. The Tenth Circuit has held that "[o]nly where the stigmatization results in the inability to obtain other employment does [a government employment defamation] claim rise to a constitutional level."[79] The stigmatization from Odhuno's response on these applications has made him unemployable. Had Rose and Sunderraj not falsely implicated Odhuno in the abuse, he would not have been required to answer this question affirmatively.

And fourth, Odhuno has shown that Rose and Sunderraj's statements were published. In the context of a liberty interest claim, "publication" is accorded its ordinary meaning, which is "to be made public."[80] Rose and Sunderraj made the statements concerning Odhuno to Avita and

---

[78] *Id*. at 768 (quoting *Renaud v. Wyo. Dep't of Family Servs*., 203 F.3d 723, 727 (10th Cir. 2000)).

[79] *Allen v. Denver Pub. Sch. Bd*., 928 F.2d 978, 982 (10th Cir. 1991), *disapproved of on other grounds, Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1228 (10th Cir. 2000).

[80] *Harrison v. Board of Cty. Comm'rs for Adams Cty, Colo*., 775 F. Supp. 365, 367 (D. Colo. 1991) (citing *Bishop v. Wood*, 426 U.S. 341, 348 (1976)).

Axiom. These are third parties. They are not governmental agencies.[81] Therefore, the statements were made public.

Odhuno has satisfied the four-part test necessary to show a deprivation of a liberty interest in his good name and reputation. He was therefore entitled to a name-clearing hearing, which Defendants did not provide.[82] Accordingly, Odhuno has satisfied the first prong of qualified immunity—violation of a constitutional right.

The Court next examines the second prong of qualified immunity—whether the law was clearly established. Several Tenth Circuit cases decided before August 2014 support Odhuno's § 1983 and *Bivens* claims for deprivation of a liberty interest in his good name and reputation.[83] In *Brown v. Montoya*, the defendant wrongly required the plaintiff to register as a sex offender and be placed in the sex offender probation unit upon release from custody.[84] The plaintiff brought suit under § 1983 alleging that his procedural due process rights had been violated, and the defendant sought qualified immunity.[85] On appeal from the district court's denial of qualified immunity, the Tenth Circuit applied the "stigma plus" test, in which "governmental defamation, coupled with an alteration in legal status, violates a liberty interest that triggers procedural due process protection."[86] The Tenth Circuit found that the defendant made a false statement about

---

[81] *See Asbill v. Hous. Auth. of Choctaw Nation of Okla.*, 726 F.2d 1499, 1503 (10th Cir.1984) ("[I]ntra-government dissemination, by itself, falls short of the Supreme Court's notion of publication: 'to be made public' ").

[82] *McDonald*, 769 F.3d at 1213.

[83] *Brown v. Montoya*, 662 F.3d 1152 (10th Cir. 2011); *see also Bjorklund*, 467 F. App'x at 767-70; *Gwinn v. Awmiller*, 354 F.3d 1211, 1221-24 (10th Cir. 2004).

[84] 662 F.3d at 1157.

[85] *Id.*

[86] *Id.* at 1167.

the plaintiff by wrongly directing him to register in the sex offender probation unit and directing him to register as a sex offender, and that these actions damaged the plaintiff's reputation.[87] The Tenth Circuit also found that the defendant's actions altered the plaintiff's legal status because the sex offender registration carried steep penalties for noncompliance and placement on the sex offender unit limited Brown's employment and residence options.[88] Because the plaintiff was given no process before being placed in the sex offender probation unit and directed to register as a sex offender, the Tenth Circuit concluded that the plaintiff did not receive constitutionally required due process.[89]

*Brown* establishes that governmental defamation coupled with a deprivation of a liberty interest entitles a person to procedural due process protections.[90] Like the plaintiff in *Brown*, Odhuno has shown that Defendants' conduct damaged his reputation and altered his legal status. He was terminated from employment and cannot obtain future employment because he is required to respond affirmatively to questions regarding whether he has been accused of abuse. *Brown* may not be completely analogous to this case, but in the words of the *Brown* court, "[r]equiring a right to be clearly established is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent."[91] In light of the Tenth Circuit's decision in *Brown*, the unlawfulness of Rose and Sunderraj's conduct is apparent.

---

[87] *Id*. at 1169.

[88] *Id*.

[89] *Id*. at 1169-70.

[90] *Id*.

[91] *Id*. at 1171. (internal quotation marks omitted).

This is especially true when *Brown* is read in conjunction with *Bjorklund v. Miller*. The plaintiff in *Bjorklund* was the chief executive officer of the county public facilities authority.[92] The plaintiff's employment was terminated and the defendant, who was a member of the board that terminated the plaintiff, made false and defamatory statements relating to his termination in two newspaper articles.[93] The plaintiff then brought a § 1983 claim alleging that the defendant deprived him a liberty interest in his good name without due process.[94] The district court denied the defendant's motion for summary judgment on the basis of qualified immunity.

The Tenth Circuit began is analysis by restating the four elements necessary to bring a "stigma-plus" claim in the context of employment termination. Having found that these elements were satisfied, the court concluded that the plaintiff was deprived of a name-clearing hearing.[95] Therefore, the defendant was not entitled to qualified immunity.[96]

Defendants argue that *Bjorklund* is distinguishable from this case because the plaintiff in *Bjorklund* was terminated by a public entity while Odhuno was terminated by a private entity. It is true that Odhuno was not employed by a government entity and that other Tenth Circuit cases applying this doctrine have done so in the context of discharge from government jobs. But, the situation in this case is no different from *Bjorklund*. Odhuno has come forward with evidence showing that Defendants made false and stigmatizing statements to exclude him from his current and future employment. Any infringement of Odhuno's liberty is the same as if he lost a

---

[92] *Bjorklund*, 467 F. App'x at 760.

[93] *Id*. at 761-63.

[94] *Id*.

[95] *Id*. at 768-69.

[96] *Id*. at 770.

government job.[97]  Furthermore, it is well established that a private party may be considered a state actor.  Under the state compulsion test, a state may exercise such "coercive power or . . . provide [] such significant encouragement, either overt or covert, that the [private party's choice] must in law be deemed to be that of the State."[98]  Here, Odhuno has come forward with evidence that when viewed in the light most favorable to him show that Rose and Sunderraj compelled Avita to terminate him to abate immediate jeopardy.  Therefore, *Bjorklund* provides further support that the law was clearly established at the time of Defendants' conduct in this case.

Finally, one other Tenth Circuit decision generally supports Odhuno's claim that Defendants are not entitled to qualified immunity.  In *Snell v. Tunnell*,[99] the Tenth Circuit affirmed the denial of a qualified immunity as to three defendant child abuse investigators.[100]  The defendants knowingly falsified allegations of child pornography and prostitution against the plaintiffs, who were operators of a children's shelter, to obtain a court order to remove seven children from the plaintiff's home.[101]  The Tenth Circuit affirmed the denial of qualified immunity holding that as it related to a child abuse investigation, "a reasonable public official would have known that using known false information to secure an order to justify entry and search of a private home would violate the Fourth Amendment's proscription on unreasonable searches and seizures."[102]

---

[97] *See Wroblewski v. City of Washburn*, 965 F.2d 452, 456 (7th Cir. 1992) (suggesting that the loss of private employment could be the "plus" in a stigma plus case).

[98] *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (citations omitted).

[99] 920 F.2d 673 (10th Cir. 1990).

[100] *Id*. at 676.

[101] *Id*. at 677-86.

[102] *Id*. at 700.

The Tenth Circuit analyzed the facts of *Snell* in the context of a Fourth Amendment claim, and not a Fourteenth Amendment claim. Under *Snell*, however, no reasonable official in Sunderraj and Rose's positions could believe that conveying unsubstantiated information to Avita to compel Odhuno's termination was not a violation of his constitutional rights.[103] And when read in conjunction with *Brown* and *Bjorklund*, "the violative nature of [Defendants'] conduct is clearly established."[104] Therefore, Defendants Rose and Sunderraj are not entitled to qualified immunity on Odhuno's § 1983 and *Bivens* claims for deprivation of a liberty interest in his good name and reputation without due process of law.

### 3.     Equal Protection

Odhuno claims that Defendants Rose and Sunderraj discriminated against him based on his race, national origin, and/or gender in violation of his Fourteenth Amendment right to equal protection. "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."[105] "The ultimate issue in any case alleging a violation of the Equal Protection Clause is whether plaintiffs can prove intentional discrimination. . . . Plaintiffs must show that they were treated differently because of their membership in a protected class, and not for some other reason."[106] Furthermore, to show a

---

[103] *See Poore v. Glanz*, 724 Fed. App'x 635, 643 (10th Cir. 2018) ("[T]he qualified immunity analysis is not 'a scavenger hunt for prior cases with precisely the same facts.'" (citation omitted)).

[104] *Ziglar*, 137 S. Ct. at 1866 (internal quotations omitted).

[105] *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

[106] *Redpath v. City of Overland Park*, 857 F. Supp. 1448, 1458 (D. Kan. 1994) (internal citations omitted).

violation of the Equal Protection clause, Odhuno must establish "proof of racially discriminatory intent or purpose."[107]

Odhuno has not come forward with any evidence or argument in response to Sunderraj's summary judgment motion showing that she violated his right to equal protection or that her actions were motivated by racial animus toward him.[108]  Therefore, Odhuno has not met his burden at this stage of the litigation, and Sunderraj is entitled to dismissal of Odhuno's § 1983 and *Bivens* claims for violation of his right to equal protection.

Odhuno has, however, produced evidence showing that Rose treated Odhuno differently than other alleged perpetrators and that her actions were motivated by racial animus.  After the immediate jeopardy announcement, Underwood—Avita's administrator—proposed to Rose that Avita suspend all black male nurses.  Rose responded by asking "just nurses?" indicating that Underwood should suspend all black male employees.  As a result, Avita suspended all black male employees, including a cook, regardless of whether they ever provided any care to the resident. When this evidence is viewed in the light most favorable to Odhuno, it shows racially discriminatory intent or purpose towards black individuals.  The Court doubts that if the resident would have described her alleged abuser as a white nurse, Rose would have insisted that Avita suspend all Caucasian employees.  Therefore, Odhuno has shown a violation of his right to equal protection under the Fourteenth Amendment.

---

[107] *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)

[108] Odhuno cannot rely on Rose's actions to defeat Sunderraj's assertion of qualified immunity on this claim. "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Turning to whether the law was clearly established at the time of Rose's alleged violation, the Court recognizes that Odhuno has not come forward with a Tenth Circuit case directly on point. The law, however, does not require that "the very action in question has previously been held unlawful."[109]  A government official "might lose qualified immunity even if there is no reported case directly on point."[110]  Here, both the Supreme Court and Tenth Circuit have stated that the Equal Protection Clause of the Fourteenth Amendment is violated when the plaintiff comes forward with proof of racially discriminatory intent or purpose.[111]  Under this law, the unlawfulness of Rose's conduct would have been apparent.  Therefore, the Court declines to grant Rose qualified immunity on this claim.

4.    *Defendants' Alleged Violation of Medicare Statute, Federal Regulations, and KDADS Protocol*

Odhuno argues that Rose and Sunderraj did not comply with the due process safeguards built into the federal Medicare statute governing nursing facilities, the Medicare regulations, and KDADS protocol.  The Medicare statute imposes requirements on the State when nurse aides have been accused of neglect, abuse or misappropriation of a resident.  Specifically, 42 U.S.C. § 1396r(g)(1)(C) states:

> The State shall provide, through the agency responsible for surveys and certification of nursing facilities under this subsection, for a process for the receipt and timely review and investigation of allegations of neglect and abuse and misappropriation of resident property by a nurse aide of a resident . . . .The State shall, after notice to the individual involved and a reasonable opportunity for a hearing for the individual to rebut allegations, make a finding as to the accuracy of the allegations.  If the State finds that a nurse aide has neglected or abused a resident

---

[109] *Ziglar*, 137 S. Ct. 1866 (internal quotation marks omitted).

[110] *Id*. at 1867 (internal quotation marks omitted).

[111] *Village of Arlington Heights*, 429 U.S. at 265; *Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir. 1988).

or misappropriated resident property in a facility, the State shall notify the nurse aide and the registry of such finding.

The Court is puzzled at this stage of litigation as to whether Odhuno is asserting a claim for violation of 42 U.S.C. §1396r(g)(1)(C) under § 1983. Odhuno does not cite this statute anywhere in the Amended Complaint. Indeed, the first time he asserts that Defendants violated it is in response to Defendants' Motion for Summary Judgment. That response simply argues that Defendants' violated the statute. It does not explain how Defendants' alleged violation affects their qualified immunity defense or any other cause of action in the Amended Complaint.

A plaintiff may obtain relief under § 1983 for violation of a federal statutory right, but to do so, the plaintiff must show that the statute confers upon that individual a federal right.[112] It is not sufficient to show that the defendant simply violated the statute.[113] Here, the parties only briefly touched on whether Defendants violated 42 U.S.C. § 1396r(g)(1)(C). They have not addressed whether Odhuno asserted a claim for violation of this statute in his Amended Complaint. Nor have they addressed the relevant legal arguments governing whether the statute confers a legal right upon CNAs so that they may bring a claim under § 1983.[114] The Court is not going to

---

[112] *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (citation omitted).

[113] See *id.* The Supreme Court articulated a three-part test in *Blessing* for determining whether a statute confers an individual federal right. "First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States." 520 U.S. at 340-41 (internal citations omitted).

[114] *Id.*; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002). The Court notes that while Odhuno alleges Defendants violated the federal Medicare regulations governing nursing facilities, he cannot bring a claim for violation of these regulations under § 1983. *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not.").

unilaterally engage in this analysis and therefore makes no finding as to whether Defendants violated 42 U.S.C. § 1396r(g)(1)(C).

## C.    Official Capacity Claim

Defendant Keck contends that Odhuno's official capacity claim seeking equitable relief against him as Secretary of KDADS is barred by sovereign immunity. The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This amendment has been broadly interpreted, and among other things, prohibits suits brought by individuals against state officials acting in their official capacities.[115] This prohibition does not apply, however, if the state waives sovereign immunity, if Congress validly abrogates the state's immunity, or if the suit falls within the *Ex parte Young* doctrine.[116]

Odhuno relies on the *Ex parte Young* doctrine in this case. Under that doctrine, the Eleventh Amendment does not bar suit against state officials in their official capacities if it seeks prospective relief for the officials' ongoing violation of federal law.[117] In analyzing whether this exception applies, the Court "need only conduct this 'straightforward inquiry.' "[118] Thus, the analysis of whether the doctrine applies does not involve an analysis of the merits of a claim.[119]

---

[115] *Harris v. Owens*, 264 F.3d 1282, 1289-90 (10th Cir. 2001).

[116] *Id*. at 1290.

[117] *Id*.; *see also Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012).

[118] *Columbian Fin. Corp. v. Stork*, 702 F. App'x 717, 720 (10th Cir. 2017) (quoting *Muscogee*, 669 F.3d at 1167).

[119] *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002) ("[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim.").

Keck argues that *Ex parte Young* does not apply because Ohduno's requested relief stems from past harm. However, courts have uniformly recognized that injunctive relief in the form of a court order to expunge or remove files or false information falls within the scope of *Ex parte Young*.[120] In this case, Ohduno has alleged an ongoing violation of his constitutional rights and seeks prospective injunctive relief. He asserts that KDADS has kept and maintained official records indicating that he abused the resident and has made no effort to correct or expunge those official reports to make it clear that no evidence of actual abuse was ever found by KDADS investigators. Thus, he is seeking injunctive relief in the form of a court order "that a statement be placed on all KDADS databases indicating plaintiff has been totally exonerated from any alleged wrongdoing during his Avita employment, as well as for KDADS to cease disseminating false information regarding plaintiff to his potential employers and medical field educators." This proposed injunctive relief is not limited to past violations. It would also prevent future harm to Odhuno. Therefore, it cannot be characterized solely as retroactive injunctive relief and is not barred by the Eleventh Amendment.

Keck also argues that *Ex parte Young* does not apply because there is no evidence to support Odhuno's claim that KDADS substantiated that he abused a resident of Avita and that KDADS has no file or record which includes any findings regarding the Avita's resident's allegations. According to Keck, the complaint survey file and the public Statement of Deficiencies are CMS files that KDADS does not have the authority to alter, modify, or destroy. These arguments, however, are not persuasive. The issues of whether KDADS substantiated that Odhuno

---

[120] *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007); *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992); *Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986); *Donald M v. Matavia*, 668 F. Supp. 714, 714-15 (D. Mass. 1987).

abused a resident and whether the complaint survey file and Statement of Deficiencies indicate that Odhuno committed the alleged abuse involve an analysis of the merits of Odhuno's claims. Thus, they are irrelevant to whether the *Ex parte Young* doctrine applies. Furthermore, to the extent KDADS claims to have no control over these documents because they belong to CMS, Keck has offered no evidence in support of this assertion, and the Court has no way of knowing whether it is true or not. Therefore, the Court concludes that Odhuno's official capacity claim against Keck is not barred by Eleventh Amendment immunity.

**D.      Odhuno's State Law Claims**

Defendants request that the Court decline to exercise supplemental jurisdiction over Odhuno's tort of outrage claim brought under Kansas law. Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over a claim if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Although Odhuno has not opposed the § 1983 and *Bivens* claims against Defendants Fortney, Schiffelbein, and Banuelos, these claims are still pending against Defendants Rose and Sunderraj because the Court denied them qualified immunity. In addition, there are federal claims pending against Avita and Axiom, as well as the state tort of outrage claim. Therefore, it is in the interest

of judicial economy, fairness, and convenience for the Court to exercise supplemental jurisdiction over the tort claim, and the Court will continue to do so.[121]

## IV.    Conclusion

After carefully reviewing the evidence and case law, the Court concludes that Rose and Sunderraj are not entitled to qualified immunity therefore denies Defendants' Motion for Summary Judgment as to these Defendants.  Because Odhuno chose not to oppose Defendants' Motion for Summary Judgment as to Shiffelbein, Fortney, and Banuelos, the Court grants summary judgment to these Defendants on Odhuno's § 1983 and *Bivens* claims.  Additionally, the Court concludes that Defendant Keck is not entitled to sovereign immunity and therefore denies his motion for summary judgment.  The Court will continue to exercise supplemental jurisdiction over Odhuno's state law tort claim.

**IT IS THEREFORE ORDERED** that KDADS Defendants Motion for Summary Judgment (Doc. 105) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 14th day of December, 2018.


*Eric F. Melgren*
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[121] *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988) (stating that district courts should "deal with cases involving pendent claims in the manner that best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine").