# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JOHN PAUL ODHUNO,

*Plaintiff,*

vs.

Case No. 15-1347-EFM

REED'S COVE HEALTH AND
REHABILITATION, LLC d/b/a AVITA;
AXIOM HEALTHCARE SERVICES, LLC;
AUDREY SUNDERRAJ; CAROL
SCHIFFELBEIN; CHRISTAN ROSE;
TERESA FORTNEY; TREVA BANUELOS;
and LAURA HOWARD, in her official
capacity as Secretary of the Kansas
Department for Aging and Disability
Services,

*Defendants.*

## MEMORANDUM AND ORDER

Plaintiff John Paul Odhuno was employed as a certified nurse aide ("CNA") by Defendant

Reed's Cove Health and Rehabilitation, LLC ("Reeds Cove"). Reeds Cove is a long-term care

facility for the elderly that is managed by Defendant Axiom Health Care Services, LLC

("Axiom"). In late July 2014, the Kansas Department for Aging and Disability Services

("KDADS") investigated Reeds Cove after receiving an anonymous tip of alleged resident abuse.

During the investigation, Odhuno's employment was terminated. Odhuno now asserts multiple

claims against Reeds Cove and Axiom as well as against KDADS Secretary Laura Howard and five KDADS employees involved in the investigation.

This matter comes before the Court on Defendants Reeds Cove and Axiom's Motion for Summary Judgment (Doc. 191). Defendants seek judgment as a matter of law on Odhuno's discrimination claims under Title VII and 42 U.S.C. § 1981 and on the issue of whether Odhuno can receive back wages after September 17, 2014. They also seek judgment as a matter of law on Odhuno's state law tort of outrage claim. For the reasons discussed below, the Court denies Defendants' motion on the Title VII and § 1981 discrimination claims, reserves ruling on the back wages issue, and grants Defendants' motion on the tort of outrage claim.

## I.        Factual and Procedural Background

### A.        Parties and Relevant Persons

Odhuno is a black male of Kenyan descent. In 2001, upon finishing high school, he moved from Kenya to the United States. On January 14, 2014, he was hired to work as a CNA at Reeds Cove.

Reeds Cove operates a skilled nursing facility in Wichita, Kansas. It is licensed as an adult care home with the State of Kansas and participates in the Medicare program. This allows it to receive payments on behalf of residents who are receiving Medicare and/or Medicaid benefits. Reeds Cove is governed by federal regulations issued by the Centers for Medicare and Medicaid Services ("CMS"). In July and August of 2014, Vanessa Underwood was employed as Reeds Cove's administrator.

Axiom is an administrative services company that contracts with health care facilities, including Reeds Cove, to provide various support functions and consulting services. These consulting services include advice and assistance on regulatory compliance and employment

issues, such as suspensions and terminations.  For the time period at issue here, Chance Becnel was Axiom's President and Chief Operating Officer; Weston Parsons was Axiom's Vice President of Operations; Kathi Bragg was Axiom's Vice President of Human Resources; and Kimberly Summers was a nurse consultant.  Becnel also sits on Reeds Cove's governing body.

## B.        Axiom's Relationship to Reeds Cove

Becnel has described Axiom as an administrative and support company for Reeds Cove. Axiom and Reeds Cove entered into an Administrative Services Agreement in January 2013. Under that Agreement, Axiom generally was to "provide [Reeds Cove] with all administrative and consulting services necessary or appropriate for [Reeds Cove] to be able to run an effective and efficient operation."  Specifically, the Agreement states that Axiom must provide human resources services to Reeds Cove, including "recommendations on the recruitment of physician and non-physician staff, training of non-physician staff, performing appraisals and salary reviews, [and] hiring and supervising . . . ."

With respect to employment issues, Axiom has no authority over the facilities it supports, but it encourages the facilities to use the human relations support services for which they pay. With respect to employee termination, Axiom requests that its client communities consult with Axiom prior to making the decision to terminate employment.  It is common for Axiom to be involved with the facility leadership when it comes to suspensions or terminations of its client's employees.  But, it is not normal practice for Axiom to terminate employees on behalf of its client communities.

Axiom does not make work rules, schedules, pay rates, or otherwise supervise Reeds Cove employees.  It does not maintain personnel files on Reeds Cove employees.  Axiom does, however, administer group benefit plans, such as a health insurance plan and a retirement/pension plan, in

which Reeds Cove participates.  It also maintains a "legal file" on all Reeds Cove employees that have employment-related legal issues pending.

**C.     July 23, 2014 Complaint and Reeds Cove's Initial Investigation**

On July 18, 2014, a Reeds Cove resident (the "Resident") requested that no male caregivers perform her personal care.  On July 23, 2014, a contract therapist reported to Underwood that the Resident informed her that a black male nurse made her uncomfortable, touched her inappropriately, and had taken her out in the courtyard and was rough with her in the grass during the previous holiday.  The Resident's report did not identify an alleged perpetrator other than a black male nurse.

Underwood immediately began investigating the allegations.  She interviewed the Resident and staff members who worked with her.  She did not, however, interview Odhuno who sometimes worked the night shift in the Resident's unit, or any other black male. Nor did she ask any Reeds Cove Staff if they knew whether a black male nurse was providing personal care to the Resident.

The Resident, who had medical diagnoses of metabolic encephalopathy and dementia, was examined by a nurse for signs of abuse, and none were found.  Additionally, Underwood reviewed footage from the surveillance cameras covering the entrance to/from the courtyard for the July 4, 2014, holiday weekend and observed that the Resident only went into the courtyard on one occasion, during which she was accompanied by her son.  Ultimately, Underwood determined that the Resident's allegations of abuse could not be substantiated.

Reeds Cove's policy at the time of the complaint required Underwood to report allegations of abuse to KDADS.  She did not report these allegations.  Underwood understands that she did not conduct her investigation in accordance with Reeds Cove's policy.

## D.    KDADS Complaint Survey

On July 31, 2014, KDADS arrived at Reeds Cove to conduct an on-site complaint survey (i.e., investigation) that was based on the same abuse allegations reported on July 23.  The KDADS employees present at Reeds Cove on July 31 were Christen Rose and Treva Banuelos, with Rose serving as the lead.  Shortly after arriving at Reeds Cove, the KDADS surveyors met with Underwood.  At that time, they only disclosed that they were conducting a complaint survey.  They did not disclose the nature of the allegations or information about an alleged perpetrator.  Upon KDADS' arrival at Reeds Cove, Axiom's Vice President of Operations, Weston Parsons, went to the facility to meet with Underwood regarding the investigation.

On the afternoon of July 31, Rose (KDADS) notified Underwood (Reeds Cove) that she was placing Reeds Cove in "immediate jeopardy" status.  Immediate jeopardy means that KDADS had determined through its investigation that Reeds Cove residents were in immediate danger due to an alleged perpetrator of abuse working at the facility.  Rose told Underwood that one of the reasons Reeds Cove was put on immediate jeopardy status was because it failed to investigate the allegation.

Upon becoming aware of the immediate jeopardy status, Reeds Cove had a regulatory obligation to protect its residents while investigating the circumstances causing immediate jeopardy.  Reeds Cove's policy for situations alleging resident abuse provided that "[a]ny alleged perpetrator of abuse, neglect, or exploitation will be immediately suspended from employment and will leave the employment property and not return to the property until the investigation by the facility and law enforcement is complete and the incident is resolved."  KDADS did not identify Odhuno or any other specific person as the alleged perpetrator at the time of the immediate jeopardy announcement.

After the immediate jeopardy announcement, Underwood discussed with Rose the scope of the suspensions Reeds Cove would impose to protect its residents. Underwood testified that she initially proposed suspending black, male nurses, although Rose does not recall whether she initially made this proposal or not. Upon Rose's questioning, Underwood believed that Rose did not view suspending only nurses to be sufficient, so Underwood proposed suspending all black male employees. Rose did not challenge this proposal, and Underwood admits that it was her decision to suspend the black male employees.

Although Rose knew that the complaint submitted to KDADS identified a possible alleged perpetrator as a black male CNA named Paul, she did not share this information with Reeds Cove on July 31 because at that point her investigation had not corroborated it.

Underwood consulted Axiom employees before and after making the decision to suspend all black male employees. Summers (Axiom) testified regarding the suspensions as follows:

Q. What do you recall the description that Miss Underwood said that Miss Rose had described as the alleged perpetrator?

A. I believe it was black male nurses.

Q. Okay. So did you encourage or oppose the suspension of all black male staff?

A. It was just a collaboration. I don't – I don't remember specifically opposing or encouraging. I just said if this is what – how they – Christan [Rose] identified the alleged perpetrator, we need to include everybody that falls in that category.

Reeds Cove began implementing the suspensions immediately following the meeting with Rose. In total, 12 black male employees were suspended. Eight were CNAs; two were nurses; one was a dietary manager; and one was a cook.

From July 31 to August 2, 2014, Reeds Cove, with assistance from Axiom, conducted a second investigation of the Resident's complaints. Again, Reeds Cove was not able to substantiate

any of the Resident's allegations.  By the end of the day on August 1, Reeds Cove began to allow the suspended employees to return to work.  On August 1, Underwood informed KDADS employee Teresa Fortney that Reeds Cove did not substantiate any of the allegations in the Resident's complaint and that all suspended staff were being allowed to return to work.  Fortney forwarded this information to Rose, and it was memorialized in Rose's investigation report.

All of the employees, including Odhuno, who were suspended as part of the KDADS survey were paid for any shifts that they missed.  Based on the Resident's strong preference for female caregivers and to help avoid further complaints from the Resident, as of August 1, Reeds Cove no longer assigned male employees to the Resident's unit.

Before August 4, 2014, Reeds Cove submitted an Immediate Plan of Correction to KDADS that outlined the steps the facility had taken, including the immediate suspension of male, black staff and the re-education of all staff on recognizing and reporting abuse and neglect issues.  On August 4, Underwood sent four emails containing a comprehensive summary of Reeds Cove's investigation with supporting documentation to four KDADS employees, including KDADS Director of Survey and Certification Audrey Sunderraj.  The first email contained a summary supporting Reeds Cove's conclusion that the abuse allegations were unfounded.

E.     **August 5 Conference with KDADS**

KDADS did not inform Reeds Cove that Odhuno was the alleged perpetrator until August 5, 2014.  That day, around 4:22 p.m., a meeting was held at Reeds Cove in which Underwood (Reeds Cove), Parsons (Axiom), and Summers (Axiom) appeared in person.  Rose (KDADS surveyor) also appeared in person and Sunderraj (KDADS supervisor) appeared by phone.  During the meeting, Rose stated that she believed Reeds Cove's residents were not safe around Odhuno.  Rose and Sunderraj were aware of the actions Reeds Cove had taken after being placed in

immediate jeopardy, but still believed that Reeds Cove placed other residents at risk by returning Odhuno from suspension and assigning him to another unit in the facility.

Summers made a written account of the August 5 meeting. That summary describes the meeting ending in the following exchange:

> Audrey [Sunderraj] then said "We are done. We have shared with you that we are very concerned. Your IJ [immediate jeopardy] status will be determined by the decisions you make regarding this employee." Christan [Rose] said again "We will let you know the status of your IJ [immediate jeopardy] when you let us know the status of his suspension. Actually, his employment."

Rose testified that she did not remember if these exact words were spoken. Rose testified that neither she nor her supervisors ever requested that Odhuno be terminated. She testified, "We told the facility they had to come up with a plan to abate the immediate jeopardy. The termination of Mr. Odhuno is what they presented us with."

Sunderraj testified as follows about the meeting:

> Q. Well, it goes on to say, Audrey then went on to say, we're done, we have shared with you that we are very concerned. Your IJ [immediate jeopardy] status will be determined by the decisions you make regarding this employee. Is that what you told – (incomplete)
>
> A. No. I said we will make a decision after we receive your abatement plan.
>
> Q. Okay. And, there's no question you were discussing as far as this employee or the employee that might be a risk at these other houses, that was Mr. Odhuno?
>
> A. I said just moving an alleged perpetrator to another unit is not acceptable.

Sunderraj also testified that it was Reeds Cove's decision with respect to the particular plan proposed to abate immediate jeopardy. She also testified that during the August 5 meeting, she "made it pretty clear that we [KDADS] were not satisfied that residents were all protected, and so the facility had some decisions to make."

Based on this exchange, Underwood, Summers, and Parsons believed that if Odhuno's employment was not terminated, Reeds Cove's immediate jeopardy status would not be abated. Underwood understood that CMS would assess a civil monetary penalty against Reeds Cove for each day it was in immediate jeopardy status. Underwood also understood that failure to abate immediate jeopardy status would result in CMS assessing enforcement penalties that could include a ban on Medicare admissions, and result in the termination of Reeds Cove's provider agreement with Medicare. The termination of this agreement would render Reeds Cove ineligible to receive payment for Medicare/Medicaid patients and likely force Reeds Cove to close.

KDADS has testified that, in lieu of termination, adult care facilities sometimes pair an employee suspected of abuse with a trusted employee to abate immediate jeopardy status. KDADS does not, however, inform facilities of their options to abate immediate jeopardy. When asked what Reeds Cove could have done in lieu of termination, Rose testified, "It's not up to me for them to know – to even know their options. I can't tell them what to do. We're not allowed to do that. The facility has to come up with a plan once we tell them the problem."

**F.      Odhuno's Termination of Employment**

Shortly after the meeting on August 5, Parsons (Axiom) told Rose that Odhuno's employment with Reeds Cove was being terminated. Very soon after, KDADS rescinded Reeds Cove's immediate jeopardy status.

On August 6, Underwood, Summers, and Bragg met with Rose. Bragg wanted to know how KDADS identified Odhuno and why they never spoke with him. Rose reiterated her belief that Odhuno was the alleged perpetrator. She said that she believed the Resident and believed that the abuse had occurred.

Although Underwood (Reeds Cove) made the decision to terminate Odhuno, she was so upset about the decision that she asked Bragg (Axiom) to handle it for her. When Odhuno arrived for his shift on August 6, Bragg and Parsons (Axiom) informed him that his employment was terminated. Bragg told him that he was identified by KDADS as the alleged perpetrator and that Reeds Cove's immediate jeopardy status would not be cleared until he was terminated. She also gave him the Notice of Disciplinary Action, which she prepared and signed, stating that his termination was effective August 6, 2014.

At the conclusion of its investigation, KDADS memorialized the agency's findings in a Statement of Deficiencies. KDADS determined that "the facility abated the immediate jeopardy on 8/5/14 at 5:00 p.m. when the facility completed their investigation, provided re-education on ANE [abuse, neglect, exploitation] to all employees on reporting allegations, suspended all non-Caucasian staff of the opposite gender that were in the building the time the immediate jeopardy was identified, then all non-Caucasian staff of the opposite gender until the facility's investigation was complete. The alleged perpetrator was also removed from the facility and was not expected to return." CMS imposed civil monetary penalties totaling $82,750.

At Underwood's request, Axiom representatives discussed Odhuno's termination with him in Bencel's office a day or two after it occurred. Odhuno was verbally told that if he agreed to waive any legal claims against Reeds Cove and/or Axiom, he would be offered a severance and that, when he finished his nursing degree, he would be offered a position as a registered nurse at Reeds Cove. Becnel also testified the following regarding the meeting:

> It was pretty short. He came to the Axiom office, and I believe it was on a Friday. Kathi (Bragg) was not quite in the room yet. So we small talked. Kathi eventually came in, and from my recollection, I was very empathetic about the heck of a pickle he was in. I apologized on behalf of the [sic] Reeds Cove and Axiom that he was put in this position, and that I and collectively the company would do everything it

-10-

could to be able to safely get him back on the employment without having regulatory risk. And then we talked about some of the different things that might show up in the severance agreement, and I don't think it was more than maybe half an hour, 45 minutes from start to finish.

## G. Defendants' Post-Investigation Conduct

On July 31 or August 5, Underwood called the Wichita Police Department's hotline to report the allegations. She made this report because Rose instructed her to do so. On August 13, a detective from the Wichita Police Department arrived at Reeds Cove to investigate the abuse allegations reported by Underwood on July 31. The detective interviewed the Resident. The next day, at the detective's request, Underwood provided her the Resident's son's name and phone number and Odhuno's name and phone number by email. The detective subsequently interviewed Odhuno, which included reading him his *Miranda* rights.

In late August and early September 2014, Chance Becnel called the Secretary of KDADS to discuss Odhuno's re-employment. On September 16 and 17, Reeds Cove, through legal counsel, extended an unconditional offer to reinstate Odhuno to a CNA position at Reeds Cove under the same terms and conditions as his previous employment. The written offer did not state that Odhuno would have to dismiss his claims against Reeds Cove. Odhuno declined the offer of reinstatement because he believed the offer was conditioned on what KDADS was going to do as a result of the investigation. He believed, but was not sure, that his CNA certification would be affected. He does not recall whether he checked the on-line registry to confirm the status of his registration or otherwise called KDADS to ask.

On April 22, 2015, Reeds Cove, through counsel, contacted Odhuno's counsel to remind Odhuno that the unconditional offer of reinstatement was still available. Odhuno, however,

rejected the offer of reinstatement.  As of April 2016, Odhuno understood that his CNA certification was still active and valid.

The Kenyan community has a high deference for the elderly.  If Odhuno's Kenyan family members found out about the allegations against him, he would be excommunicated from his Kenyan community.  Ohduno has attempted to obtain employment as a CNA at multiple elder care facilities since his termination from Reeds Cove.  On the job applications Odhuno has submitted for employment as a CNA, he has been asked whether he has ever been accused of sexual abuse.  Odhuno has not been able to obtain employment as a CNA at a facility other than Reeds Cove since his termination.  As a result of being accused of sexual abuse, Odhuno has been depressed, in fear that he will be denied educational and employment opportunities, and feels intense shame at being reminded of being accused of sexual assault.

## H.    Procedural History

Odhuno filed this lawsuit on November 3, 2015.  In his Third Amended Complaint, he asserts claims against Reeds Cove, Axiom, the KDADS employees who participated in the complaint survey, and the Secretary of KDADS.  At issue before the Court in the pending motion are Odhuno's claims against Reeds Cove and Axiom.  Against Reeds Cove, Odhuno asserts a claim of race and gender discrimination under Title VII based on the suspension and termination of his employment.  Against Reeds Cove and Axiom, Odhuno asserts a claim of race discrimination under 42 U.S.C. § 1981 based on the suspension and termination of his employment and a claim for outrage under Kansas law.  Defendants move for summary judgment on all claims asserted against them.  Additionally, if the Court allows Odhuno's discrimination claims to proceed, Defendants ask the Court to limit Odhuno's back wage damages as of September 17, 2014—the date he rejected Reeds Cove's offer of reinstatement.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[1]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[2]  The movant bears the initial burden of proof and must show the lack of evidence on the nonmovant's claim.[3]  If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead set forth specific facts showing a genuine issue for trial as to those matters for which it carries the burden of proof.[4]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[5]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[6]

## III.    Analysis

### A.    Title VII and § 1981 Discrimination Claims

Before the Court examines the merits of Odhuno's Title VII and § 1981 discrimination claims, it must address Odhuno's argument that Defendants only seek summary judgment on these claims based on the termination, and not the suspension, of his employment.  Odhuno makes this

---

[1] Fed. R. Civ. P. 56(a).

[2] *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citations omitted).

[3] *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citations omitted).

[4] *Id*. (citing *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)).

[5] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998)).

[6] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (citation omitted).

argument based on the erroneous statement by Defendants in their opening brief that Odhuno's "discrimination claims focus solely on the termination of his employment." As Odhuno points out, Odhuno asserts discrimination claims based on both the suspension *and* termination of his employment in the Pretrial Order.

The Court declines to limit Defendants' motion only to the termination claims. Defendants seek summary judgment on all claims asserted against them—which includes the suspension claims. Furthermore, they fully addressed the facts surrounding Odhuno's suspension in their statement of uncontroverted facts and the merits of Odhuno's suspension in the pretext arguments of their opening brief. The Court therefore will consider the suspension claim within the scope of Defendants' summary judgment motion.

The elements of Odhuno's discrimination claims are the same under Title VII and § 1981.[7] Because Odhuno relies on circumstantial evidence to support his claims, the Court will analyze them pursuant to the *McDonnell Douglas* analytical framework.[8] Under this framework, the plaintiff must first demonstrate a prima facie case of discrimination.[9] Then, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision.[10] Finally, the burden shifts back to the plaintiff to demonstrate that the defendant's reason is pretextual.[11]

---

[7] *Monroe v. City of Lawrence*, 124 F. Supp. 3d 1097, 1111 (D. Kan. 2015) (citing *Randle v. City of Aurora*, 69 F.3d 441, 450 (10th Cir. 1995)).

[8] *See id.*(citation omitted) ("Absent direct evidence of racial discrimination, the parties' burdens of proof are subject to the tripartite *McDonnell Douglas* framework.").

[9] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

[10] *Id.*

[11] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

For the purposes of its motion, Reeds Cove acknowledges that Odhuno has established a prima facie case of discrimination. It argues that the Court should grant summary judgment on the discrimination claims because (1) it has provided a legitimate, non-discriminatory reason for Odhuno's suspension and termination and (2) Ohduno has not adduced admissible evidence from which a reasonable jury could find pretext.

Axiom joins Reeds Cove's arguments. But, it also argues that it was not Odhuno's employer, and thus, could not violate Odhuno's rights as a matter of law under § 1981. The Court will begin with this threshold question and then turn to the parties' arguments as to the second and third stages of the *McDonnell Douglas* framework.

### 1. Axiom qualifies as Odhuno's employer.

Section 1981 guarantees all persons equal rights "to make and enforce contracts."[12] Employment contracts, including employment at will, fall within the scope of § 1981.[13] To establish a prima facie case of discrimination under § 1981, a plaintiff must first prove the defendant was her employer.[14] The Tenth Circuit utilizes three different tests to determine whether a defendant is an employer, depending on the situation: (i) the hybrid test; (ii) the joint employer test; and (iii) the single employer test.[15] The parties agree that the hybrid test is not applicable in this case. Odhuno asserts, however, that Axiom qualifies as his employer under either the single employer or joint employer test.

---

[12] 42 U.S.C. § 1981(a).

[13] *Perry v. Woodward*, 199 F.3d 1126, 1133 (10th Cir. 1999).

[14] *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014) (citation omitted) (requiring the plaintiff to prove the defendant was her employer to make a prima facie case of wage discrimination and retaliation under Title VII).

[15] *Id.* at 1226.

a.    Single Employer Test

The single employer test allows "a plaintiff who is the employee of one entity . . . to hold another entity liable by arguing that the two entities effectively constitute a single employer."[16] This test focuses on the relationship between the potential employers themselves.[17]   Courts typically look at four factors in applying this test:   "(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control."[18]

Odhuno has adduced sufficient evidence to create a question of fact as to whether Axiom and Reeds Cove shared Ohduno under the single employer test.  The most important factor that Courts look at under this test is centralized control of labor relations.[19]   Indeed, the Tenth Circuit described this factor as "highly determinative."[20]   Here, the evidence demonstrates that Axiom exercised significant control over labor relations at Reeds Cove.  The Agreement between Reeds Cove and Axiom required Axiom to assist Reeds Cove in all aspects of human resources administration, including recruitment recommendations, staff training, appraisals and salary reviews, managing employee benefit programs, and managing workers compensation and employment insurance.  Bragg (Axiom) testified that Axiom encouraged Reeds Cove to use it for all its human resources related issues.   Furthermore, Axiom was significantly involved in Ohduno's suspension and termination.   It was Axiom employees who informed him of his

---

[16] *Id*. (quoting *Bristol v. Bd. of Cty. Comm'rs of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002)).

[17] *Knitter*, 758 F.3d at 1227.

[18] *Id*. (quoting *Bristol*, 312 F.3d at 1220).

[19] *Bristol*, 312 F.3d at 1220.

[20] *Id*.

termination on August 6 and met with him regarding a separation agreement after his termination. Becnel (Axiom) testified that during that meeting he "apologized on behalf of the [sic] Reeds Cove and Axiom that he [Odhuno] was put in this position, and that *I and collectively the company* would do everything it could to be able to safely get him back on the employment without having regulatory risk." This statement alone is persuasive evidence that the two companies acted as one when it came to matters involving labor relations. While Axiom may argue that Reeds Cove was the only entity who had the authority to discipline and terminate its employees, that argument does not consider the evidence in the light most favorable to Odhuno, which is required at this stage of litigation.

Two other factors offer support for Odhuno's position. The Agreement between Reeds Cove and Axiom requires Reeds Cove to provide Axiom office space at its facility, thus demonstrating that there is some interrelation of operations. Furthermore, Becnel is Axiom's President and Chief Operating Officer and also serves on Reeds Cove's governing board, thus demonstrating that there is some common management between the two companies.

The Court recognizes that the remaining factors do not support a finding that Axiom and Reeds Cove were a single entity. Nonetheless, Odhuno has offered an abundance of evidence that Axiom exercised significant control over Reeds Coves' labor relations, and this is the most important factor.[21] Therefore, the Court concludes that Odhuno has demonstrated a genuine issue of material fact as to whether Axiom and Reeds Cove were a single entity.

---

[21] *See Branson v. ValuMerchandisers Co.*, 2015 WL 437754, at *4 (D. Kan. 2015) (stating that the most determinative factor for the single employer test was control over labor relations and concluding that there was a genuine issue of material fact regarding whether the two defendants were an integrated enterprise).

b. Joint Employer Test

The joint employer test is proper where "an employee of one entity seeks to hold another entity liable as an employer."[22]  Under this test,

> two entities are considered joint employers if they share or co-determine those matters governing the essential terms and conditions of employment.  Both entities are employers if they both exercise significant control over the same employees.  An independent entity with sufficient control over the terms and conditions of employment of a worker formally employed by another is a joint employer. . . .[23]

Courts look at the following factors in determining whether both entities had the right to control employment: the right to terminate employment, the ability to set work rules and assignments; the ability to set conditions of employment, including compensation, benefits, and hours; conducting day-to-day supervision of employees, including employee discipline; and control of employee records, including payroll, insurance, and taxes.[24]  Odhuno argues that he has adduced sufficient evidence for a reasonable jury to find that Axiom and Reeds Cove are joint employers.  The Court agrees.

The Court first analyzes whether Axiom had the right to terminate Odhuno.  "Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances. . . ."[25]  In support of this factor, Odhuno has offered evidence that Axiom requests all of its client communities to consult with it before making the decision to suspend or terminate employment.  Indeed, Axiom President Becnel testified that it

---

[22] *Knitter*, 758 F.3d at 1226.

[23] *Id.* (internal quotation marks and citations omitted).

[24] *Id.*  (citations omitted).

[25] *Bristol*, 312 F.3d at 1219; *see also Knitter*, 758 F.3d at 1226.

was very common for Axiom to be involved with facility leadership when it comes to suspensions and terminations of client employees. He also offers evidence that it was not Reeds Cove, but Axiom employees Bragg and Parsons, who terminated his employment when he arrived at work on August 6. During that meeting, Bragg also gave him the Notice of Disciplinary Action, which she prepared and signed, stating his employment was terminated as of August 6, 2014. Furthermore, as noted above, it was Axiom President Becnel who met with him after his termination and told him that the he and "collectively the company" would do everything they could to put him back in his position.

Viewing this evidence in the light most favorable to Odhuno, the Court finds that there is a genuine issue of material fact as to whether Axiom had the authority to terminate Odhuno's employment. Underwood may have decided to terminate Odhuno's employment after the KDADS meeting on August 5, but it was Axiom employees who performed the termination on August 6. Furthermore, Becnel's testimony refers to Reeds Cove and Axiom as one company, providing further evidence that Axiom had the authority to terminate Odhuno's employment. Therefore, the Court concludes that this factor weighs in favor of Odhuno.[26]

A couple of other factors weigh in Odhuno's favor. It is uncontroverted that Reeds Cove participated in group benefit plans, such as a health insurance and a retirement/pension plan, that were administered through Axiom. In addition, although Axiom does not keep personnel files on all Reeds Cove employees, it does maintain a "legal file" on all Reeds Cove employees that have employment-related legal issues pending.

---

[26] *See Branson*, 2015 WL 437754, at *3 (finding a genuine issue of material fact as to whether the defendant was the plaintiff's employer under the joint employer test when the defendant advised that the plaintiff's position was not necessary and the defendant handled all of the plaintiff's termination paperwork and negotiated the separation agreement).

The remaining factors, however, weigh in Axiom's favor. It is undisputed that Axiom did not supervise Odhuno or direct his work. Reeds Cove determined the wage rate that Odhuno was paid. It was also responsible for determining employee schedules, job assignments, and imposing rules regarding the performance of job duties.

Viewing the factors together, the Court concludes that there is a genuine issue of material fact as to whether Axiom was Odhuno's joint employer. Although several factors favor Axiom's position, the most important factor—the right to terminate—does not. Odhuno's firing by Axiom employees and the meeting with Becnel after his termination indicates that both companies jointly exercised significant control over him.[27]

In sum, Odhuno has come forward with sufficient evidence to raise genuine factual disputes about whether Axiom constituted his employer for purposes of his § 1981 discrimination claim. Therefore, the Court denies Axiom's motion for summary judgment on this issue.

### 2. *Legitimate Reason*

Because Defendants acknowledge that Reeds Cove has established a prima facie case of discrimination, the Court will continue its analysis of Odhuno's claims under the *McDonnell Douglas* framework. At the second stage of this framework, Defendants must articulate a legitimate, nondiscriminatory reason for Odhuno's suspension and termination. Defendants are not required to "litigate the merits of the reasoning . . . [but] need only explain its actions against the plaintiff in terms that are not facially prohibited by Title VII."[28] This "exceedingly light"

---

[27] *See Carroll v. Gradient Fin. Grp., LLC*, 2013 WL 3328695, at *5 (D. Kan. 2013) (finding that the plaintiff's firing by person who was legal counsel for both companies indicated that both companies exercised significant control over the plaintiff).

[28] *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) (internal quotations and citations omitted).

requirement only requires Defendants to "provide admissible evidence of a legally sufficient explanation for the employment action . . . ."[29]  Here, Defendants have articulated legitimate, nondiscriminatory reasons behind the suspension and termination decisions.

Regarding the suspension, Reeds Cove had a regulatory obligation to suspend individuals who fell within the scope of the alleged perpetrator.  Defendants contend that Reeds Cove suspended all black male staff because KDADS did not accept its original proposal of suspending all black male nurses.  This is a legitimate, nondiscriminatory reason behind the suspension decision.

Regarding the termination, Defendants decided to terminate Odhuno's employment to abate immediate jeopardy status.  Based on Rose's statements in the meeting held August 5, Underwood believed that KDADS would not abate Reeds Cove's immediate jeopardy until Odhuno was terminated.  If Reeds Cove remained in immediate jeopardy, it would face additional monetary fines, a ban on Medicare admissions, and the eventual closure of the facility.  Financial hardship is a legitimate, non-discriminatory reason for an employer to terminate an employee.[30]  Therefore, Defendants have articulated a legitimate, nondiscriminatory reason as to Odhuno's termination.

*3.    Pretext*

Odhuno may show pretext by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendants' proffered reasons for suspension

---

[29] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (citation omitted).

[30] *See id.* at 971 (finding "financial hardship" to be a legitimate, non-discriminatory reason for the plaintiff's termination); *Jones v. Unisys Corp.*, 54 F.3d 624, 631 (10th Cir. 1995) (finding that employer's reason of significant financial hardship was a legitimate, nondiscriminatory reason for employment terminations).

and termination such "that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[31] In assessing an employer's reason, the court must assess the facts as they appear to be to the person making the decision and not the aggrieved employee.[32] Accordingly, "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[33]

Odhuno argues that a reasonable jury should doubt Defendants' reasons for suspending his employment because Reeds Cove did not comply with its written policy. Evidence that an employer's decision-making process contradicted the employer's written or unwritten policies may enable the Court to infer that discrimination unlawfully motivated the decision.[34] As Odhuno points out, Reeds Cove's policy only provided for the suspension of an "alleged perpetrator" while an investigation was conducted. At the time Underwood initiated the suspensions, she only knew that the alleged perpetrator was a "black male nurse." Instead of suspending all black male nurses, however, she suspended all black male staff, which included Odhuno and 11 other black males. Although Reeds Cove blames the scope of the suspensions on Underwood's conversation with KDADS, Rose testified that she did not require Reeds Cove to suspend all black male staff. She only directed Reeds Cove to follow the facility's own policy—which it did not do. Furthermore,

---

[31] *Lobato v. N.M. Env't Dept.*, 733 F.3d 1283, 1289 (10th Cir. 2013) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[32] *Id.* (citing *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011)).

[33] *Id.* (citing *Luster*, 667 F.3d at 1094).

[34] *Forbes v. Kinder Morgan, Inc.*, 172 F. Supp. 3d 1182, 1193 (D. Kan. 2016) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

Axiom employees who consulted with Underwood before and after the suspension testified that they did not agree with the suspension decision because it singled out an entire class of individuals.

In response, Defendants rely on case law stating that policy-deviating evidence does not necessarily demonstrate pretext.[35] This statement, however, does not immunize every employment action from judicial review for illegal discrimination. Here, Underwood's decision to suspend an entire class of individuals is a "disturbing procedural irregularity" that raises an inference of discrimination.[36] Underwood was aware of Reeds Cove's policy to suspend all individuals that qualified as an alleged perpetrator. Rose does not recall if she rejected Underwood's first proposal of suspending just black male nurses. But even if Rose did, Underwood still chose to violate Reeds Cove's policy and expand the suspension to all black males. She offered no push-back or argument against Rose as to why the suspension of an entire class of individuals might be discriminatory. Defendants may rely on Rose's alleged statements as a defense at trial. But, at this stage of the litigation, there are issues of fact that preclude summary judgment against Odhuno as to his suspension claims under Title VII and § 1981.

As to Odhuno's termination, Odhuno offers evidence that Defendants terminated him despite Reeds Cove's finding that he was not the alleged perpetrator in its investigation. He also adduces evidence that KDADS denied that Reeds Cove was required to terminate his employment to abate immediate jeopardy. Rose testified that neither she nor any of her supervisors requested that Odhuno be terminated; nor did they indicate to Reeds Cove that they would have to terminate

---

[35] *See Barnes v. CoxCom, LLC*, 2018 WL 773990, at *10 (N.D. Okla. 2018).

[36] *See Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007) (recognizing that "disturbing procedural irregularities surrounding an adverse employment action may demonstrate that an employer's proffered nondiscriminatory business reason is pretextual").

Odhuno or otherwise face immediate jeopardy. Similarly, Sunderraj testified that she told Defendants only that they would make a decision regarding immediate jeopardy after they received Reeds Cove's abatement plan. Although she informed Defendants that moving Odhuno to another unit was unacceptable, she did not explicitly state that he must be terminated. Additionally, Axiom's CEO, Becnel, contacted higher authority within KDADS to see if Reeds Cove could reinstate Odhuno after his termination without adverse consequences. He could have contacted KDADS after the August 5 meeting as well. In sum, Odhuno has directed the Court to inconsistencies and weaknesses in the legitimate stated reason for termination. There is a genuine issue of material fact as to Odhuno's termination claims under Title VII and § 1981.

Overall, the Court denies Defendants' Motion for Summary Judgment as to Odhuno's discrimination claims under Title VII and § 1981.

## B.     Back Wage Damages

Reeds Cove also seeks summary judgment on the basis that Odhuno cannot receive back wages damages as of September 17, 2014, when it tendered, and Odhuno rejected, an unconditional offer of reinstatement. Reeds Cove relies on a legal rule announced in *Ford Motor Co. v. EEOC*,[37] which states, "absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability."[38] This rule stems from the legal principle requiring a claimant "to use reasonable diligence in finding other suitable

---

[37] 458 U.S. 219 (1982).

[38] *Id.*

-24-

employment."[39]  It is also consistent with Title VII's primary goal of giving job discrimination victims employment rather than lawsuits.[40]

Recognizing the Supreme Court's holding in *Ford Motor*, the Tenth Circuit has stated that an employee's refusal to accept reinstatement to the employee's former position "forfeits his right to backpay" unless the plaintiff "has valid reasons for refusal."[41]  The Court must consider the circumstances under which the offer was made or rejected, including the terms of the offer and the reason for the refusal.[42]  An employee cannot refuse an offer of reinstatement for purely personal reasons.[43]

The Court has significant questions regarding the parties' arguments on this issue. Specifically, the Court questions whether there is a genuine issue of material fact as to whether the offer was conditional because the KDADS appeal was still pending at the time of the offer.  The Court also questions whether Odhuno's rejection of the offer was reasonable under *Giandonato*. The Court will hold a hearing on these questions near the trial date, and therefore reserves ruling on this issue.

## C.    Tort of Outrage

Defendants also seek summary judgment on Odhuno's state law claim for the tort of outrage.  The tort of outrage is the same as the tort of intentional infliction of emotional distress.[44]

---

[39] *Id.* at 231.

[40] *Id.* at 230.

[41] *Giandonato v. Sybron Corp.*, 804 F.2d 120, 124 (10th Cir. 1986) (citations omitted).

[42] *Id.*

[43] *Id.*

[44] *Valadez v. Emmis Commc'ns*, 290 Kan. 472, 229 P.3d 389, 394 (2010) (*citing Hallam v. Mercy Health Ctr. of Manhattan, Inc.*, 278 Kan. 339, 97 P.3d 492, 494 (2004)).

Kansas courts have set a high standard for this tort.[45]  To prove this claim, a plaintiff must show: "(1) [t]he conduct of the defendant was intentional or in reckless disregard of the plaintiff; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and (4) the plaintiff's mental distress was extreme and severe."[46]

In addressing outrage claims, the Court must first determine whether two threshold requirements are satisfied.[47]  The first asks whether the defendant's conduct was so extreme and outrageous as to permit recovery.[48]  The second asks "whether the emotional distress suffered by the plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it."[49]  The Court will first determine whether Defendants' conduct is sufficiently egregious because if Odhuno cannot meet this requirement his claim fails.

In analyzing the sufficiency of the defendant's conduct, the Kansas Supreme Court has stated that "liability may be found only in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."[50]  Generally, liability for this tort only

---

[45] *Ginwright v. Unified Sch. Dist. No. 457*, 756 F. Supp. 1458, 1476 (D. Kan. 1991).

[46] *Valadez*, 229 P.3d at 394 (citing *Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024, 1029 (1991)).

[47] *Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175, 1179 (1981); *see also Laughinghouse v. Risser*, 754 F. Supp. 836, 843 (D. Kan. 1990).

[48] *Roberts*, 637 P.2d at 1179.

[49] *Id*.

[50] *Id*.

exists "when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, 'Outrageous!' "[51]

In the employment context, Kansas courts have been "reluctant to extend the outrage cause of action to discrimination and harassment claims."[52] As this Court has noted, "[t]he law expects and requires members of the public to be hardened to a certain amount of criticism, including reasonable employment-ending judgments."[53]

Defendants' conduct in this case is not so abhorrent that it supports a claim for outrage. Odhuno argues that Defendants' alleged discriminatory conduct in suspending all black males and terminating his employment is sufficient to support his claim. But, allegations of racial and gender discrimination, while sufficient to survive summary judgment, are not enough to support his tort of outrage claim.[54] Furthermore, the cases Odhuno cites in support of his argument are distinguishable. In *Laughinghouse v. Ritter*,[55] the court allowed the plaintiff's outrage claim to proceed to trial, but allegations in that case involved conduct by the plaintiff's employer that was described as "a concerted effort to terrorize her and to intentionally break her spirit."[56] The employer's harassment in that case amounted to screaming and cursing, unwanted touchings and

---

[51] *Id.*

[52] *Bolden v. PRC, Inc.*, 43 F.3d 545, 554 (10th Cir. 1994); *Mart v. Dr. Pepper Co.*, 923 F. Supp. 1380, 1389 (D. Kan. 1996).

[53] *Forbes*, 172 F. Supp. 3d at 1204 (internal quotation marks and ellipses omitted).

[54] *See Adair v. Beech Aircraft Corp.*, 1991 WL 97610, at *12 (D. Kan. 1991) (quoting *Fletcher v. Wesley Med. Ctr.*, 585 F. Supp. 1260, 1262 (D. Kan. 1984)) (stating that "termination of an employee, whatever the secret or undisclosed motive might be, is the kind of event that happens every day in modern business and is not the activity that is to be regarded as uncivilized barbarism").

[55] 754 F. Supp. 836.

[56] *Id.* at 843.

sexual comments, fits of rage that included throwing things and tearing up files, threats of loss of employment, and inhibition of job performance.[57]  Similarly, in *Gomez v. Hug*,[58] the allegations involved a stream of racially discriminatory comments from the plaintiff's supervisor that ended in a tirade by the supervisor, where he threatened the plaintiff which made him afraid for his family and his job.[59]  Here, Defendants' actions of suspending and terminating Odhuno do not come close to the appalling nature of the defendants' conduct in *Laughinghouse* and *Gomez*.

Odhuno also argues that Defendants' conduct was outrageous because they reported the allegations to the police and named Odhuno as the alleged perpetrator of a sexual assault against the Resident when, at the time, Defendants knew the allegations were unsubstantiated.  Because of Defendants' report, two detectives read him his *Miranda* rights and questioned him.  Odhuno misstates the facts when making this argument.  Underwood reported the sexual assault to the Wichita Police Department complaint hotline at Rose's direction.  At the time she reported the allegations, Underwood did not name Odhuno as the alleged perpetrator.

Odhuno cites *Taiwo v. Vu*[60] in support of its argument that filing a false police report qualifies as outrageous conduct.  But, the facts of that case are much more egregious than those here.  In *Taiwo*, the defendant committed assault, battery, and false imprisonment against the plaintiff.[61]  The defendant also lied to a law enforcement officer multiple times claiming that the plaintiff had vandalized her van, filed a false police report regarding the vandalization, and induced

---

[57] *Id*.

[58] 7 Kan. App. 2d 603, 645 P.2d 916 (1982).

[59] 645 P.2d at 918.

[60] 822 P.2d 1024.

[61] *Id*. at 1029-30.

an employee to lie to the police about the plaintiff's involvement in the vandalism.[62]  Here, Underwood reported the allegations to the police at KDADS' direction.  There is no evidence that Defendants offered any other information when reporting that allegation.  Furthermore, Underwood only gave the detective Odhuno's name when the detective requested it, and at that time, he had been identified by KDADS as the alleged perpetrator.  Simply put, the facts of *Taiwo* are distinguishable from this case.

An average citizen may certainly find Defendants' conduct in this case unjust.  But, he would not exclaim "Outrageous!"  Odhuno has not adduced sufficient evidence to create a genuine issue of material fact as to the egregious nature of Defendants' conduct.  Therefore, the Court grants summary judgment to Defendants on this claim.

### IV.     Conclusion

In sum, the Court concludes that Odhuno has shown a genuine issue of material fact to preclude summary judgment as to his Title VII and § 1981 discrimination claims against Axiom and Reeds Cove.  The Court denies Defendants' motion as to these claims.  The Court reserves ruling on whether Odhuno's claim for back wages should be cut off as of September 17, 2014. Finally, the Court grants summary judgment for Defendants on Odhuno's claim for the tort of outrage.

**IT IS THEREFORE ORDERED** that Defendants Reed Cove and Axiom's Combined Motion for Summary Judgment (Doc. 191) is **GRANTED IN PART AND DENIED IN PART**. The Court reserves ruling on the issue of whether Odhuno can recover back wages after September 17, 2014.  The Court will contact the parties to set a hearing on this issue near the trial date.

---

[62] *Id.*

**IT IS SO ORDERED**.

Dated this 10th day of March, 2020.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE